1

**POTTER HANDY LLP**
Mark D. Potter (SBN 166317)
mark@potterhandy.com
James M. Treglio (SBN 228077)
jimt@potterhandy.com
8033 Linda Vista Road, Suite 200
San Diego, CA 92111
(858) 375-7385
Fax: (888) 422-5191

Attorneys for Plaintiffs and the Class

## UNITED STATES DISTRICT COURT

## BY AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN MILLER, an individual, on behalf of themselves and all persons similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>RP ON-SITE, LLC, a Delaware Limited Liability Company with its principal place of business in California, and Does 1-100, inclusive<br><br>Defendants. | CASE NO. 5:19-cv-02114-LHK<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE** |

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to Federal Rule of Evidence 201, Plaintiff Brian Miller respectfully request the Court take judicial notice of the documents attached hereto as Exhibits 12 through 18 in support of their Motion for Class Certification.

This request for judicial notice is proper as judicial notice may be taken of "adjudicative facts" (e.g., court records, pleadings, orders, etc.) and other facts not subject to reasonable dispute and either "generally known" in the community or "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b); (Cal. Prac. Guide Fed. Civ. Pro. Before Trial Ch. 14-E, ¶14:190).

Pursuant to Federal Rule of Evidence 201(d), this request for judicial notice is also proper since judicial notice may be taken at any stage of the proceeding, Fed. R. Evid. 201(d); *see also Lowry v. Barnhart*, 329 F.3d 1019, 1024 (9th Cir. 2003); and *Bryant v. Carleson*, 444 F.2d 353, 357-58 (9th Cir. 1971), and a court shall take judicial notice of such matter if requested by a party and supplied with the necessary information, and this request for judicial notice constitutes notice and an opportunity to address the request by the party affected. Fed. R. Evid. 201(e); and *Mullis v. United States Bank, Ct*. 828 F.2d 1385, 1388, fn 9 (9th Cir. 1987).

This request for judicial notice is also proper as the Court may take judicial notice of any matter "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

Fed. R. Evid. 201(b).

For the reasons set forth herein, Plaintiff hereby request that the Court take judicial notice of the following documents attached as the following exhibits attached hereto since they may be taken judicial notice of as they are records of another district court's own files and are relevant to issues presented in Plaintiff's accompanying Motion for Class Certification.

**Exhibit 12**: Case history of Brian Miller's 1996 Conviction

**Exhibit 13**: Case history of Brian Miller's 2000 Conviction

**Exhibit 14:** Department Order Manual of Arizona Department of Corrections

**Exhibit 15**: Adjustment Procedures and Programs for Kentucky Corrections

1    **Exhibit 16**: Inmate Information Handbook of Federal Bureau of Prisons

2    **Exhibit 17**: Arizona Prisoner Record, prisoner's name and information redacted.

3    **Exhibit 18**: South Carolina Prisoner Record, prisoner's name and information redacted.

4

5    Dated: September 4, 2020                **POTTER HANDY LLP**

6

7                                     By: /s/James M. Treglio

8                                          Mark Potter, Esq.
                                           James M. Treglio, Esq.

9                                          Attorneys for Plaintiffs and the Class

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE**

# Exhibit 12



Select Language

Powered by Google Translate

# Criminal Court Case Information – Case History

## Case Information

Case Type:   Criminal              Location:      Southeast

## Party Information

| Party Name - Number | Relationship | Sex | Attorney | Judge | Case # |
|---|---|---|---|---|---|
| State Of Arizona - (1) | Plaintiff | N/A | UDALL, DAVID | | |
| B Grand Jury - (2) | Deft Grand Jury | N/A | To Be Determined | | |
| Brian Michael Miller - (3) | Defendant | M | Lundin, Anders | Whitehead | CR1996-092288-A |
| Clerk Of The Court - (4) | In The Matter Of (IMO) | N/A | To Be Determined | | |

## Disposition Information

| Party Name | ARSCode | Description | Crime Date | Disposition Code | Disposition | Date |
|---|---|---|---|---|---|---|
| Brian Michael Miller | 13-1802 (F3) | THEFT | 7/20/1996 | Dismissed - Plea Other | Dismissed Due To Plea On Other Count | 12/12/1996 |
| Brian Michael Miller | 13-1902 (F4) | ROBBERY | 7/20/1996 | Pled Guilty As Charged | Pled Guilty As Charged | 10/29/1996 |
| Brian Michael Miller | 13-1304 (F2) | KIDNAP | 7/20/1996 | Dismissed - Plea Other | Dismissed Due To Plea On Other Count | 12/12/1996 |
| Brian Michael Miller | 13-1904 (F3) | ATTEMPT TO COMMIT - ARMED ROBBERY | 7/20/1996 | Dismissed - Plea Other | Dismissed Due To Plea On Other Count | 12/12/1996 |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 5/11/2017 | ORD - Order - Party (A) | 5/11/2017 | |
| **NOTE:** DENIED GUN RIGHTS | | | |
| 3/13/2017 | CFI - Criminal Financial Information Worksheet - Party (A) | 3/13/2017 | |
| **NOTE:** Criminal Financial Information Worksheet | | | |
| 3/10/2017 | APL - Application - Party (A) | 3/10/2017 | Defendant (3) |
| **NOTE:** TO RESTORE GUN RIGHTS | | | |
| 12/8/2015 | OSJ - Order re: Setting Aside Judgment of Guilt - Party (A) | 12/9/2015 | |
| **NOTE:** GRANTED CIVIL RIGHTS | | | |
| 10/19/2015 | CFI - Criminal Financial Information Worksheet - Party (A) | 10/19/2015 | |
| **NOTE:** Criminal Financial Information Worksheet | | | |
| 10/9/2015 | ASJ - Application to Set aside Judgment / Dismiss Charges - Party (A) | 10/9/2015 | Defendant (3) |
| **NOTE:** TO RESTORE CIVIL RIGHTS | | | |
| 5/23/2000 | 115 - ME: Dispo-Revoke/Prison (monetary Orders Entered) - Party (A) | 5/23/2000 | |
| 5/23/2000 | DRE - Disposition Report - Party (A) | 5/26/2000 | |
| **NOTE:** SUPPLEMENTAL | | | |
| 5/17/2000 | NRR - Notice Of Rights - Party (A) | 5/19/2000 | |
| 5/15/2000 | MEM - Memorandum - Party (A) | 5/18/2000 | Defendant (3) |
| **NOTE:** SENTENCING AND RELATED CASE CR99-95933 | | | |
| 4/18/2000 | 117 - ME: Guilt New Chg/Prob Violation - Party (A) | 4/18/2000 | |

| | | | |
|---|---|---|---|
| 4/1/2000 | 123 - ME: Mental Exam Def Competent - Party (A) | 4/1/2000 | |
| 3/28/2000 | SDD - Notice: Sealed Document - Party (A) | 4/10/2000 | |
| **NOTE:** REPORT BY EUGENE ALMER 2-7-00/RELATED CASE CR99-95933 | | | |
| 2/18/2000 | 122 - ME: Mental Exam Experts Appt - Party (A) | 2/18/2000 | |
| 2/8/2000 | 088 - ME: Case Transferred - Party (A) | 2/8/2000 | |
| 1/31/2000 | IAP - Initial Appearance Probation Revocation - Party (A) | 2/3/2000 | |
| 1/14/2000 | 173 - ME: Arraignment Reset - Party (A) | 1/26/2000 | |
| 1/4/2000 | 121 - ME: Ord/Prescreening Report - Party (A) | 1/7/2000 | |
| 12/16/1999 | 112 - ME: Revocation Arraignment - Party (A) | 12/16/1999 | |
| 12/9/1999 | BWA - Bench Warrant - Party (A) | 12/14/1999 | |
| **NOTE:** PROBATION VIOLATION 11-26-99 | | | |
| 8/16/1999 | PVW - Probation Violation Bench Warrant - Party (A) | 8/24/1999 | |
| 12/17/1996 | 109 - ME: Sentence - Probation - Party (A) | 12/18/1996 | |
| 12/12/1996 | JOR - Judgment And Order - Party (A) | 12/12/1996 | |
| 10:20:00 AM | | 10:20:00 AM | |
| **NOTE:** This docket was added by the conversion for a judgment | | | |
| 12/12/1996 | PSR - Presentence Report - Party (A) | 12/16/1996 | |
| 12/12/1996 | LET - Letter - Party (A) | 12/17/1996 | |
| 12/12/1996 | NOT - Notice - Party (A) | 12/17/1996 | |
| **NOTE:** RIGHT TO APPEAL | | | |
| 12/9/1996 | 169 - ME: Sent/Dispo Reset - Party (A) | 12/11/1996 | |
| 11/4/1996 | 105 - ME: Plea Agreement/Change Of Plea - Party (A) | 11/6/1996 | |
| 10/29/1996 | PAG - Plea Agreement - Party (A) | 11/7/1996 | |
| 10/28/1996 | 064 - ME: Trial Continued/Reset - Party (A) | 10/31/1996 | |
| 10/15/1996 | 027 - ME: Pretrial Conference - Party (A) | 10/18/1996 | |
| 10/3/1996 | STA - Statement - Party (A) | 10/4/1996 | Plaintiff (1) |
| **NOTE:** SUPPLEMENTAL DISCLOSURE | | | |
| 8/29/1996 | 005 - ME: Hearing - Party (A) | 8/30/1996 | |
| 8/27/1996 | ROR - Release Order - Party (A) | 9/10/1996 | |
| **NOTE:** 3RD PTY SUPERVISED/SECURED BOND $1,000.00 082796 | | | |
| 8/27/1996 | MOT - Motion - Party (A) | 9/10/1996 | Defendant (3) |
| **NOTE:** FOR TEMP RMVL OF COURT FILES & ORDER | | | |
| 8/21/1996 | RES - Response - Party (A) | 8/27/1996 | Plaintiff (1) |
| **NOTE:** TO DEF MRD | | | |
| 8/21/1996 | LWI - List Of Witnesses - Party (A) | 8/27/1996 | Plaintiff (1) |
| **NOTE:** AND EVIDENCE | | | |
| 8/14/1996 | MRD - Motion to Release Defendant on Own Recognizance, Reduce Bond and/or Release to a Third Party - Party (A) | 8/20/1996 | Defendant (3) |
| 8/9/1996 | 152 - ME: Not Guilty Plea Arraign - Party (A) | 8/12/1996 | |
| 7/29/1996 | IND - Indictment - Party (A) | 7/31/1996 | Plaintiff (1) |
| **NOTE:** CT I: ATTEMPTED ARMED ROBBERY CL 3 FEL; CT II: KIDNAPPING CL 4 FEL; CT III: ROBBERY CL 4 FEL; CT IV: THEFT CL 3 FEL; DR 96102901 TEMPE PD DOC: ON OR ABT 7-20-96 | | | |
| 7/29/1996 | 606 - ME: GJ Not/Supervening Indictment - Party (A) | 7/31/1996 | |
| 7/29/1996 | DWL - Defendant/Witness List - Party (A) | 7/31/1996 | |
| 7/29/1996 | NSI - Notice of Supervening Indictment - Party (A) | 7/31/1996 | Plaintiff (1) |
| **NOTE:** CTS 1,3,4: BOND $47,700 NOT POSTED; CT 2: NI | | | |

## Case Calendar

**There are no calendar events on file**

# Exhibit 13

Select Language ⌄
Powered by Google Translate



# Criminal Court Case Information – Case History

## Case Information

Case Type:    Criminal                Location:        Southeast

## Party Information

| Party Name - Number | Relationship | Sex | Attorney | Judge | Case # |
|---|---|---|---|---|---|
| State Of Arizona - (1) | Plaintiff | N/A | UDALL, DAVID | | |
| Brian Michael Miller - (2) | Defendant | M | Lundin, Anders | Whitehead | CR1999-095933-A |

## Disposition Information

| Party Name | ARSCode | Description | Crime Date | Disposition Code | Disposition | Date |
|---|---|---|---|---|---|---|
| Brian Michael Miller | 13-1204 (F3) | AGGRAVATED ASSAULT | 6/30/1999 | Pled Guilty As Charged | Pled Guilty As Charged | 4/12/2000 |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 5/11/2017 | ORD - Order - Party (A) | 5/11/2017 | |
| **NOTE:** DENIED GUN RIGHTS | | | |
| 3/27/2017 | CFI - Criminal Financial Information Worksheet - Party (A) | 3/27/2017 | |
| **NOTE:** Criminal Financial Information Worksheet | | | |
| 3/10/2017 | APL - Application - Party (A) | 3/10/2017 | Defendant (2) |
| **NOTE:** TO RESTORE GUN RIGHTS | | | |
| 12/8/2015 | OSJ - Order re: Setting Aside Judgment of Guilt - Party (A) | 12/9/2015 | |
| **NOTE:** GRANTED CIVIL RIGHTS | | | |
| 11/2/2015 | CFI - Criminal Financial Information Worksheet - Party (A) | 11/2/2015 | |
| **NOTE:** Criminal Financial Information Worksheet | | | |
| 10/9/2015 | ASJ - Application to Set aside Judgment / Dismiss Charges - Party (A) | 10/9/2015 | Defendant (2) |
| **NOTE:** TO RESTORE CIVIL RIGHTS | | | |
| 10/12/2001 | 023 - ME: Order Entered By Court - Party (A) | 10/12/2001 | |
| 10/4/2001 | LET - Letter - Party (A) | 10/5/2001 | |
| 8/2/2000 | 021 - ME: Nunc Pro Tunc Order - Party (A) | 8/2/2000 | |
| 7/27/2000 | LET - Letter - Party (A) | 8/4/2000 | |
| 5/23/2000 | 193 - ME: Sentence-Imprisonment (monetary Orders Entered) - Party (A) | 5/23/2000 | |
| 5/18/2000 | LET - Letter - Party (A) | 5/19/2000 | |
| 5/18/2000 | NOT - Notice - Party (A) | 5/22/2000 | Defendant (2) |
| **NOTE:** SUPPLEMENTAL/ OF FILING OF CORRESPONDENCE | | | |
| 5/18/2000 | NOT - Notice - Party (A) | 5/22/2000 | Defendant (2) |
| **NOTE:** OF FILING OF CORRESPONDENCE | | | |
| 5/17/2000 | NRR - Notice Of Rights - Party (A) | 5/19/2000 | |
| 5/17/2000 | PSR - Presentence Report - Party (A) | 5/26/2000 | |
| **NOTE:** RELATED CASE #CR9692288 | | | |
| 5/15/2000 | NOT - Notice - Party (A) | 5/18/2000 | Plaintiff (1) |
| **NOTE:** OF FILING OF CORRESPONDENCE | | | |
| 5/15/2000 | NOT - Notice - Party (A) | 5/18/2000 | Defendant (2) |
| **NOTE:** SUPPLEMENTAL | | | |
| 4/18/2000 | 105 - ME: Plea Agreement/Change Of Plea - Party (A) | 4/18/2000 | |
| 4/12/2000 | PAG - Plea Agreement - Party (A) | 4/26/2000 | |
| 4/4/2000 | STP - Stipulation - Party (A) | 4/11/2000 | |
| **NOTE:** FOR DETERMINATION OF COMPETENCY ON BASIS OF EXPERTS REPORTS | | | |
| 4/3/2000 | NDP - Notice of Discovery - Party (A) | 4/10/2000 | Plaintiff (1) |

| | | | |
|---|---|---|---|
| 4/3/2000 | ACO - Allegation of Historical Priors - Party (A) | 4/10/2000 | Plaintiff (1) |
| 4/3/2000 | ADN - Allegation of Dangerous Nature Felony - Party (A) | 4/10/2000 | Plaintiff (1) |
| 4/3/2000 | RQH - Request For Hearing - Party (A) | 4/10/2000 | Plaintiff (1) |

**NOTE:** RULE 609

| | | | |
|---|---|---|---|
| 4/1/2000 | 123 - ME: Mental Exam Def Competent - Party (A) | 4/1/2000 | |
| 2/18/2000 | 122 - ME: Mental Exam Experts Appt - Party (A) | 2/18/2000 | |
| 2/8/2000 | 120 - ME: Hrg/Motion/Rule 11 Exam - Party (A) | 2/8/2000 | |
| 2/2/2000 | 173 - ME: Arraignment Reset - Party (A) | 2/4/2000 | |
| 12/20/1999 | WAR - Warrant For Arrest - Party (A) | 12/21/1999 | |

**NOTE:** 11-26-99

| | | | |
|---|---|---|---|
| 12/18/1999 | 121 - ME: Ord/Prescreening Report - Party (A) | 12/18/1999 | |
| 12/13/1999 | INF - Information - Party (A) | 12/15/1999 | Plaintiff (1) |

**NOTE:** AGGRAVATED ASSAULT/CL 3 FEL

| | | | |
|---|---|---|---|
| 12/13/1999 | 023 - ME: Order Entered By Court - Party (A) | 12/22/1999 | |
| 12/13/1999 | MCO - Motion To Continue - Party (A) | 12/29/1999 | Defendant (2) |

**NOTE:** GUILTY ARRAIGNMENT & JOIN IN RULE 11 PROCEDDING

| | | | |
|---|---|---|---|
| 12/8/1999 | COM - Complaint - Party (A) | 12/10/1999 | |

**NOTE:** CT 1: AGGRAVATED ASSAULT CL 3 FEL; DOC: ON 06/30/1999 CR9901485FE

| | | | |
|---|---|---|---|
| 12/8/1999 | BIN - Bindover - Party (A) | 12/10/1999 | |

**NOTE:** RELEASE ORD: BOND $6000.00 WPH/ARR: 12-06-1999/12-14-1999-PIA: 07-01-1999 DEF ATTY: ELIZABETH J FLYNN ¢PD!; TRANSMITTAL CERTIFICATION------------------------BEGIN SUPERIOR COURT PLEADINGS------------------------


## Case Calendar

**There are no calendar events on file**

# Exhibit 14

**CHAPTER: 800**

Inmate Management

<u>DEPARTMENT ORDER:</u>
803 – Inmate Disciplinary Procedure

<u>OFFICE OF PRIMARY RESPONSIBILITY:</u>

**DIR**

<u>Effective Date:</u>

**October 16, 2016**

<u>Amendment:</u>

**February 28, 2020**

<u>Supersedes:</u>

**DO 803 (6/7/14)**

<u>Scheduled Review Date:</u>

**January 1, 2021**

<u>ACCESS</u>
☐ **Contains Restricted Section(s)**

# Arizona Department of Corrections

## Department Order Manual



~~David Shinn, Director~~

# TABLE OF CONTENTS

PURPOSE ....................................................................................................................... 1

PROCEDURES ............................................................................................................... 1

1.0    GENERAL REQUIREMENTS ............................................................................ 1

2.0    PRE-HEARING DETENTION ............................................................................. 2

3.0    FILING AND DISPOSITION OF DISCIPLINARY REPORTS ............................ 3

4.0    INVESTIGATIONS AND CONFIDENTIAL INFORMANTS ............................... 4

5.0    CLASS A AND CLASS B VIOLATIONS ............................................................ 7

6.0    CLASS C VIOLATIONS .................................................................................... 8

7.0    DISCIPLINARY HEARINGS ............................................................................. 9

8.0    RESTITUTION HEARINGS ............................................................................. 13

9.0    PENALTIES FOR CLASS A AND B VIOLATIONS .......................................... 15

10.0   DISCIPLINARY REVIEW AND APPEAL .......................................................... 16

11.0   RESTITUTION REVIEW AND APPEAL .......................................................... 20

12.0   VEXATIOUS GRIEVANCES AND VEXATIOUS GRIEVANT DESIGNATION ... 22

13.0   RECORDS AND REPORTS ............................................................................ 23

IMPLEMENTATION ....................................................................................................... 23

DEFINITIONS/GLOSSARY ........................................................................................... 23

ATTACHMENTS ........................................................................................................... 23

FORMS LIST ................................................................................................................. 24

AUTHORITY .................................................................................................................. 24

# PURPOSE

The Arizona Department of Corrections (Department) maintains written rules of inmate conduct, sanctions, and procedures for violations which are communicated to all inmates and staff. These rules mirror the state's criminal code to the greatest extent possible. Disciplinary procedures are carried out promptly and with adherence to due process requirements.

# PROCEDURES

**1.0   GENERAL REQUIREMENTS**

1.1     The Warden at each Reception Center shall ensure information regarding the disciplinary process is included upon intake.

   1.1.1     Wardens shall ensure copies of this Department Order are available in all Inmate Resource Centers/libraries, in both English and Spanish.

1.2     Penalties imposed on inmates shall be fair, reasonable and consistent with the severity of the violation. The Department strives to operate its prisons under conditions and yielding consequences as much like the real world as possible. To this end, rule violations are aligned with the applicable criminal code so the seriousness of the violation reflects underlying community norms and values and results in comparable consequences.

1.3     Confidential information shall be restricted throughout the disciplinary process in accordance with Department Order #901, Inmate Records Information and Court Action.

1.4     Commission of any rule violation, which is also a violation of criminal law, may result in referral of the case to the appropriate court or law enforcement agency for consideration for prosecution of the case.

   1.4.1     Inmates are subject to all laws of the United States, the State of Arizona, county and municipality. Inmates violating any law may be charged and prosecuted for violation in the appropriate federal, state or local court.

   1.4.2     The filing of charges in a judicial court for the violation of local, state or federal laws does not prevent the administrative processing of the same act as a disciplinary matter or of the filing of a disciplinary action against the inmate.

1.5     Staff Assistants shall be assigned when a charged inmate is illiterate, does not understand English or where the complexity of the issue makes it unlikely the inmate will be able to collect and present evidence. Staff Assistants are assigned to help inmates only to understand the charges against them, the disciplinary hearing process, the process for presenting their version of the charges, and the process to appeal.

   1.5.1     Staff Assistants shall not act on behalf of, or serve as advocates for inmates. Inmates may not act as Staff Assistants.

   1.5.2     Staff Assistants shall be selected by the unit Deputy Warden, have the rank or equivalent rank of Sergeant or above, be familiar with Department policy and procedures and not hold the position of Disciplinary Coordinator or Disciplinary Hearing Officer.

1.5.3    Inmates do not have the right to legal counsel in the disciplinary hearing process.

1.5.4    The Disciplinary Coordinator and the Disciplinary Hearing Officer are responsible for the assignment of a Staff Assistant. A current list of Staff Assistants shall be maintained by the Disciplinary Hearing Officer. The list shall be readily available to the Disciplinary Coordinator and posted on the inmate bulletin board.

    1.5.4.1    In cases where the inmate requires the use of a translator (either sign language or foreign language) the Staff Assistant and the interpreter shall work together to ensure the inmate understands the charge, the disciplinary process, their rights and responsibilities, as well as possible penalties.

1.5.5    If during the disciplinary process an inmate exhibits behavior that indicates the need for a mental health assessment to determine if the inmate's current mental state makes the inmate incapable of understanding the proceedings, the hearing shall be adjourned and the Disciplinary Hearing Officer shall refer the inmate to Mental Health for evaluation. Mental Health shall assign a licensed psychologist to prepare the mental health assessment.

1.5.6    If the assigned licensed psychologist determines the inmate is competent to proceed, then the hearing shall be reconvened. The Disciplinary Coordinator shall note on the Result of Disciplinary Hearing, Form 803-5, that the inmate was determined competent by the Mental Health Assessor.

1.5.7    If the assigned licensed psychologist determines the inmate is not competent to proceed, then the hearing shall be adjourned pending further evaluation.

1.5.8    Competency is a determination by the assigned licensed psychologist in which the inmate understands the nature of the proceedings, the pending charges and possible sanctions.

    1.5.8.1    Mental Health shall review the inmate's status every ten calendar days and inform the Disciplinary Coordinator immediately upon determining whether the inmate is competent to proceed.

1.6    Violation of any time frame specified in this Department Order does not mandate dismissal of the case, unless due process requirements are not met. To avoid time frame violations, a case may be postponed with the approval of the unit Deputy Warden.

## 2.0    PRE-HEARING DETENTION

2.1    The unit Deputy Warden may place an inmate in pre-hearing detention at a Complex Detention Unit (CDU) when charged with Class A, B or C violations and an investigation is required using the Assignment to Investigative Detention/Form No. 2A, Form 803-7. Inmates shall receive verbal notification of the reasons for detention at the time of their initial placement immediately following the rule violation.

2.2    The unit Deputy Warden or designee shall review the inmate's pre-hearing status by the next workday after admission to the CDU. The unit Deputy Warden or designee may retain the inmate in detention or authorize release to general population.

2.3     Inmates in pre-hearing detention shall be afforded privileges as outlined in Department Order #804, <u>Inmate Behavior Control</u>.

2.4     Inmates held in pre-hearing detention pending an investigation for a rule violation or pending a disciplinary hearing shall have their status reviewed every 30 calendar days by the Warden or designated Deputy Warden. Extensions of pre-hearing detention shall be made in writing at the end of each 30 calendar day period and provided to the Warden and the Division Director for Prison Operations.

**3.0     FILING AND DISPOSITION OF DISCIPLINARY REPORTS**

3.1     Any Department, contract or private prison employee may file an Inmate Disciplinary Report, Form 803-1, for any conduct listed in the Rule Violations, Attachment A.

3.2     An Inmate Disciplinary Report form shall contain only one violation per incident with a full explanation of supporting facts. The violation charged shall be the one with the highest severity.

3.3     The employee initiating the Inmate Disciplinary Report form shall complete the first portion of the form within 24 hours of the determination that a violation may have occurred, or within 24 hours of an investigation being completed. The contents of the report shall include:

    3.3.1     The number, class and violation as listed in Attachment A.

    3.3.2     The date, time and specific location of the alleged violation.

    3.3.3     A detailed description of the conduct that constitutes the violation.

        3.3.3.1     If an Assault on Staff (02A, 03B or 04B), the employee shall document the name and ADC number of the charged inmate and the names and ADC numbers of any other inmates who participated in the staff assault incident.

    3.3.4     The names of any staff witnesses.

    3.3.5     The names and ADC numbers of any inmate witnesses where disclosure would not compromise the safety and security of the inmate.

    3.3.6     The date and time the report is written.

    3.3.7     The date, time, name and rank of the staff member who advised the inmate of the pending disciplinary charge.

    3.3.8     The signature, rank, and staff identification number of the employee writing the report. All signatures shall be legible and include the printed last name of the employee underneath or next to the signature.

    3.3.9     Any of the following that apply:

        3.3.9.1     A description and location of any physical evidence

        3.3.9.2     A description of any force used by the inmate or staff

        3.3.9.3     Any immediate corrective action taken

    3.3.9.4    Any unusual inmate behavior

    3.3.9.5    Witnesses

3.4    The employee shall complete and submit the report to the on-duty shift supervisor. The supervisor shall:

    3.4.1    Review the report for content to ensure appropriateness of the charge.

    3.4.2    Return the report to the employee for correction, if it is not completed properly.

    3.4.3    Sign the report prior to forwarding it to the Disciplinary Coordinator.

3.5    The Disciplinary Coordinator shall:

    3.5.1    Assign a case tracking number, which identifies the Inmate Disciplinary Report form throughout the process.

    3.5.2    Enter tracking number and incident date into the disciplinary log.

3.6    When an inmate is hospitalized, escapes, or is otherwise outside the institution during the period between a disciplinary violation and the serving of charges, the time frames shall begin when the inmate returns to Department custody.

## 4.0    INVESTIGATIONS AND CONFIDENTIAL INFORMANTS

4.1    <u>Investigation of Charges</u> – The Disciplinary Coordinator shall gather evidence and initiate an objective investigation of the charge within 24 hours of receipt of the Inmate Disciplinary Report, which shall be completed without delay. Any delay longer than five workdays shall be explained in the appropriate section of the disciplinary packet.

    4.1.1    The Disciplinary Coordinator shall:

        4.1.1.1    Obtain the inmate's version of the violation using the Inmate Discipline - Investigative Report, Form 803-8, and shall contact any staff member or inmates who, in the Disciplinary Coordinator's judgment, may have information pertaining to the allegation and charge.

        4.1.1.2    Omit from the report any opinions regarding the innocence or guilt of the charged inmate.

        4.1.1.3    If the inmate has requested witnesses, document the inmate's request on the Inmate Discipline - Witness Request/Statement/Refusal, Form 803-3.

        4.1.1.4    Obtain from the inmate a summary of expected testimony of a requested witness, as a condition of the witness being contacted. The Disciplinary Coordinator shall also obtain any relevant questions the inmate may want the witness to be asked.

4.1.1.5    Interview relevant inmate and staff witnesses, and request all witnesses to complete an Inmate Discipline - Witness Request /Statement/Refusal form. A reason shall be entered on the Inmate Discipline - Investigative Report form if witnesses are not contacted or refuse to complete a statement form. Staff witnesses requested by the inmate shall not refuse to answer relevant inmate questions or complete a statement form.

4.2    <u>Confidential Informants and Confidential Information Reliability Assessment Questionnaires (CIRAQ), Form 801-3</u>

4.2.1    When admitting confidential information in a disciplinary case, information provided by a confidential informant may only be considered as evidence when:

4.2.1.1    Staff reasonably concludes the information provided by the confidential informant is reliable.

4.2.1.2    The Disciplinary Hearing Officer finds the confidential informant for safety considerations prevent the disclosure of the informant's name.

4.2.2    If a discipline case is based in part or in whole on confidential information, the information shall be presented to the Disciplinary Hearing Officer in written format only on the CIRAQ. The Disciplinary Coordinator shall ensure a completed CIRAQ is included in the disciplinary packet for each confidential informant, or confidential source relied upon (i.e., tape recording and video recordings).

4.2.3    Any supporting documentation containing information of a confidential nature related to the CIRAQ(s) included in a case shall be attached and clearly stamped, "CONFIDENTIAL."

4.2.4    When CIRAQ(s) are used in a disciplinary case, the Disciplinary Coordinator shall review the Inmate Disciplinary Report form to ensure a statement notifying the inmate that confidential information will be presented to the Disciplinary Hearing Officer, shall not have access to the confidential information.

4.2.4.1    If a discipline case is based solely on confidential information, it will not be necessary to call confidential informants as witnesses.

4.2.4.2    If the discipline case is based on other testimony or evidence in addition to the confidential information then witness requests may be allowed for the information not deemed confidential in nature.

4.2.4.3    A staff member may not be a confidential source.

4.2.5    If the Disciplinary Coordinator finds notification of any of the above information would tend to identify the confidential source, the information may be omitted from the Inmate Disciplinary Report form.

4.2.5.1    When specific facts are omitted from the Inmate Disciplinary Report form, an explanation documenting the reason for the omission shall be contained in the CIRAQ.

4.2.5.2    Failure to document the basis for omitting facts shall result in the case being returned by the Disciplinary Hearing Officer to the institution for inclusion of the information or a re-hearing ordered with the inmate receiving the information in order to prepare a defense.

4.2.5.3    If a re-hearing is ordered, it shall be completed within 60 calendar days from the date it was returned to the Disciplinary Hearing Officer.

4.3    <u>Assessing Reliability of the CIRAQ</u>

4.3.1    The CIRAQ shall contain the following information:

4.3.1.1    The identity of the staff member conducting the investigation.

4.3.1.2    A description of the source as it relates to the Department. For example, CI #001 is an inmate assigned to the Department and Exhibit A is a transcription of a recorded telephone conversation, which occurred on (date).

4.3.1.3    The specific information each source gave in language, which is factual (quotes) rather than conclusionary.

4.3.2    The staff completing the CIRAQ shall establish reliability of the informant in the CIRAQ as follows:

4.3.2.1    The confidential informant has been proven reliable in the past. If this is the basis, the Disciplinary Hearing Officer shall be provided a synopsis outlining the past reliability and reference(s) to the other case(s) which shall be provided in the CIRAQ.

4.3.2.2    The confidential informant was an eyewitness. The report shall specifically state where the source claims to have been when he/she witnessed the incident being reported. Any corroborating evidence or information from other sources should be included to assist in establishing reliability on this basis.

4.3.2.3    The confidential informant has first-hand knowledge from the accused.

4.3.3    After the staff determines reliability of the informant, the Disciplinary Hearing Officer shall then determine the credibility of the information, by one of the following:

4.3.3.1    The information provided by the confidential informant is corroborated by statements and/or information from other confidential informants.

4.3.3.2    There is physical evidence or staff testimony which corroborates the confidential informant's information.

4.3.4    When confidential information or an informant is relied on for evidence, Disciplinary Hearing Officers shall record in the findings on the Result of Disciplinary Hearing form that they have relied on information from a confidential source and a separate CIRAQ has been completed.

4.3.5   The Disciplinary Hearing Officer's finding of guilt shall contain a statement detailing what evidence was relied upon which specifically supports the finding of guilt the confidential source(s) supplied and why the information was deemed reliable and credible.

4.3.6   All confidential information shall be stamped confidential on every page and contain the case number.

## 5.0   CLASS A AND CLASS B VIOLATIONS

5.1   All Class A violations shall be referred to the Disciplinary Hearing Officer. Class B violations, where applicable sanctions rise to the level of a major violation, shall be handled by the Disciplinary Hearing Officer.

5.2   Class B violations, where applicable sanctions do not rise to the level of a major violation, shall be handled by the Disciplinary Coordinator. Any Class B violation heard at the Disciplinary Hearing Officer level shall be handled as outlined in section 6.0 of this Department Order. However, the penalties shall not be less than those identified for Class B sanctions listed in Attachment B, except the Disciplinary Coordinator may not assess any Earned Release Credit or Parole Class III.

5.3   The Disciplinary Coordinator shall:

5.3.1   Review the Inmate Disciplinary Report form and ensure all charges have been thoroughly investigated.

5.3.2   Schedule a hearing within seven workdays of the violation filing date, except when a postponement has been obtained.

5.3.3   Consider modification of the charge consistent with all information in the Inmate Disciplinary Report form.

5.3.4   Serve the charge in writing to the inmate no later than 48 hours before the hearing. If the inmate cannot read, the Disciplinary Coordinator shall read the charge to the inmate.

5.3.5   Determine whether the inmate understands the charge, and his/her right to request a Staff Assistant.

5.3.6   Record in Section II of the Inmate Disciplinary Report form, the date, time, place and name of the person who served the written charge on the inmate.

5.3.7   Require the inmate be given at least 48 hours from the time the charge is served to prepare for the disciplinary hearing, to include the submittal of the witness statements, unless the 48 hour notice is waived in writing by the inmate.

5.3.8   Before the hearing, advise the inmate to provide a written request for the appearance of witnesses and what testimony he/she expects each witness to provide at the hearing to the Disciplinary Coordinator. The Disciplinary Coordinator shall provide questions for each witness to the Disciplinary Hearing Officer at the time of the hearing.

5.3.9     Prepare a Disciplinary File, which includes the Inmate Disciplinary Report form with all sections completed, a list of evidence, witness names, and written witness statements, and forward it to the Disciplinary Hearing Officer.

        5.3.9.1    If an inmate is transferred to another facility pending the hearing, the Inmate Disciplinary Report form and all supporting documentation may be forwarded to the Disciplinary Coordinator at the receiving unit for disposition.

## 6.0    CLASS C VIOLATIONS

6.1     <u>Class C violations are Department rule violations, as listed in Attachment A</u>

      6.1.1     Class C violations shall be referred to the Disciplinary Coordinator and disposed of within ten workdays of the filing date of the violation.

      6.1.2     The Warden shall appoint Disciplinary Coordinators sufficient in number to manage the volume of cases of each complex. The disposition of Class C violations shall be the responsibility of the Disciplinary Coordinator. The Disciplinary Coordinator shall:

        6.1.2.1    Meet with the inmate.

        6.1.2.2    Determine whether the inmate has been properly charged or whether to amend the charge.

        6.1.2.3    Conduct an investigation, if necessary.

        6.1.2.4    Interview the inmate and obtain witness statements from other inmates or staff.

        6.1.2.5    Decide whether to resolve the violation informally or formally.

        6.1.2.6    Determine whether any penalties are appropriate.

        6.1.2.7    Advise the inmate of all disciplinary appeal rights.

        6.1.2.8    Document the resolution in Section IV of the Inmate Disciplinary Report form.

      6.1.3     Penalties for Class C Violations – The Disciplinary Coordinator may dismiss the charges, resolve the matter informally, or assess penalties for Class C violations as listed in Attachment B. In addition, the Disciplinary Coordinator may:

        6.1.3.1    Order the confiscation and return of property that belongs to another inmate, staff member, other person or the state that is found in an inmate's possession without proper authorization.

        6.1.3.2    Refer the inmate to their assigned Correctional Officer III for additional restrictions consistent with the inmate's phase.

        6.1.3.3    Order confiscation and forfeiture of contraband money and property, in accordance with Department Order #909, <u>Inmate Property</u>.

      6.1.4   Class C violations for which restitution is being requested shall be treated as a Class A or B violation in which the same level process should be afforded the inmate.

## 7.0   DISCIPLINARY HEARINGS

7.1   The Warden shall appoint a staff member to act as Disciplinary Hearing Officer for each complex. The Disciplinary Hearing Officer shall be of the rank of Captain or greater. An individual shall be excluded from sitting as a Disciplinary Hearing Officer for a specific hearing for any of the following:

    7.1.1   The staff member is the individual who wrote the Inmate Disciplinary Report, which is to be heard.

    7.1.2   The staff member was directly involved in conducting the investigation before the hearing.

    7.1.3   The staff member is unable to be fair and impartial when hearing the case.

7.2   Disciplinary hearings shall be held as often as required to ensure disciplinary violations are processed in a timely manner.

7.3   The Disciplinary Hearing Officer shall prioritize all pending Inmate Disciplinary Reports by class to ensure serious rule violations are given priority.

7.4   Disciplinary hearings shall be held no more than seven workdays after the date the violation was filed. If a hearing cannot be held within seven workdays the Disciplinary Coordinator shall supply a Postponement Memorandum explaining the reasons a continuance is needed. The Warden, Deputy Warden or designee's approval is required for all postponement requests more than seven workdays.

7.5   All re-hearings shall be held within 60 calendar days of the date the re-hearing was requested. If a hearing cannot be held within 60 calendar days, the Disciplinary Coordinator shall supply a Postponement Memorandum explaining the reasons a continuance is needed. The Warden, Deputy Warden or designee's approval is required for all postponement requests, which extend more than 60 calendar days.

7.6   The Arizona Correctional Information System (ACIS) data regarding the inmate's disciplinary history shall be available to the Disciplinary Hearing Officer during the disciplinary hearing and may be considered in assessing any penalties.

7.7   Upon receipt of an Inmate Disciplinary Report, the Disciplinary Hearing Officer shall:

    7.7.1   Review the case for completeness, including:

        7.7.1.1   Properly written and completed reports and forms.

        7.7.1.2   Within time frames.

        7.7.1.3   Conflicts in statements between written reports resolved.

        7.7.1.4   ACIS report included.

        7.7.1.5   CIRAQ included, if applicable.

7.7.1.6    Inmate cited for the appropriate charge for the violation.

7.7.1.7    Determine if witnesses are to be called or if written statements are sufficient.

7.7.1.8    Decide whether the charging officer shall be called.

7.7.1.9    If it is a violation for Assault on Staff (02A, 03B, or 04B) ensure all inmates who participated in the assault are listed (name and ADC number in the description).

7.7.1.10   If it is a violation for 02A, Assault on Staff that involved Serious Injury, list the staff member(s) who were seriously injured (See the Glossary of Terms for definition of "Serious Injury.")

7.7.2    If not complete, refer the rule violation packet back to the Disciplinary Coordinator to make appropriate changes and/or adjustments.

7.7.3    If complete, proceed with the scheduled hearing, based on priority of the case (Class A, B, and then C). Hearings shall be held no more than seven workdays after the date the violation was filed. If a hearing cannot be held within seven workdays, the Disciplinary Coordinator shall supply a Postponement Memorandum explaining the reasons a continuance is needed.

7.8    The Disciplinary Hearing Officer shall conduct the hearing as follows:

7.8.1    Record the date and time of the hearing.

7.8.2    Verify the inmate's name and number by face to identification card comparison.

7.8.3    Read the charge and ask if the inmate understands the charge, and provide the inmate with the opportunity to present any and all evidence as to why any of the applicable penalties, including, but not limited to, restitution, should not be imposed. The Disciplinary Hearing Officer may modify the charge at the hearing provided the new charge is a lesser or equivalent charge which has one or more elements of the titled charge. The modification shall be noted on the record. *[Revision – February 28, 2020]*

7.8.4    Determine if the inmate requires a Staff Assistant at the hearing. The Disciplinary Hearing Officer may allow time for consultation between the inmate and designated Staff Assistant.

7.8.5    Explain the range of possible penalties which may be imposed in the event of a guilty finding.

7.8.6    Ask whether the inmate pleads guilty or not guilty.

7.8.6.1    If the inmate pleads guilty, no further evidence needs to be heard. The inmate may offer a statement concerning mitigating circumstances for the Disciplinary Hearing Officer to consider when determining penalties.

7.8.6.2    If the inmate refuses or fails to enter a plea, a "no plea" shall be entered and treated as not guilty.

7.8.6.3   If the inmate pleads not guilty, evidence shall be presented, including appropriate staff or inmate testimony or written statements. The inmate may make a closing statement concerning the misconduct for the Disciplinary Hearing Officer to consider.

7.9   The Disciplinary Hearing Officer shall determine whether to call staff or inmate witnesses to appear at the proceedings or whether written witness statements are adequate or necessary.

7.9.1   The inmate shall present to the Disciplinary Coordinator, in writing, all proposed questions for each witness he/she wishes to call.

7.9.2   Live testimony of inmate witnesses is not required. If live testimony is permitted, the Disciplinary Hearing Officer shall not permit the inmate to directly question the witness. The Disciplinary Hearing Officer shall conduct the questioning if he/she determines the questions are appropriate and relevant. The questions the inmate wishes to ask shall be submitted by the Disciplinary Coordinator in writing to the Disciplinary Hearing Officer for review.

7.9.3   When an inmate is at another facility, a written statement may be taken. Statements taken from inmates at another facility or who are not present at the hearing shall be made known to the inmate (unless confidential as defined in section 4.0 of this Department Order), at least 48 hours prior to the hearing, so he/she may respond on the record.

7.9.4   The Disciplinary Hearing Officer shall retain in the disciplinary packet the questions, which were determined as neither appropriate nor relevant.

7.9.5   The Disciplinary Hearing Officer may determine not to call a witness if the witness would be subject to a risk of reprisal, undermine authority or otherwise present a threat to the security or order of the institution, or, if the Disciplinary Hearing Officer reasonably believes the witness' testimony would be irrelevant, immaterial or repetitive. The Disciplinary Hearing Officer shall document the reason for the exclusion of any witness.

7.9.6   Although there is no maximum number of witnesses an inmate may call, the Disciplinary Hearing Officer may limit the number based on a reasonable belief the witness testimony would be repetitive testimony, irrelevant or an undue hazard to institutional safety.

7.9.7   Character witness evidence is not relevant in a disciplinary hearing and shall not be permitted.

7.9.8   The Disciplinary Hearing Officer may elect to call the charging officer as a witness to clarify any portions of the Inmate Disciplinary Report form.

7.9.9   The Disciplinary Hearing Officer may remove witnesses whose conduct interferes with the hearing.

7.10   All evidence used at the hearing shall be made known to the inmate, except the Disciplinary Hearing Officer may decide to withhold from disclosure specific information if the disclosure would endanger the safety or well-being of another person. The Disciplinary Hearing Officer shall note in the decision the reasons for excluding or limiting any evidence.

7.11 Persons other than the Disciplinary Hearing Officer, inmates and staff involved in the disciplinary matter may be present in the hearing room and observe discipline hearings. Their attendance shall be approved in advance by the Warden, Deputy Warden, Bureau Administrator or Administrator, and shall be noted on the record. These persons may be excluded if they are disruptive.

7.12 During the course of the Hearing, the Disciplinary Hearing Officer may:

7.12.1 Offer staff assistance to the inmate during the hearing and use available personnel resources, such as medical staff, or mental health staff as consultants.

7.12.2 Postpone a hearing for good cause. The reasons for postponement shall be included in the file. The Warden, Deputy Warden, Bureau Administrator or Administrator shall determine whether or not to approve a postponement. Postponements shall not exceed 28 calendar days.

7.12.3 Postpone the hearing and return the Disciplinary File to the Disciplinary Coordinator if the titled charge needs to be modified to a different charge with different elements than the current rule violation.

7.12.3.1 The Disciplinary Hearing Officer may modify the charge during the hearing and change the titled charge to a greater class charge; however, the inmate shall be notified he/she may request an additional 48 hours to prepare a defense on the modified charge. The inmate may waive this requirement.

7.12.3.2 During the course of the hearing, the Disciplinary Hearing Officer may change the titled charge to a lesser or equivalent charge without ordering a re-hearing. The lesser or equivalent charge shall have one or more of the elements of the titled charge.

7.12.4 Postpone the hearing to request other supporting documents.

7.13 The inmate charged shall be present at the disciplinary hearing unless substantial reasons exist which require his/her exclusion from the hearing.

7.13.1 If the inmate waives the right to be present or refuses to be present, the inmate shall sign the Inmate Discipline - Hearing Waiver, Form 803-4, and an employee shall witness the signature. If the inmate refuses or is unable to sign the waiver, the employee shall specifically note this on the form.

7.13.2 If the inmate's conduct disrupts the hearing, the inmate shall be removed from the area or hearing room and the hearing shall be conducted without the inmate present. The reason for the inmate's absence shall be explained on the Result of Disciplinary Hearing form.

7.13.3 The Disciplinary Hearing Officer shall ensure the inmate has the opportunity to provide a statement. The statement may be verbal, written or both.

7.14    Hearing Decisions

    7.14.1    The Disciplinary Hearing Officer may:

        7.14.1.1    Dismiss the charge. The reason for dismissal shall be provided on the Result of Disciplinary Hearing form.

        7.14.1.2    Find the inmate not guilty.

        7.14.1.3    Find the inmate guilty and impose penalties as indicated in Attachment B. As the standard of proof for guilty findings, the trier of fact (Disciplinary Hearing Officer) shall be persuaded by the evidence it is more probably true than not the inmate committed the disciplinary violation.

    7.14.2    Upon reaching a decision, the Disciplinary Hearing Officer shall:

        7.14.2.1    Prepare a written report utilizing the Result of Disciplinary Hearing form, detailing the specific evidence relied upon to arrive at the decision and the standard of proof has been met.

        7.14.2.2    Determine if restitution is owed and the amount due.

            7.14.2.2.1    For restitution purposes, the inmate(s) found guilty shall be jointly and severally liable for the full amount due.

            7.14.2.2.2    The Disciplinary Hearing Officer may enter a finding that restitution is owed and to whom, reserving the issue of the amount of restitution owed for a future hearing pursuant to those procedures outlined in section 8.0 of this Department Order. *[Revision – February 28, 2020]*

        7.14.2.3    Inform the inmate of the decision in writing, including the penalty, and verbally explain it.

        7.14.2.4    Type or legibly print the name of the Disciplinary Hearing Officer on the Result of Disciplinary Hearing form and sign the report.

        7.14.2.5    Inform the inmate that he/she may appeal the decision of the Disciplinary Hearing Officer in accordance with the established procedures for disciplinary violations involving restitution outlined in this Department Order.

        7.14.2.6    Forward the results of the hearing to the Warden, Deputy Warden, Bureau Administrator or Administrator for review.

## 8.0    RESTITUTION HEARINGS *[Revision – February 28, 2020: Sections 8.1 thru 8.6.2.5]*

8.1    The Department may assess costs for damage to property, theft, and any other cost related to a violation of Department Order, investigation or disciplinary violation.  The amounts assessed should be calculated to cover any loss incurred by any person, institution, or by the Arizona Department of Corrections.

8.2    A hearing is required to assess the amount of restitution. The purpose of the hearing is to provide the inmate an opportunity to present any and all evidence that the amount of restitution assessed is incorrect or otherwise unreasonable.  If the amount of restitution is known at the time of the Disciplinary Hearing under section 7.0 of this Department Order, then a separate hearing is not necessary.

8.3    If, after a plea of guilty or a finding of guilt resulting from the disciplinary hearing, restitution is assessed, staff shall indicate restitution is owed on the Result of Disciplinary Hearing, Form 803-5.

8.3.1    If the amount of restitution is known at the time of the plea or finding of guilt, the Disciplinary Hearing Officer shall indicate the amount assessed on the Result of Disciplinary Hearing form.

8.3.2    If the amount of restitution is not known at the time of the disciplinary hearing, the Disciplinary Hearing Officer shall indicate on the Result of Disciplinary Hearing form that restitution is owed but the amount has not yet been determined.

8.4    Once the amount of restitution owed has been determined, the Disciplinary Coordinator shall:

8.4.1    Fill out the Notice of Restitution, Form 803-11, with the amount clearly stated. The case number assigned to the Notice of Restitution form shall be the same as the case number assigned to the associated disciplinary charge.  However, the case number on the Notice of Restitution shall begin with the letter "R".

8.4.2    Schedule a hearing within seven workdays of the receipt of the restitution amount, except when a postponement has been obtained.

8.4.3    Serve the Notice of Restitution form to the inmate no later than 48 hours before the hearing.  If the inmate cannot read, the Disciplinary Coordinator shall read the Notice to the inmate.

8.4.4    Determine whether the inmate understands the Notice, and his/her right to request a Staff Assistant.

8.4.5    Record in Section II of the Notice of Restitution form the date, time, place, and name of the person who served the written Notice on the inmate.

8.4.6    Require the inmate be given at least 48 hours from the time the Notice is served to prepare for the Restitution Hearing, to include the submittal of the witness statements, unless the 48 hour notice is waived in writing by the inmate.

8.4.7    Before the hearing, advise the inmate to provide any and all evidence that purportedly supports the inmate's belief that the amount of restitution assessed is incorrect or is otherwise unreasonable.

8.4.8    Prepare a Restitution File which includes the Notice of Restitution form with all sections completed, a list of evidence, witness names, and written witness statements, and forward to the Disciplinary Hearing Officer.

8.4.8.1    If an inmate is transferred to another facility pending the hearing, the Notice of Restitution form and all supporting documentation may be forwarded to the Disciplinary Coordinator at the receiving unit for disposition.

8.5    <u>Restitution Hearings</u>

8.5.1    If restitution has been assessed as a penalty during the Disciplinary Hearing, then only the amounts of restitution owed, and the reasonableness of the amount, are proper subjects at the Restitution Hearing. No other matters, including the assessment of restitution itself, shall be contested or considered.

8.5.2    The Disciplinary Hearing Officer shall conduct the hearing pursuant to the procedures set forth in section 7.0 of this Department Order.

8.6    <u>Hearing Decisions</u>

8.6.1    The Disciplinary Hearing Officer may:

8.6.1.1    Affirm and impose the amount of restitution owed based on the evidence presented.

8.6.1.2    Revise the amount of restitution owed based on the evidence presented.

8.6.2    Upon reaching a decision, the Disciplinary Hearing Officer shall:

8.6.2.1    Prepare a written report utilizing the Result of Restitution Hearing, Form 803-12, detailing the specific evidence relied upon to support the decision and that the standard of proof has been met.

8.6.2.2    Inform the inmate of the decision assessing the amount of restitution owed, and verbally explain it.

8.6.2.3    Type or legibly print the name of the Disciplinary Hearing Officer on the Result of Restitution Hearing form and sign the report.

8.6.2.4    Inform the inmate that he/she may appeal the decision of the Disciplinary Hearing Officer in accordance with the established procedures for disciplinary violations involving restitution outlined in this Department Order.

8.6.2.5    Forward the results of the hearing to the Warden, Deputy Warden, Bureau Administrator or Administrator for review.

## 9.0    PENALTIES FOR CLASS A AND B VIOLATIONS

9.1    The penalties which shall be imposed for disciplinary violations are outlined in Attachment B. Class B rule violations not handled at the Disciplinary Coordinator level shall not be outside of the range for each class of violations.

9.2     The Disciplinary Hearing Officer may assess Earned Release Credit forfeitures beyond the five calendar days mandated by Arizona Revised Statute (A.R.S.) for "positive" urinalysis tests or refusal to submit to a urinalysis test.

9.3     An inmate found guilty of Violation 38B, 37B, 21B or other violation resulting in a positive urinalysis test shall be charged the cost of the urinalysis test and any subsequent re-test based on the number of positive results.

    9.3.1     Inmates that require transport to the hospital due to substance abuse shall be charged restitution for all medical related expenses and cost of staff overtime in accordance with Department Order #905, <u>Inmate Trust Account/Money System</u>.

9.4     An inmate found guilty of any assault, sexual assault, or any violation involving physical harm or serious physical injury to a Department employee, contract or private prison employee shall be liable for any costs incurred by the employee including medical costs and cleaning/replacing uniforms.

9.5     An inmate found guilty of escape shall be assessed restitution for costs resulting from damage or destruction of state property during the course of the escape. The inmate shall also be required to pay apprehension costs in accordance with Department Order #905, <u>Inmate Trust Account/Money System</u>.

9.6     An inmate pleading guilty to, or having been found guilty of, arson (05A), possession of a communication device (16A), tampering with or manipulating any locking device or door which allows for unauthorized access (19A), shall have the penalties specific to these violations imposed as listed in Attachment A. *[Revision – February 28, 2020]*

9.7     Suspensions of penalties may be imposed in 30 calendar day increments up to a maximum of 90 calendar days and may be granted with the condition the inmate not be found guilty of any other violations during the suspension period. The Disciplinary Coordinator shall explain the reasons for the suspension in writing.

    9.7.1     A Revocation of Suspended Sentence, Form 803-9, shall be completed by the Disciplinary Hearing Officer for previously imposed Class A and B penalty suspensions and by the Disciplinary Coordinator for previously imposed Class C penalty suspensions.

    9.7.2     A suspended penalty which is revoked shall be imposed and served consecutively to any other penalties being served.

    9.7.3     All penalties with the exception of Parole Class III may be suspended.

9.8     There shall be no stay or delay of any penalty imposed pending an appeal.

## 10.0  DISCIPLINARY REVIEW AND APPEAL

10.1     <u>Review</u> – Following a disciplinary hearing conducted by a Disciplinary Hearing Officer, the unit Deputy Warden shall administratively review the Inmate Disciplinary Report no later than two workdays. This includes all reports where an appeal has not been filed. The Deputy Warden's review shall include, but is not limited to the following:

10.1.1   Verification the Inmate Disciplinary Report was completed correctly and the inmate was appropriately charged. The Deputy Warden may return the case to the Disciplinary Hearing Officer for a re-hearing, if the titled charge needs to be modified to a different charge that does not contain elements of the current violation charged. The Deputy Warden may modify the titled charge to a lesser or equivalent charge without ordering a re-hearing. The lesser or equivalent charge shall have one or more of the elements of the titled charge.

10.1.2   Examination of all documents in the record and determining the inmate received due process, the hearing was conducted appropriately and there was adequacy of proof.

10.1.3   Make a determination that the penalties assessed are appropriate for the charge and are consistent with penalty guidelines in Attachment B. The Deputy Warden may revise the penalties downward to the lowest penalty listed for Class B violations.

10.1.4   Should the Deputy Warden return any case to the Disciplinary Hearing Officer, the reason for the return shall be provided in writing.

10.1.4.1   Dismissals by the Disciplinary Coordinator or Disciplinary Hearing Officer based on due process do not constitute not guilty findings. They are not considered dismissals on the merits of the case. The dismissal of the violation does not preclude the Deputy Warden from returning the case to the Disciplinary Hearing Officer for a re-hearing. The inmate is not precluded from raising due process concerns on appeal.

10.1.4.2   Cases dismissed by the Disciplinary Hearing Officer solely on the basis of adequacy of proof may not be returned for a re-hearing by the Deputy Warden unless new evidence is discovered. A summary of the new evidence to be considered shall be noted by the Deputy Warden on the Result of Disciplinary Hearing form or by an attached memo.

10.2   <u>Appeals</u> – Staff receiving an Appeal of Disciplinary Charge, Form 803-2, shall sign, date, note the time, and provide the receipt (pink copy) to the inmate. The form shall then be forwarded to the Disciplinary Coordinator for processing to the appropriate review authority.

10.2.1   Time frames for an appeal decision shall begin when the appellate authority or designee receives the appeal.

10.2.2   An appeal is not a re-hearing at which new evidence may be introduced. Staff conducting appeals shall only review the case record and file.

10.2.3   Appeals of Class B Violations, heard by the Disciplinary Coordinator and Class C Violations - Inmates may submit an appeal of a Class C violation within five calendar days of receiving the guilty finding by completing an Appeal of Disciplinary Charge form. The Appeal form shall be submitted to the Disciplinary Hearing Officer through the Disciplinary Coordinator.

10.2.3.1    The Disciplinary Hearing Officer shall:

    10.2.3.1.1    Verify the Inmate Disciplinary Report was completed correctly and the inmate was appropriately charged. The Disciplinary Hearing Officer may return the case to the Disciplinary Coordinator to have the charge modified to the more appropriate Class C charge based on conduct contained in the Inmate Disciplinary Report.

    10.2.3.1.2    Review all documents in the record and determine the inmate received due process and there was adequate proof.

    10.2.3.1.3    Determine the penalties assessed are appropriate for the violation and consistent with the guidelines provided in Attachment B.

10.2.3.2    The Disciplinary Hearing Officer may not increase penalties, but may revise the penalties downward to lowest penalty listed for Class B violations.

10.2.3.3    Should the Disciplinary Hearing Officer return any case to the Disciplinary Coordinator, the Disciplinary Hearing Officer shall provide the specific reason(s) for the return.

10.2.3.4    The Disciplinary Hearing Officer shall:

    10.2.3.4.1    Review the appeal and provide a written decision to the inmate within 20 calendar days, using the Decision of Appeal, Form 803-6.

    10.2.3.4.2    Address all issues raised in the appeal and shall review all documents in the record. The reasons for the decision shall be specified. The decision shall be signed and dated. The decision shall be returned to the inmate through the Disciplinary Coordinator.

10.2.3.5    For Class C violations or Class B violations heard by the Disciplinary Coordinator, the Disciplinary Hearing Officer's appeal decision is final and administrative remedies shall be considered exhausted with the Disciplinary Hearing Officer's decision.

10.2.4    First Level Appeals of Class A and B Violations – Inmates may submit an appeal of a Class A and B violation within five calendar days of receiving the guilty findings using an Appeal of Disciplinary Charge form or an Appeal form designated for that purpose. The Deputy Warden shall consider whether due process was afforded the inmate, there was adequate proof, and the penalties were assessed appropriately.

10.2.4.1    The Deputy Warden may:

    10.2.4.1.1    Return the case to the Disciplinary Hearing Officer for re-hearing if the original violation should be modified to a lesser or equivalent violation which does not contain elements of the original violation.

10.2.4.1.2   Modify the original violation to a lesser or equivalent violation without ordering a re-hearing, if the lesser or equivalent violation contains one or more of the elements of the original violation.

10.2.4.1.3   Approve the findings of the Disciplinary Hearing Officer.

10.2.4.1.4   Dismiss the case. The reason for the dismissal must be recorded.

10.2.4.1.5   Dismiss the case upon determining due process was not met. Dismissals based on due process violations do not constitute not guilty findings. They are not considered dismissals on the merits of the case. The dismissal of the violation does not preclude the Deputy Warden from returning the case to the Disciplinary Hearing Officer for a re-hearing.

10.2.4.2   A case dismissed on appeal at the Deputy Warden level based solely on adequacy of proof may not be returned for a re-hearing.

10.2.4.3   The Deputy Warden shall determine whether the penalties assessed are appropriate for the charge and consistent with other similar violations. The Deputy Warden may not increase penalties, but may revise the penalties downward to lowest penalty listed for Class B violations.

10.2.4.4   Should the Deputy Warden return any case to the Disciplinary Hearing Officer, the Deputy Warden shall provide the specific reason(s) for the return.

10.2.4.5   The Deputy Warden shall review the appeal and provide a written decision to the inmate within 20 calendar days, using the Decision of Appeal form. The reasons for the decision shall be specified. The decision shall be signed and dated. The decision shall be returned to the inmate through the Disciplinary Coordinator.

10.2.4.6   Cases returned for re-hearing do not require the assignment of a new Disciplinary Hearing Officer.

10.2.5   Second Level Appeals to the Director – An inmate who rejects the response may submit a second level appeal within five calendar days of receiving the Step One decision, using the Appeal of Disciplinary Charge form, through the Disciplinary Coordinator's Office, who shall forward the packet to the Legal Services at Mail Code 481. A second level appeal shall not include matters not previously raised by inmate in the first level appeal.

10.2.5.1   The Director or designee shall:

10.2.5.1.1   Consider the appeal's merits based upon whether the inmate received due process, there was adequacy of proof, and the penalties assessed were appropriate.

10.2.5.1.2   Verify the Inmate Disciplinary Report was completed correctly and the inmate was appropriately charged. The Director or designee may not change the titled charge to a greater charge, but may change the charge to a lesser or equivalent charge without ordering a re-hearing. The lesser or equivalent charge must have one or more of the elements of the titled charge.

10.2.5.2   The Director or designee may:

10.2.5.2.1   Approve the findings of the unit.

10.2.5.2.2   Dismiss the case on appeal.

10.2.5.2.3   Dismiss the case upon determining the inmate did not receive adequate due process. Dismissals based on due process violations do not constitute not guilty findings. They are not considered dismissals on the merits of the case. The Director or designee may return the case to the unit for a re-hearing.

10.2.5.3   A case dismissed on appeal at the Director's level based solely on adequacy of proof is not subject to re-hearing.

10.2.5.4   The Director or designee shall:

10.2.5.4.1   Determine the penalties assessed are appropriate for the charge and consistent with other similar violations. The Director or designee may not add or increase penalties, but may revise the penalties downward to whatever extent deemed appropriate.

10.2.5.4.2   Provide a written decision to the inmate within 30 calendar days. The decision shall be signed and dated. The decision shall be returned to the inmate through the Disciplinary Coordinator.

10.2.5.5   The decision of the Director or designee is final and all administrative remedies shall be considered exhausted with the Step Two Appeal. *[Revision – February 28, 2020]*

## 11.0  RESTITUTION REVIEW AND APPEAL *[Revision – February 28, 2020: Sections 11.1 thru 11.2.4.4]*

11.1   <u>Review</u> – No later than two workdays following a restitution hearing conducted by a Disciplinary Hearing Officer, the unit Deputy Warden shall administratively review the Notice of Restitution form. This includes all reports where an appeal has not been filed. The Deputy Warden's review shall include, but is not limited to, the following:

11.1.1   Verification of the Notice of Restitution form was completed correctly and that the amount of restitution was appropriately assessed.

11.1.2   Examination of all documents in the record and determining the inmate received due process, the hearing was conducted appropriately, and the burden of proof was met.

11.2   <u>Appeals</u> – Staff receiving an Appeal of Restitution Owed, Form 803-13, shall sign, date, note the time, and provide the receipt (pink copy) to the inmate. The form shall then be forwarded to the Disciplinary Coordinator for processing to the appropriate review authority.

11.2.1   Time frames for an appeal decision shall begin when the appellate authority or designee receives the appeal.

11.2.2   An appeal is not a re-hearing at which new evidence may be introduced. Staff conducting appeals shall only review the case record and file.

11.2.3   First Level Appeals for Appeals of all Restitution Hearings – Inmates may submit an appeal of a Restitution Hearing within five calendar days of receiving the guilty findings using an Appeal of Restitution Owed form or an Appeal form designated for that purpose.  The Deputy Warden shall consider whether due process was afforded the inmate; there was adequate proof, and whether the penalties were assessed appropriately.

11.2.3.1   The Deputy Warden may:

11.2.3.1.1   Modify the original amount of restitution owed, if reasonably supported by the evidence.

11.2.3.1.2   Approve the findings of the Disciplinary Hearing Officer

11.2.3.2   The Deputy Warden shall:

11.2.3.2.1   Determine whether the amount of restitution assessed is appropriate with the charge and consistent with similar restitution hearings.  The Deputy Warden may not increase the amount of restitution owed but may reduce the amount to the lowest amount reasonably supported by the evidence.

11.2.3.2.2   Review the appeal and provide a written decision to the inmate within 20 calendar days, using the Decision of Appeal form. The reasons for the decision shall be specified. The decision shall be signed and dated.  The decision shall be returned to the inmate through the Disciplinary Coordinator.

11.2.4   Second Level Appeals to the Director - An inmate who rejects the response may submit a second level appeal within five calendar days of receiving the Step One decision, using the Appeal of Restitution Owed form, through the Disciplinary Coordinator's Office, who shall forward the packet to Legal Services through the Disciplinary Appeals email address at disciplinaryappeals@azadc.gov. A second level appeal shall pertain to only the amount of restitution assessed, and its reasonableness.  Inmates may not appeal the results of the disciplinary hearing or the fact that restitution was assessed.

11.2.4.1   The Director or Designee shall:

11.2.4.1.1   Consider the appeal's merits based upon whether the inmate received due process, there was adequacy of proof, and that the restitution was assessed appropriately.

11.2.4.1.2   Verify the Notice of Restitution Hearing form was completed correctly and the inmate was assessed the appropriate amount of restitution. The Director or designee may not increase the amount of restitution owed but may reduce the amount to the lowest amount reasonably supported by the evidence.

11.2.4.2   The Director or Designee may:

11.2.4.2.1   Approve the findings of the Deputy Warden.

11.2.4.2.2   Reduce the amount of restitution owed consistent with the evidence contained in the record.

11.2.4.2.3   Return the case to the unit for re-hearing upon finding that the inmate did not receive adequate due process.

11.2.4.3   The Director or Designee shall:

11.2.4.3.1   Determine that the amount of restitution owed is appropriate and consistent with the results of similar restitution hearings.

11.2.4.3.2   Provide a written decision to the inmate within 30 calendar days. The decision shall be signed and dated. The decision shall be returned to the inmate through the Disciplinary Coordinator.

11.2.4.4   The decision of the Director or Designee is final and all administrative remedies shall be considered exhausted with the Step Two Appeal.

**12.0   VEXATIOUS GRIEVANCES AND VEXATIOUS GRIEVANT DESIGNATION** – An inmate found guilty of Disciplinary Violation 17A, Filing Of Vexatious Grievances, specified on Attachment A shall be designated as a vexatious grievant in accordance with this section. The grievances of inmates after receiving the Vexatious Grievant designation shall be in accordance with Department Order #802, Inmate Grievance Procedure.

12.1   Department employees, contractors or private prison employees shall:

12.1.1   Use the Vexatious Grievant definition in the Glossary of Terms and the 17A description to determine if an inmate is filing vexatious grievances.

12.1.2   If determining the inmate has abused the Inmate Grievance process by filing vexatious grievances, initiate an Inmate Disciplinary Report, citing 17A.

12.1.2.1   The filing of even one grievance meeting the Vexatious Grievant definition may subject the inmate to disciplinary action in accordance with this Department Order.

12.2   Inmates may appeal the 17A Disciplinary Violation in accordance with the appeal process outlined in this Department Order.

12.2.1   If the inmate fails to initiate the appeal, the Disciplinary Coordinator shall note the designation on the appropriate ACIS screen and provide a copy of the Result of Disciplinary Hearing form to the CO III and the CO IV Grievance Coordinator.

12.2.1.1   The unit CO IV Grievance Coordinator shall include the form in the inmate's Grievance Record maintained in accordance with this Department Order.

12.2.2   If the 17A Disciplinary Violation finding was upheld during the appeal process and the inmate has exhausted all administrative remedies, the Disciplinary Coordinator shall note the designation on the appropriate ACIS screen and provide a copy of the Decision of Appeal form to the CO III and the CO IV Grievance Coordinator.

12.2.2.1   The unit CO IV Grievance Coordinator shall include the form in the inmate's Grievance Record maintained in accordance with this Department Order.

12.3   Inmates found guilty of 17A shall receive penalties consistent with Class A violations, as outlined in Attachment B.

## 13.0  RECORDS AND REPORTS

13.1   All reports, documents and notifications of the disciplinary process, except for informal resolutions of disciplinary matters, shall be filed as indicated on the form distribution list.

13.2   If the case is dismissed or if the inmate is found not guilty, computer records are not purged, but no reference to the charge shall be placed in the inmate's Disciplinary File.

13.3   The Disciplinary Coordinator shall maintain a monthly statistics of the dispositions of all disciplinary charges.

# IMPLEMENTATION

The Division Director for Prison Operations shall ensure an appropriate level of training is conducted for all staff involved in the Inmate Disciplinary process.

# DEFINITIONS/GLOSSARY

Refer to the Glossary of Terms

# ATTACHMENTS *[Revision – February 28, 2020]*

Attachment A – Rule Violations
Attachment B – Penalties

## FORMS LIST *[Revision – February 28, 2020]*

803-1, Inmate Disciplinary Report
803-2, Appeal of Disciplinary Charge
803-3, Inmate Discipline - Witness Request/Statement/Refusal
803-4, Inmate Discipline - Hearing Waiver
803-5, Result of Disciplinary Hearing
803-6, Decision of Appeal
803-7, Assignment to Investigative Detention/Form No. 2A.
803-8, Inmate Discipline - Investigative Report
803-9, Revocation of Suspended Sentence
803-11, Notice of Restitution
803-12, Result of Restitution Hearing
803-13, Appeal of Restitution Owed

## AUTHORITY

A.R.S. §12-349, Unjustified Actions; Attorney Fees, Expenses and Double Damages; Exceptions; Definition
A.R.S. §13-2501, Definitions
A.R.S. §13-2505, Promoting Prison Contraband; Exceptions; X-Radiation; Classification
A.R.S. §31-201.01, Duties of the Director; Tort Actions; Medical Treatment Costs; State Immunity; Definitions
A.R.S. §31-342, Escape; Liability for Costs Incurred in Apprehension
A.R.S. §41-1604, Duties and Powers of Director
A.R.S. §41-1604.07, Earned Release Credits; Forfeiture; Restoration
A.R.S. §41-1604.10, Earned Release Credits; Forfeiture; Restoration; Applicability
A.R.S. §41-1606, Access to Prisoner Medical History Information

## ATTACHMENT A
### *[Revision – February 28, 2020]*

### RULE VIOLATIONS

| CLASS A VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 01A | Aggravated Assault (Inmate on Inmate) – Assault on another inmate<br><br>• Resulting in serious physical injury to another inmate, or<br>• Discharge, use of or threatening exhibition of a deadly weapon or dangerous instrument, or<br>• Resulting in temporary but substantial disfigurement, loss or impairment of any body organ or fracture of any body part.<br><br>Serious Physical Injury includes injury that creates reasonable risk of death or which causes serious and permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb. (i.e., broken bones, knife wounds, internal injuries, eye injuries, etc.**)** |
| 02A | Assault on Staff (that involved Serious Injury) – "Serious Injury" requires urgent and immediate medical treatment and restricts the staff's usual activity, medical treatment should be more extensive than mere first-aid, such as the application of bandages to wounds; it might include stitches, setting of broken bones, treatment of concussion, loss of consciousness, etc.<br><br>Exclude assaults that throwing liquids, blood, waste, chemicals, and/or urine, unless the throwing assault resulted in serious injury. |
| 03A | Participation in a Riot – A person in the custody of the Department who is a participant in a riot. |
| 04A | Assault (Sexual) – Intentionally or knowingly engaging in sexual intercourse or oral sexual contact with any person without the consent of such person. |
| 05A | Arson – Knowingly causing a fire or explosion, which results in physical damage to the prison facility. |
| 06A | Attempt to Commit a Class A Offense - Engaging in conduct with the intent to aid or commit a Class A offense under this classification. |
| 07A | Conspiracy to Commit a Class A Offense - To agree with one or more persons to engage in a Class A offense under this classification and to agree at least one of them shall engage in conduct constituting an overt act in furtherance of the offense. |
| 08A | Escape – Knowingly escaping, or attempting to escape, from the custody of an adult correctional facility including outside work crews, work camps, transport vehicles, and outside hospitals. |
| 09A | Kidnapping/Taking of a Hostage – Restraining another person with the intent to<br><br>• Hold for ransom, use as a shield, use as a hostage, or<br>• Inflict death, physical injury or a sexual offense on the victim, or,<br>• Place the victim or third person in reasonable apprehension of imminent physical injury. |

| CLASS A VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 10A | Manslaughter – Recklessly causing the death of another, or Intentionally aiding another to commit suicide. |
| 11A | Murder (1st Degree) – With pre-meditation intentionally causing the death of another. |
| 12A | Murder (2nd Degree) – Without pre-meditation intentionally causing the death of another. |
| 13A | Promoting Prison Contraband – Knowingly conveying contraband to any person confined in a correctional facility, or making, obtaining or possessing contraband while confined in a correctional facility or while being transported or moved. |
| 14A | Threatening or Intimidating (Gang Activity) – Threatening or intimidating by word or conduct, to cause physical injury to another or damage to the property of another in order to promote, further or assist in the interests of or cause, induce or solicit another person to participate in criminal gang activity, criminal syndicate or racketeering. |
| 15A | Possession of a Weapon – <br><br>• Knowingly making, obtaining or possessing a weapon while confined, transported or moved.<br>• Weapons include any device capable of physical injury; explosives. |
| 16A | Possession of Communication Device – Knowingly making, obtaining or possessing a communication device while confined, transported or moved. <br><br>Includes wireless communications devices, multimedia devices, any separate components which may aid in the use of wireless devices and/or multimedia storage devices (i.e., cell phones, charges, mobile chargers, cell phone batteries, and any other item which staff reasonable determines may aid in the use of wireless devices and/or multimedia storage devices), computers. |
| 17A | Filing of Vexatious Grievances – <br><br>• Repeated filing of grievances solely or primarily for the purpose of harassment.<br>• Grievances filed without substantial justification, defined as groundless or not made in good faith pursuant to A.R.S. §12-349(F).<br>• A pattern of making unreasonable, repetitive and excessive requests for information. |
| 19A | Tampering with or manipulating any locking device or door which allows for unauthorized access. |
| CLASS B VIOLATIONS | |
| **NO.** | **Rule Violation** |
| 01B | Aggravated Refusal of an Assignment – <br><br>• Refusal of any assignment for the purpose of obstructing racial integration.<br>• Refusal of any assignment. |

| CLASS B VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 02B | Assault on Inmate – <br><br> • Intentionally, knowingly or recklessly causing physical injury to another inmate, or <br> • Intentionally placing person in reasonable apprehension of imminent physical danger, or <br> • Knowingly touching another person with the intent to injure, insult or provoke such person. |
| 03B | Assault on Staff that Did Not Involve Serious Injury – <br><br> • To be considered a non-serious injury means the injury DID NOT require urgent and immediate medical treatment and did not restrict staff's usual activity. Medical treatment was basic first-aid, such as the application of bandages to wounds; it DID NOT include stitches, setting of broken bones, treatment of concussion, loss of consciousness, etc. (which would be considered "serious" injury). <br> • Includes knowingly touching staff with the intent to injure, insult or provoke such person, if it resulted in no injury or non-serious injury as described above. |
| 04B | Assault on Staff by Throwing Substances – Inmate throwing or spitting liquids, blood, waste, chemicals, urine, etc., which involved non-serious injury or no injury. <br><br> Note: If this violation resulted in serious injury, then the inmate should be charged with 02A, Assault on Staff that involved Serious Injury. |
| 05B | Attempt to Commit a Class B Violation – Engaging in conduct with the intent to aid or commit an offense under this classification. |
| 06B | Bribery – With corrupt intent, offers, or agrees to confer any benefit to an employee of the Department, private prisons or contractor with the intent to influence the employee's opinion, judgment or exercise of discretion in the performance of their duties. |
| 07B | Harassment - Displaying conduct directed at a specific person causing them to be seriously alarmed, annoyed or harassed. |
| 08B | Conspiracy to Commit a Class B Violation – To agree with one or more persons to engage in an offense under this classification and to agree at least one of them shall engage in conduct constituting an overt act in furtherance of that offense. |
| 09B | Criminal Damage – Destroying, damaging, defacing, tampering, or altering property of another, including, but not limited to, drawing or marking any building, walls, or surfaces with unauthorized messages, signs or symbols. |
| 10B | Disorderly Conduct – Engaging in violent or seriously disruptive behavior including unreasonable noise, abusive or offensive language, offensive gestures or protracted commotion that disrupts the orderly operation of the institution. |

| CLASS B VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 11B | Disrupting an Institution Count and/or Being Out of Place – Disrupting an institution count by purposely interfering with staff, or failing to be in an assigned bed or location for count; failing to be in an assigned area; being out of place in an unauthorized area. |
| 12B | Extortion – Knowingly obtaining or seeking to obtain property or services by means of a threat to do future physical injury, cause damage to property, or theft of property. |
| 13B | False Reporting – Stating a false, fraudulent or unfounded report or statement or to knowingly misrepresent a fact for the purpose of interfering with the orderly operation of the institution, which may be written or oral. |
| 14B | Forgery – Falsely making, altering, or completing any written document; possession of any false or forged document, identification material or written document. |
| 15B | Fraud – Pursuant to a scheme to defraud, knowingly obtaining any benefit by means of false or fraudulent pretenses. |
| 16B | Gambling – Possession of gambling devices, including dice, unauthorized cards, poker chips; participating as a player or organizer of any gambling activity; participating in or possession of materials related to betting and pools; benefiting from gambling activity; maintaining gambling related debts. |
| 17B | Homicide (Negligent) – Causing the death of another with criminal negligence. |
| 18B | Indecent Exposure – Intentional exposure of genitals, buttocks, pubic region or female breasts (areola or nipple); unauthorized nudity. |
| 19B | Influencing a Witness – Threaten a witness or offer, confer or agree to confer any benefit to a witness or a person believed to be a witness to influence testimony, or Knowingly induce a witness to unlawfully withhold any testimony or testify falsely. |
| 20B | Obstructing Staff – Obstructing, delaying, or otherwise preventing staff from conducting official duties; includes obstructing any investigation. |
| 21B | Possession of Drug Paraphernalia – Possession of any materials used to plant, grow, manufacture, produce, process, prepare, test, pack, conceal, inject, ingest, inhale, or otherwise introduce into the system any drugs, narcotics, stimulants and depressants, including unauthorized use of paint and/or glue. Paraphernalia includes, but is not limited to, syringes, needles, and any property altered to violate this rule. |
| 22B | Possession or Manufacture of Intoxicating Substance – Having possession or control over illegally brewed or fermented intoxicating beverages or the materials used to manufacture such substance. |

| CLASS B VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 23B | Promoting Prison Contraband – Knowingly conveying contraband to any person confined in a correctional facility.<br><br>This violation is for inmates who are not in possession of contraband, but who are found to have planned or otherwise promoted introduction of and/or conveyance of any unauthorized article. |
| 25B | Resisting or Disobeying a Verbal or Written Order – Failing to obey any verbal or written order and Department policy or directives issued by a staff member, to include the refusal of any housing assignment. |
| 26B | Rioting – Two or more persons who, acting together, recklessly use or threaten force or violence to disrupt the orderly operation of the institution. |
| 27B | Sexual Contact – Intentionally or knowingly engaging in sexual contact, which includes kissing, masturbation or any contact that can be construed as sexual in nature. |
| 28B | Stalking (Inmate to Inmate) – Intentionally or knowingly engaging in a course of conduct that would cause another to reasonably fear for their safety or death or the safety or death of an immediate family member.<br><br>Course of Conduct: Includes directing verbal, written or other threats express or implied, to a specific person on two or more occasions over a period time.<br><br>Immediate Family Member: Means a spouse, parent, child or sibling or other person regularly residing in the person's household for the past six months. |
| 29B | Stalking (Inmate to Staff) – Intentionally or knowingly engaging in a course of conduct that would cause another to reasonably fear for their safety or death or the safety or death of an immediate family member.<br><br>Course of Conduct:  Includes directing verbal, written or other threats express or implied, to a specific person on two or more occasions over a period time.<br><br>Immediate Family Member: Means a spouse, parent, child or sibling or other person regularly residing in the person's household for the past six months. |
| 30B | Tampering with a Public Record – Knowingly, with intent to defraud or deceive, make, complete, present, alter or insert a false entry on a written document which is a public record or a copy of a public record, with intent for it be taken as genuine. Record, register, file or offer for recordation, registration or filing with a government office or agency a writing which has been falsely made, altered, or contains a false entry, false statement or false information. |
| 31B | Tampering With Restraints – Removing or attempting to remove any restraint devices including handcuffs and leg irons without authorization, and/or the possession of any tool or device to alter or remove restraints, and/or compromise locking mechanisms, to include handcuff keys. |

| CLASS B VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 32B | Tampering with Security or Safety Devices – Damaging, tampering with, manipulating, or altering any security device (excluding locks) including, but not limited to, window bars, fencing, surveillance cameras, communication equipment, fire alarms, sprinklers, and fire suppression equipment. |
| 33B | Tattooing, Brands, Scarifications and Piercings – Altering one's own body or the body of another by branding, scarification, mutilation, tattoo or piercing; possession of any articles used in tattooing including unauthorized ink, tattoo guns, needles, and artwork and designs of tattoos.<br><br>Mutilate, brand, scarify or pierce means to mark the skin or other body with any mark that is placed by aid of instrument on or under the skin. |
| 34B | Theft of Property or Possession of Stolen Property – Stealing or obtaining by fraud the property of another; possession of stolen property or the property of another; controlling property with the intent to deprive the owner of the property. |
| 35B | Unlawful Assembly – Being present at an assembly of two or more persons who are engaged in, or who have the intent to, engage in riotous or unauthorized conduct. This would include engaging in or encouraging a group demonstration or work stoppage. |
| 36B | Violation of any Published Department or Institution Rule – Including Department Orders, Director's Instructions, and Institution Directives. |
| 37B | Possession of Drugs or Narcotics –<br><br>• Possession of, manufacture of, consumption of, sale of, trafficking in, any drug, narcotic, stimulant or depressant,<br>• Maintaining debts to another inmate(s) for the purchase or sale of drugs or narcotics;<br>• Possession or use of medication belonging to another.<br>• Providing another with medication. |
| 38B | Positive Test or Refusal of UA – Testing positive for, any drug, narcotic, stimulant, or depressant; refusing to submit to urinalysis testing. |
| 39B | Threatening or Intimidating – Threatening or intimidating by word or conduct to cause physical injury to another person or damage to property of another. Threats may occur by implication, word or conduct. |
| 40B | Fighting – Two or more inmates engaging in mutual combat to include fist fight, grappling, or any physical struggle. |
| CLASS C VIOLATIONS | |
| **NO.** | **Rule Violation** |
| 01C | Altering Identification – Knowingly changing physical appearance to avoid or attempt to avoid identification or conceal whereabouts. |

| CLASS C VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 02C | Bartering, Trading or Selling Goods or Services – Unauthorized exchange sale or trade of personal or state issue property items for the property or services of another. |
| 03C | Displaying Sexually Explicit Material – Display of any sexually explicit material on wall, furniture, personal or state property, where it is within plain view of staff or other inmates. |
| 04C | Disrespect to Staff – Using profanity, insulting, obscene or abusive language, in written correspondence or verbal communication to staff; addressing staff by inappropriate names or making inappropriate remarks. |
| 05C | Failure to Maintain Grooming Requirements – Violating Department grooming policy including hair regulations, bathing requirements and dress regulations. |
| 06C | Failure to Maintain Sanitation Requirements - Failing to maintain adequate housing/cell sanitation, or workplace sanitation; urinating or defecating in an unapproved area. |
| 07C | Horse Playing – Activity intended as enjoyment, recreation or amusement which may constitute as an unsafe act or threat to staff or inmate safety. |
| 08C | Littering – Leaving trash or debris on state property or disposing of trash or debris in unauthorized location or container. |
| 09C | Malingering – Feigning illness or injury to avoid work details or other institutional assignment. |
| 10C | Misuse of Mail – Violation of any published mail rule including, but not limited to, postage and unauthorized correspondence. |
| 11C | Misuse of Medication – Failing to take prescribed medication; loss of medication. |
| 12C | Misuse of Telephone – Making obscene or harassing phone calls; using the telephone to operate a business; telephoning members of the general public without approval; violation of any published telephone rule. |
| 13C | Possession of Minor or Nuisance Contraband – Possession of contraband items, including, but not limited to, authorized personal property in excess of authorized amounts, possession of altered clothing, possession of excess or altered linens, or any item which has been altered or for which approval has not been given. |
| 14C | Smoking or Use of Tobacco in an Unauthorized Area – Smoking or chewing tobacco inside of any state building or unauthorized area inside or outside of any correctional facility. |

| CLASS C VIOLATIONS | |
|---|---|
| **NO.** | **Rule Violation** |
| 16C | Unauthorized Access to the Internet – Unauthorized access to the internet through the use of a computer, computer system, network, communication service provider or remote computing service. |
| 17C | Unsafe Use of Machinery or Equipment – Failing to follow safety procedures; use of machinery/equipment for purpose other than its intended use; loss of control of machinery/equipment or exercise of poor judgment in use of machinery or equipment. |
| 18C | Violation of Visitation Rules – Violation of any Published Visiting Rule. |
| 19C | Hand Holding – Hand holding between inmates is prohibited. |

## ATTACHMENT B
### *[Revision – February 28, 2020]*

**PENALTIES**

| PENALTIES | CLASS A | CLASS B | CLASS C |
|---|---|---|---|
| TIME LOSS | 0 to All | 0 - 120 Calendar Days | No |
| PAROLE CLASS III | 90 - 180 Calendar Days | 0 - 90 Calendar Days | No |
| RESTITUTION | Yes | Yes | Yes |
| LOSS OF PRIVILEGE | 30 Calendar Days | 30 Calendar Days | 15 Calendar Days |
| EXTRA DUTY | 0 - 40 hours | 0 - 30 hours | 0 - 20 hours |
| FORFEIT CONTRABAND PROPERTY | Yes | Yes | Yes |

**PENALTIES FOR 05A, 16A, AND 19A VIOLATIONS**

| PENALTIES | FIRST OFFENSE | SECOND OFFENSE | THIRD OFFENSE |
|---|---|---|---|
| TIME LOSS | 0 to All | 0 to All | 0 to All |
| PAROLE CLASS III | 90 - 180 Calendar Days | 90 - 180 Calendar Days | 90 - 180 Calendar Days |
| RESTITUTION | Yes | Yes | Yes |
| LOSS OF PRIVILEGE | 180 Calendar Days | 360 Calendar Days | 720 Calendar Days |
| EXTRA DUTY | 0 - 40 hours | 0 - 40 hours | 0 - 40 hours |

| | | | |
|---|---|---|---|
| FORFEIT CONTRABAND PROPERTY | Yes | Yes | Yes |
| | | | |
| MONETARY FINE | $500 | $1,000 | $2,000 |
| | | | |

A finding of guilt for a Class A, B or C violation may result in inmate reclassification. Refer the inmate to the Classification Manual.

# Exhibit 15

501 KAR 6:020

| | KENTUCKY CORRECTIONS Policies and Procedures | Policy Number 15.6 | Total Pages 13 |
|---|---|---|---|
| | | Date Filed March 14, 2018 | Effective Date June 1, 2018 |

| Authority /References | Subject |
|---|---|
| KRS 196.035 and 197.020 Wolf v. McDonnell, 418 U.S. 539 (1974); Walpole v. Hill, 472 U.S. 445, (1985); Smith v. O'Dea, Ky. App., 938 S.W.2d 575 (1997); Haney v. Thomas, 406 S.W.3d 823 (Ky. 2013); Ramirez v. Nietzel, 424 S.W.3d 911 (Ky. 2014) ACA 4-4227, 4-4234, 4-4235, 4-4237 through 4-4248, CPP 3.23, 6.1, 15.2 | ADJUSTMENT PROCEDURES AND PROGRAMS |

I.    DEFINITIONS

"Adjustment Committee" means a committee appointed by the Warden of an institution empowered to hear, adjudicate and assess appropriate discipline for violations of rules or regulations.

"Detention" means placing an inmate in administrative segregation to ensure the safety and security of the institution, other inmates, staff or visitors pending appropriate administrative action.

"Disciplinary report" means a written report prepared by a staff member that alleges a violation of rules or regulations by an inmate.

"Fact finder" means the adjustment committee, adjustment officer, or unit hearing officer who hears and decides a disciplinary report.

"Major violation" means any violation of a Category III or higher rule contained in CPP 15.2.

"Minor violation" means any violation of a Category I or II rule contained in CPP 15.2.

"Unit Hearing Officer or Adjustment Officer" means a staff member appointed by the Warden or his designee, empowered to hear, adjudicate and assess appropriate penalties for violations of rules or regulations.

II.    POLICY and PROCEDURES

An alleged violation of rules and regulations shall be fairly processed.  An inmate's due process rights shall be fully protected.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 2 |

A.    General

    1.    The Adjustment Committee is an independent body that shall consist of at least three (3) members appointed by the Warden or his designee.

        a.    At least one (1) member shall be a program staff member.

        b.    At least one (1) member shall be a security staff member.

        c.    The chairperson shall be at the supervisory level.

        d.    It shall be within the discretion of the Warden to use an Adjustment Committee, Adjustment Officer, or both.

    2.    Adjustment Officer

        a.    The Warden or his designee may appoint an Adjustment Officer.

        b.    The Adjustment Officer shall be a staff member at the supervisory level.

    3.    Unit Hearing Officer

        a.    The Warden or his designee may appoint a Unit Hearing Officer.

        b.    The Unit Hearing Officer shall be a staff member at the supervisory level.

        c.    The Unit Hearing Officer shall hear a minor violation if the inmate waives his right to be heard by the Adjustment Committee or Adjustment Officer.

        d.    A waiver to be heard by the Unit Hearing Officer shall be signed by the inmate and attached to the disciplinary report.

    4.    Disqualification

        a.    A committee member, Adjustment Officer or Unit Hearing Officer shall be disqualified in every case in which he has:

            (1)    Filed the complaint or witnessed the incident;

            (2)    Participated as an investigating officer; or

            (3)    Been assigned the subsequent review of the decision.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 3 |

B.   Functions of the Adjustment Committee, Adjustment Officer and Unit Hearing Officer

    1.   The Adjustment Committee, Adjustment Officer or Unit Hearing Officer:

        a.   Shall hear and decide a disciplinary report based solely on information obtained in the hearing process, including staff reports, the statements of the inmate charged, and evidence derived from witnesses and documents.

        b.   Shall review all available video and consider as documentary evidence in making the final decision, if an inmate requests as an exhibit a video recording of the incident giving rise to the institutional charge.  Any video evidence considered shall remain confidential and shall not be shown or provided to the inmate without written approval from the warden.

        c.   Shall assess penalties for a violation of the rules or regulations as provided in CPP 15.2.

            (1)   If an amendment is made to another violation within the same category or to a lower category violation, and the committee is convinced the amendment will alter the inmate's defense to the amended violation, the committee or officer shall give the inmate the option of at least a twenty-four (24) hour continuance for preparation.

            (2)   However, nothing in this policy shall prohibit a charge from being amended to conform to the evidence presented. Amendment options before the committee or officer shall include amending to a lower category violation; amending the violation within the same category; or, dismissing the charged violation.

        d.   May send back for further investigation and more appropriate charge.

            (1)   Prior to the hearing, if it appears that the charge is not proper, the committee chairperson or officer may send the disciplinary report back to an investigator for a more appropriate charge, including a higher charge.

            (2)   If during the hearing, the fact finder determines that the charge is inappropriate, the report may be returned to the investigator for a more appropriate charge, including a

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 4 |

higher charge, but the committee or officer shall not participate in a subsequent re-hearing. This procedure shall be in addition to amending the charge within the same category or a lower category, whichever is more appropriate.

e.   May make recommendations as to referrals for prosecution.

f.   May suspend the discipline for a period not to exceed six (6) months.

   (1)   During the suspension period if the inmate has not been found to have an additional rule violation, the discipline shall be vacated, but the disciplinary report and related documents shall be retained in the inmate electronic record.

   (2)   Suspended discipline may be revoked during the period of suspension upon the finding of a Major Violation.

g.   If more than one (1) disciplinary violation is heard, or the inmate is currently serving or waiting to serve disciplinary segregation and the decision is made to assess segregation time, it shall be designated as to whether the time shall be served consecutively or concurrently.

2.   The institution shall preserve the audio tape recording of the hearing for a period of two (2) years from the date of the Warden's review.  If, through any mechanical malfunction, the recording is lost, nothing shall effect the ultimate decision of the committee or officer, pending the Warden's review.

3.   Function of Staff Counsel or Assigned Legal Aide

a.   The function of staff counsel, if one is assigned, or assigned legal aide shall be to aid the inmate in preparing and presenting a defense.

b.   Staff counsel or an assigned legal aide shall be appointed if it appears that an inmate is not capable of collecting and presenting evidence on his behalf.

c.   In all cases, the inmate and staff counsel or the assigned legal aide shall leave the hearing during the deliberation phase.

C.   Adjustment Procedures

1.   The Disciplinary Report

a.   The disciplinary report shall be clear, concise and contain only the facts the reporting employee has personally witnessed or otherwise verified, including a statement of how verification is made.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 5 |

     b.     A report shall be entered in the offender management system.

2.     The disciplinary report shall include:

     a.     a description of the incident;

     b.     the date and time of the incident;

     c.     the date and time the report is completed;

     d.     list of witnesses to the incident;

     e.     disposition of physical evidence;

     f.     any immediate action taken, including use of force, or unusual inmate behavior;

     g.     the reporting employee's signature.

3.     Upon completion of the disciplinary report it shall be reviewed by the shift supervisor or other designated supervisor .

4.     Investigation

     a.     Supervisor's Review

          (1)     Upon receipt of a disciplinary report, the shift supervisor or other designated supervisor shall begin the initial investigation by reviewing the report to determine that it contains all pertinent data.

          (2)     The supervisor's review shall begin within twenty-four (24) hours of the completion of the disciplinary report unless circumstances prevent it, which shall be documented on Part I of the report.

          (3)     Upon the completion of his review, the supervisor shall sign the report, indicating the date and time the review was begun.

          (4)     The supervisor shall not be prohibited from completing the review if he witnessed or investigated the incident.

     b.     Investigator's Review

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 6 |

(1)    Following the supervisor's review:

    (a)    The investigation shall be completed in a timely manner whenever possible, by an appropriate supervisor not involved in the incident. The investigator's review shall begin as soon as practicable after the completion of the supervisor's review.

    (b)    Nothing in this policy shall prohibit the supervisor's review and investigator's review from being conducted by the same supervisor unless the individual witnessed the incident.

(2)    During the course of the investigator's review, the investigator shall:

    (a)    Collect evidence, documents and statements.

    (b)    Interview witnesses, unless a witness is clearly irrelevant to the issues presented, and record a brief statement of what the witness reports.

    (c)    Assign the most appropriate violation.

    (d)    List witnesses the inmate indicates he wishes to have at the hearing.

    (e)    Advise the inmate of his right to consult with an assigned legal aide of his choice at least twenty-four (24) hours prior to the hearing and list the choice in the space provided. If the inmate does not provide his choice, he shall be informed that unless he does so within twenty-four (24) hours of receiving the report, he has waived his legal aide. If the inmate submits a choice after the investigation, he shall do so in writing to the chairperson of the adjustment committee or to the adjustment officer.

    (f)    Record on the form and advise the inmate of the anticipated date, time, and place of the hearing. An inmate transferred from another facility or a community service center shall be notified of the anticipated date and time of the hearing upon arrival to the institution provided the necessary documentation is received upon his arrival.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 7 |

(g)    Advise the inmate of his right to waive his presence at the hearing.

(h)    Nothing in this policy shall prohibit a disciplinary report from being re-investigated if deemed appropriate or necessary.

(3)    Upon completion of the investigation, the investigator shall:

(a)    Place the date and time the investigation is completed on the report and have the inmate sign the report.

(b)    Provide the inmate a copy of the disciplinary report. If the report is not provided, the report shall be given to the inmate not less than twenty-four (24) hours prior to the hearing unless notice is waived.

(c)    Provide the inmate with a copy of all documents to be used by the Adjustment Committee or Adjustment Officer unless the disclosure of those documents constitutes a threat to the safety and security of an inmate, the public, or the institution.  The inmate is not entitled to documents or other evidence that is not submitted for the hearing. Documents include reports, photographs, tests, tape recordings or other written materials to be used as evidence.

(i)    Excluding those documents prohibited from disclosure as noted above, documents not provided the inmate immediately following the completion of the investigation shall be provided not less than twenty-four (24) hours prior to the hearing.

(ii)    If the documents are not provided, a summary of the information contained in the documents shall be provided.  The summary may be included in and consist of the disciplinary report, which shall be noted on Part I of the disciplinary report.

(d)    If during the investigation, the investigator determines there is insufficient evidence to support a charge against the inmate, he shall dismiss the disciplinary report.  Further action shall not be taken

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 8 |

on the report other than placing it in a designated file for record-keeping purposes.

5.   Inmate Responsibilities

a.   If the inmate has not done so during the course of the investigation, the inmate shall:

(1)   Identify to the Adjustment Committee or Adjustment Officer what assigned legal aide or staff counsel, if one is available, he has chosen within twenty-four (24) hours of his receipt of the completed disciplinary report.

(2)   Identify to the Adjustment Committee or Adjustment Officer what witnesses he has selected not less than twenty-four (24) hours prior to the initial hearing.

b.   Failure to identify an assigned legal aide, staff counsel or witnesses in accordance with this procedure shall constitute a waiver.

c.   Special consideration may be given to an inmate transferred from another institution or community center to identify his legal aide or staff counsel no later than twenty-four (24) hours before the hearing.

D.   The Hearing

1.   The hearing shall be held within seven (7) working days after the completion of the investigation.  A delay beyond this time shall be justified and documented in writing on Part II of the report.  This time limitation is to benefit staff and does not constitute a time in which the inmate has a right to a hearing.

2.   At the hearing the inmate shall be entitled to the following:

a.   An opportunity to be present during all phases of the hearing, except the deliberations phase, unless he waives this right or his unruly or aberrant behavior does not permit attendance.  If an inmate is denied the right to be present during the hearing, the reason shall be stated in writing on Part II of the report.  If the inmate has a legal aide and is ejected from the hearing, the legal aide shall remain in the hearing unless his conduct dictates otherwise.  If an inmate is ejected from the hearing and does not have a legal aide, the assigned legal aide shall be directed to attend the remainder of the hearing, if one is available.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 9 |

b.  Assistance by a chosen assigned legal aide or appointed staff counsel who has been given an opportunity to confer with the inmate at least twenty-four (24) hours in advance of the hearing unless denied under provisions of C.4 b.2.f..  If a legal aide or staff counsel is denied, the reason for denial shall be stated in writing on Part II of the report.

c.  Consideration of those documents or a summary of those documents provided to the inmate at least twenty-four (24) hours before the hearing.  If the documents or the summary is not provided to the inmate, the reason for failure to make these documents available to him shall be made a part of the record of the proceedings.

d.  An opportunity to make a statement and to present documentary evidence.

e.  To be informed of his right to remain silent during the hearing but that his silence may be used against him in the hearing.

f.  An opportunity to call witnesses unless doing so is unduly hazardous to institutional safety and correctional goals; is irrelevant to the issues; is cumulative; or, is unnecessary.  If an inmate is not permitted to call a witness, justification shall be made in writing on Part II of the report or, if the reason is based on security information that should not be revealed to the inmate, in a confidential supplement to the findings.

g.  An opportunity to question the reporting employee and relevant witnesses, unless doing so will be unduly hazardous to institutional safety and correctional goals or a reason in f. above.

(1)  A speaker phone, telephone, or written statements may be used at the hearing.

(2)  If the Adjustment Committee or Officer denies the inmate the opportunity to call and confront the reporting employee or witness, justification shall be made in writing on Part II of the report.

h.  May plead guilty.

3.  The fact finder shall prepare a written record that includes:

a.  The date and time of the hearing and reasons for a continuance, if any.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 10 |

b.    A list of witnesses called or denied.

c.    A summary of the evidence upon which the decision and discipline is based.

d.    The decision shall have specific findings of fact. The findings may be based on facts contained in the employee's report. The findings shall explicitly state which facts were determined to be true if facts in the employee's report are relied upon.

e.    If an inmate requests documentary evidence regarding the incident giving rise to the disciplinary report, the fact finder shall:

    (1)    State in the written findings that:

        (a)    The documentary evidence was reviewed and considered in arriving at the final decision; and

        (b)    If any documentary evidence is not made available to the inmate for security reasons, a confidential supplement to the written findings exists regarding the documentary evidence.

    (2)    Prepare a supplemental, confidential finding describing any documentary evidence that is not made available to the inmate for security reasons that was considered in arriving at the final decision and retain a copy of the documentary evidence described in the supplemental confidential finding.

f.    If information from a confidential informant is relied upon in the findings of fact, the decision shall reflect evidence of the reliability of the information from the confidential informant or identify corroborating factors. The evidence may include:

    (1)    An oath or affirmation of the investigating officer as to the truth of his report containing confidential information with his appearance before the decision maker;

    (2)    Corroborating testimony;

    (3)    A statement on the record by the chairman or adjustment officer that he had firsthand knowledge of the sources of information and considered them reliable on the basis of their past record of reliability;

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 11 |

        (4)      In camera review of material documenting the investigator's assessment of the credibility of the confidential informant;

        (5)      Multiple unnamed informants whose stories are consistent and corroborate one another; or

        (6)      Other factors that provide some corroboration of the information provided by the confidential informant.

g.      The discipline imposed and the reason for imposing it.

h.      A statement as to whether the discipline may be stayed during an appeal and the reason.

i.      The signature of all committee members or adjustment officer.

j.      The signature of the inmate and assigned legal aide or staff counsel.

4.      If the Adjustment Committee or Adjustment Officer finds the inmate did not commit the violation or if an appeal results in the reversal, the disciplinary report shall be removed from the inmate's file.

5.      After resolution of the adjustment proceeding, an adjustment officer or committee may refer the incident to the internal affairs officer for investigation pursuant to CPP 3.23.

E.      Disposition of Disciplinary Report Forms

1.      At the end of the hearing and completion of the form, a copy shall be given to the inmate .

2.      The disciplinary report shall be routed to the Warden or his designee for his signature after action by the Adjustment Committee or Adjustment Officer.

3.      If the inmate is scheduled to meet the Parole Board or has been recommended for parole and receives a disciplinary report, the institutional Offender Information office shall forward a copy of the disciplinary report to the Central Office Placement Office. The Placement Office shall forward the disciplinary report to the Parole Board.

F.      Appeals

1.      An inmate may appeal in writing the adjustment decision to the Warden.

2.      The appeal shall be directed to the Warden of the institution whose Adjustment Committee or Adjustment Officer heard the case.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 12 |

3.   The inmate has fifteen (15) days after the decision to detail the reasons for the appeal.  If an inmate is due to be released by minimum expiration of his sentence within the fifteen (15) days, the Warden's review shall occur prior to the inmate being released and the inmate may still file his appeal for further review by the Warden.

4.   The Warden or his designee shall respond in writing within thirty (30) days of the Adjustment Committee or Adjustment Officer decision.

5.   The Warden or his designee may, during his review:

a.   order a rehearing because of procedural errors, substantive errors, or other appropriate reasons;

b.   reduce the penalty;

c.   suspend the penalty for a period of time not to exceed six (6) months;

d.   void the disciplinary report in its entirety;

e.   reduce the category of violations;

f.   remand the charge for a new hearing before a different Adjustment Committee or Adjustment Officer.

6.   The Warden or his designee shall not during his administrative or appellate review:

a.   order a rehearing if the action has been dismissed;

b.   raise the discipline;

c.   order a rehearing on a new charge that carries a higher penalty.

7.   An appeal may not be taken beyond the Warden.

8.   The Warden has the authority at any time to order the disciplinary report to be vacated upon justification and may allow it to be re-investigated or re-heard, or both.  This is at the Warden's level only and shall not create any new time for additional appeals.  The Warden may also dismiss the report.

G.   Access to Disciplinary Hearing Tapes

1.   Access to tapes shall be arranged pursuant to CPP 6.1.

| Policy Number | Effective Date | Page |
|---|---|---|
| 15.6 | June 1, 2018 | 13 |

2.     Copies of that portion of the tape, pertaining to the particular hearing concerned, less the deliberation phase, shall be provided, if the audiotape is available.

3.     A reasonable fee consistent with the cost of providing the materials involved may be charged.

H.     Informal Resolution of Minor Violations

1.     If an inmate waives his right to a hearing by the Adjustment Committee or Adjustment Officer on a Minor Violation:

  a.     The disciplinary report shall be heard by a Unit Hearing Officer.

  b.     At the unit hearing the inmate shall be entitled to make a statement and present documentary evidence.

2.     At the conclusion of the unit hearing, the Unit Hearing Officer shall complete the disciplinary report and indicate:

  a.     The finding;

  b.     The discipline imposed;

  c.     The date and time of hearing;

  d.     The signature of the Unit Hearing Officer.

3.     A copy of the completed report shall be given to the inmate.

4.     Decisions of a Unit Hearing Officer shall not be subject to appeal.

5.     The completed disciplinary report shall be forwarded to the Unit Director, Warden or appropriate designee for an administrative review.

\* CPP 15.6                                                        ATTACHMENT I


KENTUCKY DEPARTMENT OF CORRECTIONS
W A I V E R

NAME _____NUMBER _____
having been accused of a rule violation as follows:

Corrections Policy 15.2 - Rule Violations and Penalties


_____

_____

_____

_____


I agree to have the alleged violation heard by a Unit Hearing Officer for an informal resolution of
the accusation.  In making this agreement, I waive the following:

      1.      The right to have my case heard by the full institutional Adjustment Committee or
              Adjustment Officer.

      2.      The right to be represented by inmate or assigned legal aide.

      3.      The right to call witnesses on my behalf and to confront and cross-examine my
              accuser and hostile witnesses.

      4.      The right to appeal the decision of the Unit Hearing Officer.


I acknowledge that if my case is heard by the Unit Hearing Officer and if I am found guilty, neither
the disciplinary report nor any documents relating to the disciplinary action shall be placed in my
institutional or Central Office folder unless it is used as evidence to enhance punishment as
contained in CPP 15.2.  However, the unit or institution may keep a separate record for statistical,
counseling or other purposes not related to my permanent records.


_____
Inmate Signature                                       Date


_____
Signature of Witness or                                 Date
Investigating Officer

# Exhibit 16

# Inmate Information Handbook
# Federal Bureau of Prisons

## <u>Introduction</u>

The purpose of this handbook is to provide newly committed inmates and others interested in the Federal Bureau of Prisons with general information regarding the Bureau, its programs, institutions, and the rules and regulations they will encounter during confinement.   It is not a specific guide to the detailed policies of the Bureau or all procedures in effect at each Bureau location.

The U.S. Medical Center for Federal Prisoners (USMCFP) is temporarily your community.   What kind of community it is depends on you!   If you and every other inmate take the proper attitude toward each other and the staff, you can be assured you will not encounter any problems while you are here.

Conduct yourself in such a way as to not interfere with the rights of other inmates.   If you have a proper regard for the staff, you will be able to work with them instead of against them.   Also, remember the accepted rules of good conduct, good manners, common sense (in other words, the Golden Rule), do not possess any contraband, and you will not have any difficulty.

This booklet contains general information procedures and regulations developed to help you become better acquainted with the operations of your new community.   Many of the most frequently asked questions have been answered in this booklet.   If you are concerned about something not covered, you are urged to ask any staff member.   If they cannot help you, they will refer you to someone who can.

You are encouraged to read this booklet and **YOU ARE RESPONSIBLE FOR KNOWING THE CONTENTS**.   Keep it in your possession while you are here so you can refer to it later when a question might arise.

1

Revised November 2012

# TABLE OF CONTENTS

| | |
|---|---|
| Introduction | Page 1 |
| Admission Procedures and Housing | Page 3 |
| Medical Center Buildings | Page 3 |
| Smoking Policy | Page 4 |
| Intake, Classification, and the Unit Team Orientation | Page 4 |
| Daily Inmate Life | Page 6 |
| Quarter's Rules | Page 9 |
| Commissary | Page 11 |
| Inmate Telephone System | Page 12 |
| Dress Code | Page 13 |
| Security Procedures | Page 14 |
| Programs and Services | Page 16 |
| Seclusion, Restraints, Suicide Prevention | Page 20 |
| Self-Improvement Programs | Page 20 |
| Medical Services | Page 22 |
| Contact with the Community and Public | Page 26 |
| Access to Legal Services | Page 32 |
| Problem/Grievance Resolution | Page 35 |
| Disciplinary Procedures | Page 36 |
| Release | Page 38 |
| Residential Re-Entry Programs | Page 42 |
| Conclusion | Page 44 |
| | |
| **APPENDIX** | |
| | |
| Inmate Rights and Responsibilities | Page 45 |
| Health Care Rights and Responsibilities | Page 47 |
| Inmate Fact Sheet-Preventive Health Program | Page 52 |
| Sexual Assault | Page 53 |
| Visiting Room Rules and Regulations | Page 55 |
| Advance Directive and Durable Power of Attorney | Page 59 |
| Health Care Directives | Page 62 |
| Prohibited Acts and Disciplinary Severity Scale | Page 66 |
| Inmate Personal Property List | Page 82 |
| Foreign Consulates/Embassies | Page 85 |
| Sexually Transmitted Disease Information | Page 87 |
| Staff Directory | Page 95 |
| Photo of Proper Cell Sanitation | Page 96 |

Revised November 2012

## Admission Procedures and Housing

All new arrivals will be processed through the Receiving and Discharge Unit.

Your personal property will be inventoried and you are required to ship unauthorized items home, as there are no facilities for storage here.

Official identification procedures will be completed and you will be issued appropriate institution clothing along with health and comfort supplies.

A determination of appropriate housing will be based on your individual type of admission and needs.  If you are assigned to the Work Cadre Unit, you will be assigned to either 8-Building or 9-Building.  If you are assigned to the Hospital Unit, you will be admitted to an appropriate floor in 1-Building (3/4), 2-Building, or 3-Building upon arrival.  The Residential Drug Abuse Program (RDAP) inmates are generally assigned to the first floor of 2-Building.

Each hospital unit is responsible for discussing the different phases of the Medical Center with patients on their wards.  This is done by your Unit Officer, Counselor, Case Manager, Doctor, Unit Manager, Nurse, and others who make up the treatment team.

If you are assigned to the Mental Health Unit, you will be admitted to an observation ward.  The length of stay there will depend upon the completion of an evaluation of your mental condition.  Generally, your stay in this ward will be short, provided you meet the requirements to move from a closed ward to a ward with more privileges and responsibilities.  All residents in the Mental Health Unit are permitted to work and engage in institution activities when they are on open wards.

## Medical Center Buildings

1-Building:  Consists of Administrative Offices, X-Ray Unit, and Visiting Room on the first floor; Medical Clinics and other administrative offices on the second floor; Acute Surgical Nursing Unit on the third floor; and the Surgical area and housing unit on the fourth floor.  The basement area houses the Medical Laboratory, Central Supply, Pharmacy, Receiving and Discharge, and the Mail Room.

2-Building:  Consists of Administrative Detention and Segregation Unit 2-1 East, with Medical and Surgical patients housed on Ward 2-2.  The basement consists of the Records Office, Segregation Property Room, Nurse Educator, Lieutenant=s and Captain=s Office, and Legal Office.   Ward 2-1 West houses RDAP inmates.

3-Building:  The first floor consists of a Chronic Medical Unit and the second floor consists of a Long Term Care Unit and a Respiratory Therapy Unit.  The Medical/Surgical Unit Team Offices are on Ward 3-1.  The Dental Clinic, Medical Records, Physical Therapy, and Dialysis are located in the basement of 3-Building.

4-Building:  Consists of Main Kitchen and Dining Room area on the 1st floor.  On the basement level are the Officer's Dining Room, Safety and Environmental Health Offices, and Commissary Sales.  The second floor consists of Vocational, Recreational, and Rehabilitative Therapy offices in addition to the Substance Abuse Program office.   The third floor is a classroom for AA/NA programs.

5-Building:  Central Storeroom

6-Building:  Laundry

7-Building:  Powerhouse

8-Building:  On the basement level are the Barber Shop, Prosthetics/Orthopedic Shop, Clothing Room, Education Department, Learning Center, and Testing Room.   Work Cadre Unit inmates are housed on the first and second

3

Revised November 2012

floors as well as Work Cadre Unit Management staff offices.

9-Building:   This building houses Work Cadre inmates

10-Building:   10A and 10 South (A/B/C/D) presently make up the Mental Health Treatment Unit which receives psychiatric patients transferred from the Mental Health Evaluation Unit.   Short term and long term patients are housed on the Mental Health Treatment Unit and intensive programs are provided.   10-North (E/F/G) makes up the Mental Health Evaluation Unit, which includes both unsentenced Forensic cases and sentenced Diagnostic and Observation cases.

11-Building:   Facilities Management Maintenance Shops.

14-Building:   Recreation Center, pool tables, Art & Craft Shop, Leisure Library, Law Library, Weight Lifting area, Card Tables, etc.

19-Building:   Gym, Chapel, Music Room, Religious Services, and Chaplain's Offices.

Corridors:   The basement areas of all buildings are connected by tunnel corridors.   It is prohibited to litter, smoke, run, loiter or create excessive noise in the corridors.   **All inmates in the corridor must have their shirt tails tucked in when moving during regular business hours.**   When congregating for approved functions (commissary, call-outs, etc.,) a single line against the wall along the passageway adjacent to the entry door must be formed to prevent blocking the corridor.

**Location of the Medical Center**

The Medical Center for Federal Prisoners is located in the southwest part of the city of Springfield, Missouri, at the corner of Kansas Expressway and Sunshine Street (1900 West Sunshine Street).

**Mailing Address**

The inmate mailing address of the Medical Center for Federal Prisoners is:

Inmate Name & Register Number
U.S. Medical Center for Federal Prisoners
P.O. Box 4000
Springfield, Missouri   65801-4000

<u>**Smoking Policy**</u>

USMCFP Springfield is a tobacco-free institution.   All inmate smoking, tobacco use, and possession of tobacco products is prohibited.   Tobacco products are considered contraband and will confiscated and the inmate possessing the tobacco materials will be subject to disciplinary action.

<u>**Intake, Classification, and the Unit Team Orientation**</u>

All inmates will be initially assigned to the Admission and Orientation (A&O) Program following arrival.   Inmates are immediately provided with a copy of the institution's rules and regulations, which includes information on inmate rights and responsibilities.   While in A&O status, you will learn about the facility's programs, services, policies, and procedures. The centralized Admission and Orientation Program is a mandatory program and your attendance is required. *You are to wear appropriate khaki shirt and pants during the A&O Program.*   During the centralized Admission and Orientation Program, you will hear lectures from staff regarding their programs and departments.   Inmates are given a social and medical screening at the time of arrival, and will also be screened by Mental Health staff.   At the end of the A&O Program, Work Cadre Unit inmates will be assigned to a job and a permanent housing unit.

4

Revised November 2012
**Classification Teams (Unit Teams)**

All Bureau of Prisons' institutions are organized into a unit management system.   A unit is a self-contained inmate living area that includes both housing sections and office areas for unit staff.   Each unit is staffed by a unit team directly responsible for their assigned inmates.   The unit staff offices are readily accessible to each inmate.   The unit staff typically includes the Unit Manager, one or more Case Managers, one or more Unit Counselor, and one or more Unit Secretary.   When available, the Staff Psychologist, Education Advisor, and Unit Officer will sit on a Unit Team and be considered as unit staff.

Generally, the issues of concern or interest should initially be discussed with members of the unit team.   Unit team members are available to assist in many areas, including parole matters, release planning, personal and family problems, counseling, and assistance in setting and attaining goals while in prison.   Ordinarily, a member of the unit staff will be at the institution weekdays from 7:30 a.m. to 9:00 p.m. and during the day on weekends and holidays.   The unit team members usually schedule their working hours in such a manner one of them will be available at times when inmates are not working.

**General Functions of Unit Staff**

**Unit Manager:**   The Unit Manager is the administrative head of the unit and oversees all unit programs and activities.   The Unit Manager is a department head and has a close working relationship with other departments and personnel.   The Unit Manager is the "Chairperson" of the team, reviews all team decisions, and usually chairs the Unit Discipline Committee.

**Case Manager:**   The Case Manager is responsible for all casework services and prepares classification material, progress reports, release plans, correspondence and other materials relating to the inmate's commitment.   The Case Manager is responsible to the Unit Manager on a daily basis and the Case Management Coordinator (a specialist department head who provides technical assistance to unit staff in case management affairs) with reference to specialized training and duties.   The Case Manager serves as a liaison between the inmate, the administration, the community and is a frequent member of the Unit Discipline Committee.

**Unit Counselor:**   The Unit Counselor provides counseling and guidance for the inmates of the unit in areas of institutional adjustment, personal difficulties, and plans for the future.   The Counselor plays a leading role in all segments of unit programs and is a voting member of the unit team.   The Unit Counselor will visit inmate work assignments regularly and is the individual to approach for daily problems.   As a senior staff member, the Counselor provides leadership and guidance to other staff in the unit.   They hold major responsibilities for the security, safety, and sanitation of the unit.   The Unit Counselor is a frequent member of the Unit Discipline Committee.

**Unit Secretary:**   The Unit Secretary performs clerical and administrative duties and may sit as a member of the unit team.

**Unit Officer**:   The Unit Officers have direct responsibility for the day-to-day supervision of inmates and the enforcement of rules and regulations.   They have safety, security, and sanitation responsibilities in the unit.   Unit officers are in regular contact with inmates in units and are encouraged to establish professional relationships with them as long as such interaction does not interfere with their primary duties.   Unit officers are jointly supervised by the Unit Manager and the Captain during his/her unit assignment.

**Unit Nurses:**   In the Hospital and Mental Health Units, nurses are considered members of the unit team.   In addition to medical duties, they are also responsible for enforcing unit rules and regulations, and may be asked to provide input into unit team decisions.

5

Revised November 2012

**Communications**

The unit bulletin board displays items of interest to inmates, including staff schedules, call-outs, and unit rules. Unit Managers may utilize Town Hall meetings at his/her discretion to foster improved communications. Inmates may not post anything on the unit bulletin boards without staff permission.

**Program Reviews**

Individual inmate initial classifications will be held within 28 days or 21 days for pretrial inmates. Program reviews will be held every 90 to 180 days. These are held by the unit teams to review programs, work assignments, transfers, custody, institutional adjustment, etc. An inmate may request in writing via a Inmate Request to Staff Member form or Cop-Out to his Unit Manager an advanced Program Review in circumstances such as the dismissal of a detainer, a reduction in sentence, etc.

**Town Hall Meetings**

These meetings are held to make announcements and to discuss changes in the policy and procedures of the unit. Inmates are encouraged to ask pertinent questions of the staff and any guest speakers who are present. These questions should pertain to the unit as a whole, rather than personal questions or problems.

Personal problems will be resolved by unit staff members during the regular working hours which are posted in each unit. An "Open Door" policy is in effect during posted open house hours. General interest topics will be addressed by staff and posted on bulletin boards in the Unit.

**Team Participation in Parole Hearings**

The Unit Team prepares Progress Reports and compiles other information in the inmate's central file for presentation to the United States Parole Commission or other appropriate agencies.

The vast majority of inmates arriving in the institution are serving non-paroleable , new law sentences.

The inmate's Case Manager will ordinarily be present at the inmate's parole hearing. The Case Manager's function at the hearing is to assist the parole examiners and is not a staff representative for the inmate.

**Consulates and Embassies**

For inmates who are not citizens of the United States, a directory of all consulates and embassies is included in this handbook. Should an inmate need assistance in contacting the consulate or embassy or *to vote in an election in their native country*, a request in writing should be directed to the unit team.

**Daily Inmate Life**

**Safety and Sanitation**

It is the inmate's responsibility to check his living area immediately after being assigned there, and to report all damage to the Correctional Officer, Case Manager, or Unit Counselor. An inmate may be held financially liable for any damage to his or her personal living area and is responsible for any contraband found within his living area.

Each inmate is responsible for making his bed in accordance with regulations by 7:30 a.m. weekdays and by 10:00 a.m. on weekends and holidays. Work days off during the week are considered to be the inmate's Saturday and Sunday. Each inmate is also responsible for sweeping and mopping his personal living area to ensure it is clean and sanitary. Lockers must be neatly arranged inside and out and all shelving must be neat and clean.

6

Revised November 2012

Toothpaste, toothbrushes, combs, razors, and soap are issued by the institution and are available in the housing units.   Inmates may purchase name brand items through the commissary.   Linen and other laundry, in most instances, may be exchanged once a week.

In addition to daily safety and sanitation rounds by the Unit Officers, sanitation inspections are conducted, randomly, each month by a member of the Safety and Environmental Health Department.

**Personal Property Limits**

Inmate property may be limited for sanitation and security reasons.   Excess property can constitute a fire hazard or impair staff searches of the living area. The following list is not all-inclusive, but it is a guide to the kind of items an inmate may be authorized.

**Storage Space**

Each inmate has been provided a wall locker in which to maintain his personal property.   Many of these lockers are the small, half-size lockers lacking adequate space to contain all of an inmate's property.

*   One (1) towel and face cloth may be placed at the end of the inmate's bed rail.   The towel will be spread fully open with the face cloth centered on top of it.

*   Shoes may be kept outside of the locker, however, they must be neatly aligned under the bed.   **Only the amount of shoes authorized by policy are allowed to be maintained in your area**. If the bunk is a double bunk and the long side is against the wall, the bottom bunk will display their shoes on the right side, top bunk on the left. (as seen when standing in front of the bed).

* Thermos (water coolers) may be kept under the bed outside of clear view.   However, in accordance with the Institutional Supplement, an inmate may only have one (1) cooler / thermos.

* Dirty laundry bags (one per inmate) will be hung on the side of the locker.   If the locker has no hooks, the laundry bag will be placed on the floor beside the locker.    Do not hang laundry bags from the end of the bed.

* Inmates who currently have coats, may hang their coat over the laundry bag on the side of the locker.   If there are no hooks on the locker, then the coat may be hung from the far end of the bed!   No other items may be hung from the bed.

* Personal fans (when not in use) may be placed under the bed (out of clear view).   At no time will fans be strung from various parts of the bed, locker, or wall.   When in use, fans must be placed on the locker, desk, or floor.

* Inmates owning a small alarm clock, may place this clock on the desk or locker.

* Two (2) pictures (in a frame) may be placed on the desk or locker.

* Art work such as pictures too large to placed in the lockers, may be maintained in such a way as to not be noticeable in clear view.   This will be managed and approved on a case-by-case basis by the unit team and the unit officer.

* Beds will be made with the white blanket completely covering the sheets. Edges of sheets and blanket will be tucked neatly and tight on all sides. The pillow will be placed neatly at the head of the bed. One (1) extra sheet and one (1) extra white blanket may be displayed on the foot of the bed. They must be folded neatly with the blanket on top of the sheet.

* Floors will be swept and mopped, and trash cans emptied every day.

Revised November 2012

*   Windows and window ledges will be clean.

*   Walls and lockers will not have any items posted or hanging on them.   Calendars, posters, pictures, etc., will be placed/hung inside the lockers.

**ALL** other items of personal property will be kept in the locker or discarded.   Should such items be discovered not properly stored, they will be confiscated, and an incident report will be issued.

**Clothing Issue**

Soon after your arrival, you will be issued the following clothing and linens:

- Four(4) pairs of khaki pants
- Four(4) khaki button up shirts
- Four(4) T-Shirts
- Four(4) pairs of socks
- Four(4) pairs of undershorts
- One(1) belt and buckle
- One(1) pair of shoes
- Four(4) bath towels
- Four(4) wash cloths
- Two(2) blankets
- Two(2) sheets
- One(1) pillow case
- One(1) pillow
- One(1)laundry bag

If your job assignment requires you to wear white clothing, the Clothing Room staff will issue you an adequate supply. Ask your work supervisor when you are to go to the Clothing Room to be issued your clean whites.

Khakis may be worn on the yard, but DO NOT wear whites for recreational activities.

**Clothing**

Soon after your arrival, you will be issued four (4) sets of khakis, four (4) pair of undershorts, and one (1) pair of shoes from the Clothing Room.

If your job assignment requires you to wear white clothing, the Clothing Room will issue you an adequate supply. Ask your work supervisor when you are to go to the Clothing Room for clean whites.

Clean socks, T-Shirts, towels, and wash cloths are obtained in the Clothing Room.   Khakis may be worn on the yard, but DO NOT wear whites for recreational activities.

**Special Purchase Items:**   Special Purchase items will be authorized only to the point where they can be contained in the storage area provided for personal property.

**Legal Materials:**   Inmates are allowed to maintain legal materials and supplies (not to exceed a locally established volume limit) in their locker.

**Pre-sentence Investigation Reports, (PSRs) more commonly referred to as PSIs and Statement of Reasons (SORs):**    In 2002, the Bureau of Prisons revised Program Statement 1351.05, Release of Information, to prohibit inmates from possessing PSRs and SORs.   This revision was undertaken due to sensitive information contained in these reports that could be used by other inmates for unauthorized purposes.   These reports are not available to the public and not being deemed public information, therefore, were excluded from inmate possession.

8

Revised November 2012

**Public available documents, such as trial transcripts and court docket sheets:**   These documents contain sensitive information similar to the PSR and SOR.   However, since they are publicly available documents, we will not prohibit inmates from possessing them.   We are cautioning inmates to secure these documents in their lockers. Inmates are further cautioned not to disclose the contents of these documents to other inmates.

We are also taking this opportunity to caution inmates to secure documents which may contain personal information concerning family members, personal acquaintances, or which may contain other personal information concerning health, financial, or legal matters.

We retain the right and obligation to control or limit inmate possession of documents which, after individual review, have been determined to pose a threat to the security and good order of the institution.

**Hobby Craft Materials:**   Hobby shop raw materials in the units, if permitted at all, are limited to those which can be stored in the inmate's locker, provided they do not pose a safety, sanitation, or security hazard.   Disposal of completed hobby craft work must be arranged **immediately** after completion with the Recreation Department staff. Crafts like oil painting, leather craft, ceramics, and copper work are not permitted in the housing unit.

**Food Storage:**   Food items left open create a health hazard.   These items must be properly sealed at all times. Empty jars may not be used as drinking containers or containers for items other than what they were meant for and are to be thrown away.

**Letters, Books, Photographs, Newspapers, and Magazines:**   An inmate will be limited to FIVE (5) magazines or newspapers that can be stored in the locker or shelf provided in each room.   Ordinarily, picture frames sold in the Commissary may be displayed.      No more than one (1) photograph album is allowed and twenty-five (25) single photos.   Two (2) photographs may be placed in a clear plastic picture frame without glass no larger than 8" x 10" and displayed on top of a locker or desk.   Inmates may not retain Polaroid photographs.   Nothing is to be tacked, stapled, or taped to any surface except to bulletin boards.

**Sports and Musical Equipment:**   A limited amount of personal sports equipment may be maintained in the unit (i.e. tennis racket, tennis balls, handball, handball gloves).   Certain musical instruments, not to exceed a reasonable dollar value, may be authorized to be stored in living quarters by the Unit Manager.   Only one (1) approved instrument is authorized.

**Radios and Watches:**   An inmate may not own or possess more than one (1) approved radio and/or watch at any one time.   Proof of ownership, through appropriate property receipts, will be required.   Watches must have a declared value of $100 or less and cannot have stones or be electronically sophisticated.   Radios with a tape recorder and/or tape player are not authorized.   Radios and watches will be inscribed with the inmate's registration number.   Only walkman-type radios are permitted and headphones are required at all times.   While an inmate is in holdover status he may not purchase, own, or possess a radio or watch.   Inmates may not give any items of value to other inmates e.g., radios, MP3 players, watches, sneakers, and Commissary items.

**Jewelry:**   Inmates may have a plain wedding band without stones and, with prior approval, a religious medal without stones.   For additional clarification refer, to the current Institution Supplement on Personal Property - Inmate.   An authorized property set with limits is attached to the back of the handbook

**Quarter's Rules**

In order to minimize maintenance costs, permit uniform inspection and search procedures, and maintain orderly congregate living, institutions impose reasonable regulations on inmate conduct and furnishings in housing units. To that end, Unit Officers inspect rooms daily and publish individual ratings of appearance.

Pictures cannot be posted on walls or sides of lockers.

Revised November 2012

All beds are to be made daily in the prescribed manner.   If a cell or room is not acceptable, corrective action including incident reports can be expected.

Unit meal rotation is ordinarily based on the monthly sanitation ratings of each unit; in such a system, the unit with the highest safety and sanitation rating is called first and the unit with the lowest rating is called last.

Room or cell doors must be closed when inmates are not in them and doors may not be propped open.

Each inmate is responsible for the cleaning of his room.   Additionally, inmates are assigned cleaning tasks in the unit during off hours.

Orderlies work 40-hour weeks and are responsible for the unit sanitation.   However, everyone is responsible for cleaning up after themselves.   Trash and wastebaskets are to be emptied prior to 8:00 a.m. each day.

Beds will be made each weekday by an established time.   Hospital beds are to be maintained in the LOW position at all times.   On weekends and holidays, beds will be made whenever inmates are awake or gone from the room, cubicle, or cell room.   At no time, will a mattress be removed from a bunk and placed on the floor.

Showers are available every day, but inmates may not be in the shower during an official count.   Showers are closed from 10:30 pm until 6:00 am.     Food Service workers and others with irregular work shifts may shower during the day as long as showering does not interfere with the cleaning of the unit.

Inter-room/cell visitation is normally allowed in the units.   A limited number of inmates, including the cell occupant(s), are allowed in a room.   During room visitation, the door will remain open.

**Removal of food from the dining room is not permitted.**

Steel-toed safety shoes must be worn to work, including orderly positions in the unit, and in other designated foot hazard areas.   This does not include personal tennis shoes or loafers.   Only shoes or sneakers may be worn in the dining room area.

Unit televisions may be viewed during established off-duty hours, which generally coincide with the hours rooms or cells are unlocked in the unit.   During normal working hours, the television may be viewed at the discretion of the Unit Officer.

Inmates may play cards and approved games during established hours providing noise is not excessive.

**Wake-up**

General wake-up for all inmates is typically 6:00 a.m.   The unit is called to breakfast by the Lieutenant on the basis of a rotating schedule.   The Unit Officer will announce breakfast, when notified, and the Control Center will announce meal times.   Inmates are given a reasonable amount of time to leave the unit if they desire breakfast. Inmates are responsible for being at work on time.   Late sleepers, who are unable to maintain rooms or arrive at work on time, are subject to disciplinary action.

**Bulletin Boards**

Each ward has a bulletin board for the convenience of the inmates.   Inmates are responsible to check the bulletin board daily for call-outs and other information that might be of benefit.

Information pertaining to institution activities along with a daily change sheet and call-outs are posted.   Also, notices of additions to policies pertaining to inmate management will be placed on the bulletin board.   Inmates may not post material on the unit bulletin board without staff authorization.

10

Revised November 2012
**Mail Call**

Mail Call is held on each ward immediately after the 4:00 p.m. count Monday through Friday.  Mail will only be given to the inmate to whom it is addressed.

**Clothing and Linen Exchange**

The Clothing Room operates on a Monday through Friday schedule. Inmates may exchange clothing any of these days from 6:45am until closed movement after the morning meal. All clothing exchanges are done on a one for one basis with a maximum of two of each clothing item a day. Example: two (2) dirty towels for two (2) clean towels. Clean khakis, whites, undershorts, coats, belts, shoe strings, towels and wash cloths are obtained from the Clothing Room. Do not throw dirty clothes in the cart on the unit. They must be brought to the clothing room for exchange. Washers, dryers, and laundry detergent are available for inmate use on housing unit at no charge. These are to launder personal clothing only.

Clean bed linens (sheets, pillowcases, and blankets) are exchanged one time per week, Thursday mornings from 6:45am until closed movement after the morning meal. Shoes can be exchanged Monday through Friday during open movements beginning at 8:00am.

Clothing issues, repairs, alterations, and exchange of unserviceable clothing will be handled by Clothing Room staff only. Clothing which has been altered by an inmate could result in disciplinary action.

**Commissary**

Commissary sales and copy card vending operations are available to allow an inmate the opportunity to purchase goods one time per week. Some special items are only offered at specific times. All Commissary sales are final after the sales transaction is complete and the inmate leaves the sales unit. Use of copy card services are at user risk.   All out of stock and discontinued items will be posted inside the commissary sales unit. It is the inmate's responsibility to check for out of stock or discontinued items and make any adjustments to the Commissary order form before turning it in to the Commissary.   There will be **NO** substitutions or changes after Commissary order form has been turned in to the Commissary. A Commissary bulletin board is located outside of the sales unit; check the board for posted information and news. The Commissary will stock as much variety as possible. A periodic survey for inmate input will be conducted to allow an opportunity to suggest product changes. An inmate identification card (inmate ID card) matching your personal appearance for positive identification is required for all Commissary transactions, including *ward delivery sales*, unless you are not allowed to have your ID card in your possession. It is your responsibility to maintain a current photo on your ID card, and you are to carry your inmate ID card at all times.

Inmates may be in possession of only one ID card. Possession of multiple ID cards or possession of another inmate's ID card is prohibited and disciplinary action may be taken. Inmates who lose their ID card will be charged a replacement fee of $5.00. Cards lost by staff will be replaced free of charge. Contact your unit team for assistance. Commissary sales and open house are conducted as per posted schedules. Commissary order forms are updated on a monthly basis and are available from your ward officer. Inmates can check Commissary account status and past transactions using the TRULINCS system.

Spending limitation is the maximum amount an inmate is allowed to spend per month on sales items with the exception of Inmate Telephone System credits, postage stamps, and over the counter medications. The spending limitation at this institution is equal to the national established maximum which is currently $320.00 per month. The spending limitation re-validation date is determined by the fifth digit of the inmate registration number. See the Commissary bulletin board for details.

Policy limits the quantity of the sale for various items per Commissary visit, such as the equivalent of one (1) book of postage stamps per sale. Inmates may have no more than the equivalent of 40 1st Class stamps in their possession at any time.   The Commissary may limit quantities for inventory control or security reasons. More details are

11

Revised November 2012
available on Commissary bulletin boards, in policy statements, or supplements located in the Law Library.

**INMATES ARE NOT ALLOWED TO GIVE OR SELL ANY COMMISSARY ITEMS TO ANOTHER INMATE.**

### Inmate Telephone System

You will be issued a personal phone access code (PAC) number for use of the telephone.    A fee will be charged for a replacement PAC due to negligence and for requests of written telephone account statements.   Open house hours are normally 11:15 a.m. to Noon, Monday through Friday at the 4 Bldg. The Trust Fund Services office located across from Commissary.

Purchases for Inmate Telephone System (ITS) credits are made via the telephone twice daily Monday thru Friday from 4:30 p.m. - 11:30 p.m. or during phone operational times on week-ends and holidays.   All phone numbers are managed through the TRULINCS system, each inmate is allowed 30 active phone numbers.   The maximum length of each call will be limited to 15 minutes and the interval waiting period between calls shall be 30 minutes. Inmates with no access to TRULINCS must complete a Contact Form provided by a Unit Team member to add phone numbers and contact information.   This form must be hand delivered by staff to the Trust Fund Services department, where the information will be entered into TRULINCS within 3 working days.

You are limited to a maximum of 300 minutes of calling time per validation cycle.   Ordinarily, you will be allowed an extra 100 minutes in the months of November & December.   Inmates who exhaust their 300 minute limitation or are without funds may be provided a recorded ITS telephone call for good cause at the inmate's expense or in certain circumstances a collect call.   Unit staff will prepare a memo for the Warden's signature granting approval beyond the 300-minute limitation and/or approval for a collect call on the ITS system.

Telephone hours will begin at 6:00 a.m. and end no later than 11:30 p.m.   From 11:30 p.m. to 6:00 a.m., inmate telephone access will not be available.   All inmate telephones, with the exception of one per housing unit, will not be operational 7:30 a.m. – 10:30 a.m. and 12:30 p.m. – 4:00 p.m. (excluding weekends and holidays).   With the exception of properly placed calls to an attorney, **inmate telephone calls are monitored**.   A notice regarding monitoring shall be posted by each permanent inmate telephone.

Violation of any of the rules regarding telephone use may result in institutional disciplinary action and restriction of telephone privileges.   Third party calling is prohibited.   Any unlawful inmate telephone use will be referred to law enforcement authorities.   You may also be restricted if you have a PSF for Serious Telephone Abuse.

**For more details see Policy Statement (available in Law Library)**

### TRULINCS

Inmate will need his PAC - PIN - Register #, to log on to TRULINCS.   When logging into system all numbers must be entered within 30 seconds.   (Three attempts then account will be locked and Trust Fund Dept staff will need to unlock the account.)

### FREE SERVICES
Account transactions:    account balance, commissary balance, spending limits, phone statement, etc...
Send Funds:   withdrawal screen, contact address.   Form must be printed, signed, presented to unit counselor for approval.   Money is 'captured' the moment inmate completes the transaction.   21 days to process or money is returned to account and transaction voided.
Contact List:   Phone #, addresses, email addresses
Staff Messaging: (future option)
Local Documents: (dept may post information for inmates)

12

Revised November 2012

**PAY SERVICES**
Public Messaging: (.05 /TRUunit/minute)     Emailed party must accept your request for email privileges thru CORRLINKS.com.   *NOTE:   You are not automatically approved to use e-mail, you may have a restriction due to your conviction….see your unit team.*
Law Library:   cost connected to printing services only.
Print service :(.15 page) printers are located in the Recreation Law Library.
Labels:   not required at MCFP Springfield at this time.

Location of workstations:   44 units total.
4 ea.  (8-1, 8-2, 9)
3 ea. (2-2)
2  ea. (3-1, 3-2, 1-3, 10-C, Camp).   Camp has printer/label.   10-C has printer.
1 ea. (2-1W, 2-1E, 10-A, 10-B, 10-D, 10-E, 10-F, 10-G, 10-H, 1-4) 10-A has printer
8 ea.  Recreation Center LAW LIBRARY (1 printer, 1 label printer)
1 ea.  4 building Trust Fund office.   **OPEN HOUSE 11:15 to NOON daily.**

## Dress Code

1.    Khaki pants and shirts are the authorized attire for inmates.   T-shirts may be worn with khaki pants; however, either type of shirt must be worn tucked in.   Shirts and t-shirts must be tucked in during normal business hours (Monday-Friday, 7:30 a.m.- 4:00 p.m.)   Either type of shirt may be worn untucked during non-business hours (weekdays prior to 7:30 a.m. and after 4:00 p.m., holidays, and weekends) in all areas of the institution, including the dining room.

2.    Green fatigue pants and shirts will be returned to the Laundry Department and exchanged for khaki clothing.   Green fatigue clothing will be considered contraband and confiscated.

3.    Khaki pants and tucked in shirts/t-shirts are the authorized dress for the dining room.   However, sweat pants and sweat shirts may be worn in the dining room on weekends, holidays, and non-business hours, and do not have to be tucked in.

4.    Leisure clothing such as sweat pants, sweat shirts and shorts may be worn on the recreation yard.

5.    Food Service Workers will be issued white uniforms to be worn when working in Food Service.   These uniforms may be worn while reporting to and from the job site or while reporting to a call-out during duty hours, but cannot be worn anywhere else inside the institution or on the recreation yard.

6.    Housekeeping and Nursing Attendants will be allowed to wear white shirts only while on their assigned details.

7.    Inmates on medical wards (3-1 and 3-2 only) who are not able to leave their unit due to medical reasons will be allowed to wear pajamas while they are on the ward.   They will dress in the required khaki attire if they leave the unit.

8.    Inmates may wear clothing other than khakis (non-revealing) while in their assigned housing unit.

9.    If hats are worn, the bill must face forward.   Do-Rag head wear may only be worn while in assigned housing units.

10.   Dialysis patients may wear sweat pants and sweat shirts while receiving their treatments and while reporting to and from Dialysis.

13

Revised November 2012

11.     Khakis will be worn during all visits in the Visiting Room.   Bus shoes will be provided to wear for the duration of the visit.

12.     Short pants may <u>not</u> be worn in the dining room Monday-Friday during the noon meal.   However, shorts may be worn in the dining room during the breakfast and evening meals as these meals are served prior to and after normal business hours.

<div align="center">

**Security Procedures**

</div>

<u>**Counts**</u>

One of the first realities of institutional life is count.   It is necessary for the staff to count inmates on a regular basis.   During a count, inmates are expected to stay quietly in their cells until the count is announced as clear.   Inmates are expected to be standing at bedside during official counts held during non-bedtime hours.

While count procedures vary from one unit to another, when a count is announced, each inmate must return to his or her room or bed area and remain there quietly until it is announced the count is clear.   Official counts will ordinarily be taken at about 12:00 Midnight, 3:00 a.m., 5:00 a.m., 4:00 p.m., and 9:00 p.m.   Other counts may occur during the day and evening.   **The 4:00 p.m. and 9:00 p.m. counts are a standing count.   In addition, the 10:00 a.m. count on weekends and holidays is a standing count.** You must stand by the side of your bed during these counts.

The staff will take disciplinary action if an inmate is not in his assigned area during a count or fails to stand for count.   Disciplinary action will also be taken against inmates for leaving an assigned area before the count is cleared.   The inmate must actually be seen at all counts even if the inmate must be awakened.

**Lock-down**

The time when each unit is secured for the night is contained in the unit rules.   These rules are posted on the information boards located in each housing unit.

**Call-Outs**

Call-outs are a scheduling system for appointments (which include hospital, dental, educational, team meetings, and other activities) and are posted each day on the unit bulletin boards after 4:00 p.m., on the day preceding the appointment.   It is the inmate's responsibility to check for appointments on a daily basis; all scheduled appointments are to be kept.   If a Work Cadre inmate is in need of routine medical attention, he will have to go to the 1-2 Clinic that morning between the hours of 7:00 a.m. and 7:30 a.m. and sign up for sick call.   Illnesses of an emergency nature are exceptions and are handled accordingly.

When a staff member wishes to see an inmate, the inmate is put on the call-out list ahead of time.   The list appears each day on the ward bulletin board.   Your detail supervisor or ward officer will release you at the appropriate time.   You have ten (10) minutes to make your call-out.   Refusal to appear for your call-out will result in an incident report.

If you must see a staff member on short notice, your ward officer or detail supervisor may call ahead to see if the person is available and can see you.

If a staff member finds it necessary to see an inmate on short notice, the staff member will call the inmate's ward officer or detail supervisor to see if the inmate can be sent to him at that time.

No one may just go to see a staff member without authorization as the person might not be available at that time.   Leaving your area without permission is considered "out-of-bounds", subjecting you to disciplinary action.   **Inmates are not authorized to enter any housing units other than the one he is assigned to.**

14

Revised November 2012
**Controlled Movement**

Movement throughout the institution is regulated by a procedure called Acontrolled movement≅.   The purpose of controlled movement is to ensure movement of inmates is safe and orderly.

Movement through the corridors will be done only during the ten minute interval.   You are only allowed to move to recreation and other places within this time period.   You must stay at the location until the next <u>controlled</u> movement before you can return to your unit.   **These movements will be announced over the P.A. system.**

During workday evening hours, the first controlled movement usually will begin at the end of the evening meal.   This means, after supper, inmates may travel to any unrestricted area of the institution during these hourly moves.   On Saturdays, Sundays, and holidays, the first controlled movement will begin at the end of the morning meal.

Work call is at 7:45 a.m. and is announced via the P.A. system.   You must stay on your detail until 3:45 p.m., with the exception of work passes which are issued from your detail supervisor.   We function under the controlled system and all inmates going to and coming from a call-out will do so during open movement.   Unauthorized movement during closed quarters/movement will result in an incident report and/or placement in Administrative Detention.

**Closed Quarters**

When the control center office announces closed quarters, inmates are to immediately clear the hallways and remain out of the hallways until control center staff announce closed quarters are over.

**Contraband**
Contraband is defined as any item or thing not authorized or issued by the institution, received through approved channels, or purchased through the commissary.   All staff are alert to the subject of contraband and make an effort to locate, confiscate, and report contraband in the institution.   Any item in an inmate's personal possession must be authorized and a record of the receipt of the item should be kept in the inmate's possession.   Inmates may not purchase radios or any other items from another inmate; items purchased in this manner are considered contraband and will be confiscated.   An altered item, even if an approved or issued item, is considered contraband.   Altering or damaging government property is a violation of institutional rules and the cost of the damage will be levied against the violator.

**Shakedowns**

Any staff member may search an inmate's room to retrieve contraband or stolen property.   It is not necessary for the inmate to be present when his or her room is searched.   The property and living area will be left in the same general condition as it was found.   These searches will be unannounced and random.   Your person is subject to search at any time by any staff member.   Refusal to be searched will result in disciplinary action and immediate placement in the Special Housing Unit.

**Drug Surveillance**

The Bureau operates a drug surveillance program to include mandatory random testing, as well as testing of suspect categories of inmates.   If a staff member orders an inmate to provide a urine sample for this program and the inmate does not do so he will be subject to an incident report.

**Alcohol Detection**

A program for alcohol surveillance is in effect at this institution.   Random samples of the inmate population are tested on a routine basis, as well as those suspected of alcohol use.   A positive test will result in an incident report.   Refusal to submit to the test will also result in an incident report.

Revised November 2012

**Fire Prevention and Control**

Fire prevention and safety are everyone's responsibility.   Inmates are required to report fires to the nearest staff member so property and lives can be protected.   Piles of trash or rags in closed areas, combustible material, items hanging from fixtures, bed lamps, electrical receptacles, or other hazards cannot and will not be tolerated.   The reporting of any unsafe or unhealthy conditions to the detail supervisor is encouraged.   Regular fire inspections are made in each institution by qualified professionals.

## Programs and Services

**Job Assignments**

All Work Cadre Unit inmates are expected to maintain a regular job assignment.   Inmate job assignments are controlled through the inmate performance pay committee which provides a monetary reward for actual work performed.   Federal Prison Industries (UNICOR) has a separate pay scale and this institution does not have UNICOR.   The Work Cadre Unit team is responsible for job changes and ensuring institution work quotas are met.

Institutional maintenance jobs are usually the first assignment an inmate receives.   These might include work in Food Service, as a unit orderly, or in a maintenance shop.   While an inmate is in A&O status, he may be assigned tasks in the unit and on special details.   Inmates will not be paid for work while in A&O status.   There are pay restrictions for failing to meet court ordered financial obligations, drug education requirements, and educational attainment (GED).

**FOOD SERVICE**

Nutritionally adequate meals are provided to inmates in the mainline cafeteria or in housing areas receiving satellite tray service.   Menu options include regular, Heart Healthy, and non-flesh diet programs.   Certified meals are provided when approved by Religious Services per policy.

The Heart Healthy menu option is developed to be lower in sodium, fat, cholesterol and sugar.   This option is available through mainline or on satellite trays upon request.   Also, wheat bread and fruit instead of dessert will be provided along with the regular menu upon request at mainline or on satellite trays.

**MEAL TIMES**

Week Days

6:00 – 7:00 AM
11:00 – 12:00 NOON
After 4:00 PM count is cleared

Weekends and Holidays

6:00 – 7:00 AM
After 10:00 AM count is cleared
After 4:00 PM count is cleared

***No food may be taken out of the inmate dining room.***

**Education Programs**

Many education opportunities are available to you through the Education Department.   The Education staff urges you to expand your horizons while you are here and participate in the variety of programs offered.   By policy, with minor exceptions, all Federal prisoners who do not have a High School Diploma or a GED must enroll for up to 240 hours in a GED program.   All promotions in institution assignments beyond the entry level pay grade are contingent on successful completion of the GED program.

Revised November 2012

**Education Facilities:**

**Learning Center - 8 Building Basement**
A.      GED and English as a Second Language (ESL) Classrooms
B.      Education Open House 11:30 a.m. through 12:30 p.m., Monday through Friday
C.      Adult Continuing Education classes

**Education Annex - 8 Building Basement**

A.      Parenting Program
B.      Release Preparation Program classes
C.      Adult Continuing Education classes

**4-2 Education (Located one floor above Food Service)**

A.      Vocational Training
B.      Apprenticeship/Related Trades Program
C.      Adult Continuing Education self-paced classes
D.      College Correspondence Course Test Proctoring
E.      Test Area for the Pre-GED and ABLE/ SABE/ TABE/ GED Testing area

Inmates assigned to the Work Cadre Unit will receive more detailed information in the Education A&O Program. Inmates housed in the Hospital and Mental Health Units should visit the Education Open House for more details.

Note: Inmates in the Hospital and Mental Health Units will need permission from their Unit Team to participate in Education programs to avoid conflicts with prescribed medical regimens.

**Recreation Programs**

A wide variety of recreation programs are offered year around for the enjoyment of the inmate population.   You will find both active and sedentary activities available to meet your needs.

**Recreation Facilities:**

**Recreation Center**

1.      Fitness Equipment
2.      Pool Tables and Games
3.      Craft Shop (Crafts include leather, ceramics, painting, and stick art)
4.      Law Library    **Copy machine available
5.      Leisure/Reading Library **Daily newspapers and monthly magazines
6.      Listening Library **Video and audio tapes, DVDs, and CDs

**Main Yard**

1.      Softball Field
2.      Horseshoes
3.      Bocce Ball Courts
4.      Volleyball Court
5.      Basketball Court
6.      Pavilion and Tables
7.      Walking Track
8.      Soccer
9.      Handball
10.     Flag Football

17

Revised November 2012

**Gymnasium** (Restricted schedule during summer months)

●       Music Room
●       Limited Fitness Equipment
●       Intramural Activities

Intramural activities are offered in many areas for participation. Sign up information will be posted on the unit bulletin boards.

Movies are shown over a closed circuit TV channel.   Consult bulletin boards for dates and times.

**Selective Service**

Inmates between the ages of 18 and 25 may register for Selective Service through the Correctional Systems Department.   Registration is on a voluntary basis.

**Counseling Activities**

There are many alternatives for inmates who have personal problems and desire to correct them.   These options include self-image groups and other voluntary groups.   In addition, institutions have professional staff as resources who are trained in the various social science fields.   Inmate participation in these activities will be encouraged upon the staff's assessment of inmate needs, but participation in such activities is voluntary.   The staff of each unit are available for informal counseling sessions and they conduct formal group counseling activities.

**Psychology and Psychiatry Programs**

Each unit has a psychologist assigned or available to it to provide counseling and other mental health services to unit inmates.   In some cases, the psychologist has an office in the unit where he or she can be easily reached by the inmates, help develop ongoing counseling programs, or for personal crisis intervention.   The normal hours of operation for the Psychology and Psychiatry Programs are 7:30 am till 4:00 pm, Monday through Friday.

A clinician is on-call for emergency situations 24 hours a day, seven days a week.

Bureau institutions also have a staff or contract psychiatrist who is a medical doctor and who is also available by appointment for individual problem-solving.

Psychology Department offers the following Drug Abuse Programs:

1. Drug Education
      Purpose: To educate participants about the abuse of alcohol and other drugs and to motivate participants to pursue more intensive drug abuse programming.
      This program is mandatory if the inmate meets the following criteria:
          1. Evidence in the Pre-Sentence Investigation that alcohol or other drugs use contributed to the commission of the instant offense;
          2. Alcohol or other drug use was a reason for violation of parole or probation for which the inmate is now incarcerated; or
          3. The innate was recommended for drug programming by the court.
      This program is also offered to any inmate who voluntarily wishes to participate.

2. Non-residential Drug Abuse Program
      Purpose: To provide ongoing group counseling for inmates in a non-residential format.   who either do not qualify or do not desire to participate in the Residential Drug Abuse Program.
      This program is also appropriate for inmates who have very short sentences and for those who have already completed a residential program and desire aftercare counseling prior to their release.   These

18

Revised November 2012

services include individual or group counseling, completion of the Non-Residential Drug Abuse
Interactive Workbook, and Alcoholics and Narcotics Anonymous Meetings.

3. <u>Residential Drug Abuse Program</u>

Purpose: To provide comprehensive residential drug abuse treatment for inmates with moderate to severe
histories of substance abuse. This 500 hour program is based on the biopsychosocial model of treatment.
This model stresses that individuals assume personal responsibility for changing their behavior.   While an

Individual may not have control over a variety of biological, psychological and social/environmental
factors which contributed to the development of substance abuse, the individual is responsible for the
choices he or she makes.
USMCFP-SPG offers this program to inmates who meet the qualifications and have a medical housing
need.   Non-medical inmates who qualify for this program are transferred to other institutions.

If you are interesting in Drug Abuse Programming at USMCFP-SPG you may contact the following staff located on
2-1W:

Dr. Engel, DAPC
Ms. Kinkade, DTS
Ms. Cox, DTS
Ms. Frost, DTS

**Escorted Trips**

Bedside visits and funeral trips may be authorized for inmates in lower custody categories when an immediate
family member is seriously ill, in critical condition, or has passed away.   Depending on the inmate's custody
classification, one or two Correctional Officers will escort the inmate.   All expenses will be paid by the inmate,
except for the first eight hours of each day the employee is on duty.   The funds for the proposed trip must be in the
inmate=s account prior to the trip.   There are occasions when an escorted trip is not approved, even when all
policy-required conditions have been met, based on a determination the perceived danger to Bureau of Prisons staff
during the proposed visit is too great or the security concerns about the individual inmate outweigh the need to visit
the community.

**Furloughs**

A furlough is an authorized absence from an institution by an inmate who is not under escort of a staff member, a U.
S. Marshal, other federal or state agent.   Furloughs are a privilege, not a right, and are only granted when clearly in
the public interest and for the furtherance of a legitimate correctional goal.   Ordinarily, inmates with a history of
violence and inmates with enhancements in their presentence reports for weapon=s possession will not be granted
social furloughs.

The Bureau has a social furlough program for inmates who have community custody and are two (2) years or less
from their anticipated release date and are medically able to participate in the furlough.   An inmate who meets the
eligibility requirements may submit an application for furlough to unit staff for approval.   Furloughs may be
granted for the following reasons:

Visits to dying immediate family (parent, wife, child, brother, sister)
Attendance at funeral of immediate family (same as above)
Obtaining medical services not otherwise available.
Contacting prospective employers.
Establishing or re-establishing family or community ties.
Participating in selected educational, social, civic, religious, and recreational activities
which will facilitate release transition.
Any other significant reason consistent with the public interest.

19

Revised November 2012

In all units, pre-release programming will be emphasized and staff will address concerns about readjustment, current community issues, and educational/vocational opportunities.   For eligible inmates, furloughs and Residential Re-Entry Center (halfway house) placements will be considered.

**Policies Regarding the Use of Restraints, Seclusion, and Suicide Prevention**

On rare occasions, it becomes necessary to restrict an inmate's freedom for his safety or the safety of others.   When staff determine an inmate demonstrates a clear and immediate danger to himself or to others, he may be placed in seclusion, on suicide watch, or in restraints, depending on how dangerous his behavior is.   Examples that might lead to seclusion, suicide watch, or restraints would be statements by the inmate he intends to harm himself, the discovery of an inmate's plan to harm himself or others, or highly combative behavior toward staff during normal operations such as a cell move.   During seclusion, suicide watch, and restraints, an inmate is in a special cell containing a camera so staff are able to monitor his behavior for dangerousness.   A staff member may be stationed outside the cell to watch the inmate=s behavior more closely as well.   This special monitoring is conducted to ensure the inmate's safety.

It is important to remember seclusion, suicide watch, and restraints are only used when it is absolutely necessary. The staff at the medical center are dedicated to preventing the use of these procedures whenever possible.   When there is an indication of dangerousness, we will always attempt to use nonphysical means of dealing with the situation first.   It is only when verbal interventions or other less restrictive measures have failed or would not be effective that we will proceed with seclusion, suicide watch, or restraints.   If it is determined one of these more restrictive measures is necessary to maintain the inmate's safety and the security of the institution, we will work toward a less restrictive situation as quickly as possible.   For example, if an inmate is put on suicide watch after cutting himself severely, he will be removed from suicide watch as soon as clinical staff determine he is no longer a

danger to himself.   No inmate will remain in seclusion, on suicide watch, or in restraints as the result of retaliation by staff, as a means of coercion, or solely because he has a history of dangerousness.   Staff make every effort to preserve the inmate's dignity and safety while these more restrictive measures are being used and his needs will regularly be assessed by clinical staff.   If you have any questions about the use of seclusion, suicide watch, or restraints, contact the psychologist working on your unit.

## Self-Improvement Programs

**Education**

Education Department is responsible for educational testing, academic training, social education, pre-release programs, vocational training, hobby crafts, recreational activities, the library, and the Law Library.

**Testing**

Each Work Cadre inmate who does not have a High School Diploma, General Equivalency Diploma (GED), or has not met the GED Literacy requirement will be given a placement test and enrolled in a mandatory Adult Basic Education or GED program.

**Reentry Services**

Inmates will have the opportunity to participate in many programs, classes, and activities that are designed to enhance reentry success. USMCFP Springfield has created an institution program catalog that is available to all inmates. You are strongly encouraged to look through this catalog and participate in as many programs as possible, more specifically participate in those programs that will help build skills to aid in your reentry process. Once you are within four years of your projected release date, your reentry needs will be examined more closely to determine what programs would benefit you most. You are expected to take an active role in your release preparation process. Your Unit Team as well as the institution's Reentry Affairs Coordinator will be available for reentry questions or concerns that you have.

20

Revised November 2012

**Release Preparation Program**

The Release Preparation program is designed to assist inmates in preparing themselves for release.   Inmates will be given aid in developing plans for their personal lives and for work.   These programs offer classes and information seminars concerning the personal, social, and legal responsibilities of civilian life.   Routinely scheduled information sessions with U.S. Probation Officers, halfway house personnel, other agencies, and employers are available.   You may submit a cop-out to the department responsible for the area you wish to participate in.   Your Unit Team will be able to assist you with a list of available classes for each core topic. There are six core topics and some have different classes offered in each topic.

Core Topics:
1.   Health and Nutrition
2.   Employment
3.   Personal Finance
4.   Community Resources
5.   Release Information
6.   Personal Growth

**Psychology Services**

All inmates will be screened by Psychology Services staff during the institution's A&O Program.   Screening may include an individual interview.   Psychologists are available for individual and/or group psychotherapy.   Inmates interested in services can submit an Inmate Request to Staff Member (Cop-Out) to Psychology Services.   Mental Health services are offered in the areas of drug and alcohol abuse as well as for other behavioral or emotional problems.

**Suicide Prevention**

It is not uncommon for people to experience feelings of depression and hopelessness while in jail or prison, particularly if they are newly incarcerated, serving a long sentence, experiencing family problems, problems getting along with other inmates, or receive bad news.   Sometimes, inmates consider committing suicide due to all of the pressure they are under.   Staff are trained to monitor inmates for signs of suicidality and are trained to refer all concerns to the Psychology Department.   However, staff do not always see what inmates see.   If you are personally experiencing any of the problems noted above or you or another inmate are showing signs of depression (sadness, tearfulness, lack of enjoyment in usual activities), withdrawal (staying away from others, refusing phone calls and/or visits), or hopelessness (giving away possessions, stating there is nothing to live for). PLEASE alert a staff member right away.

**Religious Programs**

Your religion is a personal and vital part of your life.   The institution will not try in any way to change your religious convictions.

Full-time Chaplains are on the staff to administer to the religious needs of the inmates.   It is our intent to provide programs and facilities to support your religious convictions.

Not only do these chaplains hold religious services every Sunday, visiting clergymen and chapel volunteers of other faiths hold regular services at the Medical Center throughout the week and weekend.

The Chaplains are available for individual counseling.   If you desire to speak with a Chaplain, it is recommended you make an appointment through the Chapel office.

Check the bulletin board on your ward or the chapel area in the hallway for a schedule of the religious services and programs.

Religious necklaces or medallions may only be worn inside your shirt when not in the Chapel.

21

Revised November 2012

**Inmate Financial Responsibility Program**

Working closely with the Administrative Office of the Courts and the Department of Justice, the Bureau administers a systematic payment program for court-imposed fines, fees, and costs.   All designated inmates are required to develop a financial plan to meet their financial obligations.   These obligations may include: Special assessments imposed under 18 USC 3013, Court ordered restitution, fines, court costs, judgments in favor of the United States, debts owed the Federal Government, cost of incarceration fees, and other court-ordered obligations (e.g., child support, alimony, other judgments).

Institution staff assist in planning but the inmate is responsible for making all payments required either from earnings within the institution or from outside resources.   The inmate must provide documentation of compliance and payment.   If an inmate refuses to meet his or her obligations, the inmate will be limited to spending a maximum of $25 per month in the commissary, will not receive performance pay above the maintenance pay level ($5.25), placed in the lowest housing status, and will not be considered for community program activities.

The status of any financial plan will be included in all progress reports and will be considered by staff when determining Security/Custody level, job assignments, eligibility for community activities, and institutional program changes.   The U.S. Parole Commission will also review financial responsibility progress at parole hearings.

## Medical Services

USMCFP Springfield's mission as a Medical Referral Center is to provide quality and appropriate medical, dental, and behavioral health care to inmates, while providing a safe, humane, cost-efficient, and secure environment for staff to work and inmates to live.   The overall Bureau health care delivery system includes local medical facilities as well as the major medical referral centers (MRC).

**Inmates**:   You have the right to receive health care while in custody of the Federal Bureau of Prisons.   Refer to Appendix A:   Inmate Rights and Responsibilities.

**Staff**:   Health Services staff at MCFP include physicians, a dentist, dental assistants, nurse practitioners, physician assistants, nurses, pharmacists, medical laboratory scientists, radiology technologists, physical therapist, pharmacy technicians, prosthetist/orthotist, certified nurse assistants, and a respiratory therapist.   Administrative and support services staff complement the professional healthcare staff.

### Assignment to a healthcare team

Each inmate is assigned a Patient Care Provider team consisting of a physician, a mid-level practitioner, and a nurse.   This team assigned will coordinate your healthcare needs.

### Physical Examinations

All newly committed general population inmates receive a complete physical examination within 14 days of admission.   Behavioral Health D&O, Forensic and Residential Services inmates receive a physical examination within 7 days of admission.   Long Term Care and Behavioral Health inpatient inmates receive an appropriate physical within 24 hours of admission.   This exam consists of clinically needed laboratory testing, HIV screening, hearing and vision screening exams, a tuberculosis skin test (TST) and a physical examination.   Diagnostic procedures related to potential communicable diseases are mandatory for the protection of the patient as well as to determine the need for additional testing.

An inmate who refuses these tests will be isolated for an appropriate clinical period of time as determined by medical staff.   Inmates referred to MCFP Springfield will have their medical record reviewed for appropriate tests.

### Examinations for Inmates Age 50 and Over

As part of the admission and annual physical exams for inmates over the age of 50, each inmate will be offered a glaucoma test, electrocardiogram, tonometry, colorectal cancer screening.   If symptoms or signs indicate, a sigmoidoscopy will be offered.   Inmates may refuse any procedure and the refusal will be documented on the physical examination form.

22

Revised November 2012

**Periodic Health Examinations**

Periodic health examinations will be available based on age specific guidelines.   This preventative health assessment can be requested through the sick call process.

**Release**

An inmate being released may request a medical evaluation if he has not had one within one (1) year prior to the projected date of release.   The medical examination should be conducted two months prior to release date.

**Sick Call Triage:**

Inmates have the right to have access to Sick Call Triage.   With this right, each inmate has the responsibility of signing up for Sick Call Triage.   Sick Call Triage is held Monday, Tuesday, Thursday and Friday from 07:00 – 7:30am.   You will be assessed and assigned an appointment on that day or a subsequent day.   Inmates who become ill after the regular sick call appointment sign-up period should ask their work supervisor or unit officer to call the clinic for an appointment.   Inmates must bring their commissary card for identification purposes when reporting to sick call or to their provider.

Inmates in detention or segregation are unable to sign up for this procedure. For that reason, a medical staff member tours each such housing unit at least once every work shift or three times a day.

Inmates assigned to the cadre unit who wish to be seen by their provider should write a Cop-Out to their provider with the issues that need to be addressed.   A co-pay of $2.00 may be assessed per visit if indicated by policy.

Inmates assigned to the hospital unit who wish to be seen by their provider should write a Cop-Out to their provider with the issues that need to be addressed.   For more pressing issues, they may talk with the ward nurse and she/he will send the information to the provider.   A co-pay of $2.00 may be assessed per visit if indicated by policy.

**Urgent and After Hours Medical Care**

Urgent and emergency medical care is available on-site 24-hours a day and seven days a week.   Contact your unit officer or detail supervisor if you feel you need emergency care.   All emergencies or injuries will be given priority for treatment. Appropriate medical care will be provided by institution hospital staff.   **Medical coverage on evenings, weekends, and holidays is for the treatment of acute medical problems only.**

**Immunizations**

Routine immunizations are given according to the Center for Disease Control (CDC) recommendations.   Influenza vaccine will be offered annually for all inmates.   Health records will be reviewed for compliance with recommendations.   Inmates with certain job assignments will be offered the Hepatitis B vaccine.   Upon request, a copy of the inmate's immunization record will be furnished for your use following release.

**Restraints and Seclusion Policy**

The institution s policy and procedures do not permit the use of restraints or seclusion for purposes such as coercion, discipline, convenience, or retaliation of staff. Restraints or seclusion are only used when non-physical interventions would not be effective. They are only used in emergency situations in which there is an imminent risk of an individual physically harming himself or others.

**Medications - Pill Line**

Controlled medications are dispensed at a prescribed location (the "pill line") during specified time periods.   You must verbally identify yourselves by your full name and register number and present your commissary ID at pill line for identification purposes.   Inmates in detention or segregation are provided their medication by staff in their cells. Inmates may pick up self-administered (non-controlled) medications at the Pharmacy on weekdays 4:30 - 5:15 p.m. and continuous medication renewals can be picked up at the Pharmacy on weekdays 11:30 a.m.- 12:15 p.m.

The pill line times are posted.   Failure to report for pill line at the posted time may result in the medication not being dispensed.

Revised November 2012

**Over the Counter (OTC) Medication for Outpatients**
A variety of OTC medication is available for purchase in the commissary.   Inmates in 10 Building and Long Term Care units are not allowed to purchase or carry OTC medications.   Indigent inmates may submit a Pharmacy OTC Medication Requisition through their counselor to obtain OTC medications.    In order to quality as indigent, an inmate may not have had more than $6.00 in your inmate trust fund account within the past 30 days.

**Dental Sick Call**
All new admissions to the Bureau of Prisons will be scheduled for a dental examination soon after their arrival. To request routine dental treatment (this includes cleaning, fillings, false teeth, etc.), sentenced inmates need to submit an Inmate Request to Staff Member (Cop-Out) to the dental clinic and their name will be placed on a waiting list. Unsentenced inmates are eligible for emergency treatment only.

The dental clinic has a dental sick call/open house from 12:00 noon to 12:30 p.m., Monday through Friday. Patients must report no later than 12:15 p.m. to be seen. Dental treatments and visits may result in a $2.00 co-pay. Emergency problems will be addressed and questions regarding dental treatment or waiting lists will be answered.

**On the Job Injuries**
If an inmate is injured while performing an assigned duty, he must immediately report the injury to their work supervisor.   The work supervisor will contact the appropriate medical staff to evaluate the injury.   The work supervisor will then report the injury to the institution Safety Manager.   The inmate may be disqualified from eligibility for lost-time wages or compensation if he fails to report a work injury promptly to the supervisor.   If injured after work duty hours, the work supervisor will contact the Nurse Manager.

If injured while performing an assigned duty, and the inmate expects to be impaired to some degree, he may submit a claim for compensation. A medical evaluation must be included in the claim before any compensation can be considered. (See Inmate Injury Compensation Handbook for details).

**Medical Co-Payments**
Pursuant to the Federal Prisoner Health Care Co-payment Act (FHCCA) of 2000 (P.L. 106-294, 18 U.S.C. 4048), The Federal Bureau of Prisons and U.S. Medical Center for Federal Prisoners provide notice of the Inmate Co-payment Program for health care, effective October 3, 2005.

**A. Application:** The Inmate Co-payment Program applies to anyone in an institution under the Bureau s jurisdiction and anyone who has been charged with or convicted of an offense against the United States, except inmates in inpatient status at a Medical Referral Center (MRC). All inmates in outpatient status at the MRCs and inmates assigned to the General Population at these facilities are subject to co-pay fees.

**B. Health Care Visits with a Fee:**
1. You must pay a fee of $2.00 for health care services, charged to your Inmate Commissary Account, per health care visit, if you receive health care services in connection with a health care visit that you requested, except for services described in section C., below.   These requested appointments include Sick Call and after-hours requests to see a health care provider. If you ask a non-medical staff member to contact medical staff to request a medical evaluation on your behalf for a health service not listed in section C., below, you will be charged a $2.00 co-pay fee for that visit.
2. You must pay a fee of $2.00 for health care services, charged to your Inmate Commissary Account, per health care visit, if you are found responsible through the Disciplinary Hearing Process to have injured an inmate who, as a result of the injury, requires a health care visit.

**C. Health Care Visits with no Fee:**
We will not charge a fee for:
1. Health care services based on health care staff referrals;
2. Health Care staff-approved follow-up treatment for a chronic condition;
3. Preventive health care services;
4. Emergency services;
5. Prenatal care;
6. 6, Diagnosis or treatment of chronic infectious diseases;
7. Mental health care; or
8. Substance abuse treatment.

24

Revised November 2012

If a health care provider orders or approves any of the following, we will also not charge a fee for:
Blood pressure monitoring;
Glucose monitoring;
Insulin injections;
Chronic care clinics;
TB testing;
Vaccinations;
Wound Care; or
Patient education.
Your health care provider will determine if the type of appointment scheduled is subject to a co-pay fee.

**D. Indigency:** An **indigent inmate** is an inmate who has not had a trust fund account balance of $6.00 for the past 30 days.   If you are considered indigent, you will not have the co-pay fee deducted from your Inmate Commissary Account.

If you are NOT indigent, but you do not have sufficient funds to make the co-pay fee on the date of the appointment, a debt will be established by TRUFACS, and the amount will be deducted as funds are deposited into your Inmate Commissary Account.

**Clinics and Specialists**
**If medical staff determine that you need further evaluation by a medical specialist, then you may be referred.   It is your responsibility to watch the call-out list for all medical appointments and to be on time. Missed appointments may result in an incident report being written.**

**Other requests such as eyeglasses, hearing aids, etc. should be pursued through the Sick Call Triage process and will be reviewed and approved by appropriate medical staff.**

**Reading Glasses**
You may purchase reading glasses from the commissary.   The Bureau will furnish prescription eyeglasses to any inmate requiring them, as documented through a professional BOP approved prescription.   Federal Prison Industries, FCI Bunter, NC, is the only approved vendor at Government expense.

**Health Records**
An inmate may request a copy of your medical record by forwarding an Inmate Request to Staff to the Medical Records Department.   Allow 10 working days for your request to be processed.   Please specify what portions of the medical record file you want copied.

**Complaints**
If you have a concern related to your health care, contact your primary care provider team (physician, mid-level provider, or nurse) to resolve your issue.   You may complete an Inmate Request to Staff form.   If you are unable to resolve your health care concern, you may file a formal request via the Administrative Remedy process.

**Joint Commission Accreditation**
USMCFP Springfield is accredited by the Joint Commission for Long Term Care, Ambulatory Care, and Behavioral Health Care.   The Joint Commission standards deal with organization quality, safety of care issues, and the safety of the environment in which care is provided.   If a concern regarding such matters cannot be resolved through the established BOP processes, you may send correspondence to the following address:

**Division of Accreditation Operations**
**Office of Quality Monitoring**
**The Joint Commission**
**One Renaissance Boulevard**
**Oakbrook Terrace, IL 60181**
**Telephone:   1-800-994-6610**
**Fax:   630-792-5636**
**Email:   complaint@jointcommission.org**

Revised November 2012

**For Treatment:** We may use medical information about you to provide you with medical treatment or services. We may disclose medical information about you to doctors, nurses, technicians, students, or other health system personnel who are involved in taking care of you in the health system.

**As Required by State and Federal Law:** The BOP may use or disclose your health information to the extent that such use or disclosure is required by law. Such as but not limited to; Those suspected of being victims of abuse, neglect, or domestic violence, threats of self-harm, threats to others, incidents     of involvement in child or elder abuse or neglect either as a victim or perpetrator,   to a public health authority that is authorized to receive such information for the purpose of controlling disease, in the course of any judicial or administrative proceeding, if you are suspected to be the victim of or perpetrator a crime, if you die and your death may have resulted from criminal conduct.

<u>**Contact with the Community and Public**</u>

**Mail Room**

The Mail Room has "Open House" four days a week.   The hours of Open House are from 11:30 a.m. - 12:15 p.m., Tuesday through Friday, except the Tuesday following a Monday holiday.

**Express Services**

Program Statement 5800.11 (Mail Management Manual) prohibits use of Express Mailing Services to the inmate population.   This includes Federal Express, Postal Express, UPS, and other private carrier services.   Registered, Certified and Certified-Return Requested services are available during the Mail Room "Open House" hours.   These services are provided at the inmate's expense.

**Outgoing Postage**

The Mail Room staff will weigh outgoing mail for correct postage due.   Large packages will be taken to the R&D area for weighing.   Staff will provide the inmate with the cost of mailing articles Certified Mail, Certified Mail Return Receipt, and insured.   These services will be paid by the inmate through postage stamps acquired from the Commissary.

Interested parties must send all funds intended for inmates at USMCFP Springfield to the LockBox Program location at the following address:

Federal Bureau of Prisons
*Inmate Committed Name*
*Inmate Register Number*
Post Office Box 474701
Des Moines, Iowa 50947-0001

Institutions throughout the Bureau of Prisons no longer accept funds received for inmates from any outside parties. Any funds received will be rejected and returned to the sender.   With the rejections, we will enclose specific instructions on how the sender may send funds to the LockBox Program.   Please notify all persons sending you funds to send them to the LockBox Program address listed above and to follow the instructions below:

   **Do not enclose personal checks, letters, pictures, or any other items in the envelope with the funds.**
   Enclose only the allowable negotiable instruments, such as money orders, government checks, and business checks.   A 15 day hold will be placed on all negotiable instruments with the exception of a postal money order or Quick Collect Western Union transfer.   The LockBox Program will accept allowable negotiable instruments from other countries provided their stated value is in U.S. currency.   The LockBox Program cannot forward any items enclosed with the negotiable instrument to the inmate.   Items, personal in nature, must be mailed directly to the Bureau of Prisons institution where the inmate is housed.

   Print the inmate's (addressees') committed name (no nicknames) and register number on all money orders, U.S. Treasury, state, and local government checks, and any negotiable instruments from other countries (payable in U.S. currency) AND   on the envelope.

   Print or type the sender's name and return address in the upper left hand corner of the envelope.   This will ensure funds can be returned to the sender in the event they cannot be posted to an inmate's account.

26

Revised November 2012
**Inmate Electronic Funds Transfer/Quick Collect**

Inmate's families and friends may send inmates funds through Western Union's Quick Collect Program.   All funds sent via Western Union's Quick Collect will be posted to the inmate's account within two to four hours, when those funds are sent between 7:00 a.m. and 9:00 p.m. EST (seven days per week, including holidays).   Funds received after 9:00 p.m. EST will be posted by 9:00 a.m. the following morning.   Funds sent to an inmate through Western Union Quick Collect may be sent via one of the following ways:

   1) At an agent location with cash: The inmate=s family or friends must complete a Blue Quick Collect Send Form.   To find the nearest agent they may call 1-800-325-6000 or go to www.westernunion.com.

   2) By phone using a credit/debit card:   The inmate=s family or friends may call 1-800-634-3422 and press option 2.

   3) Online using a credit/debit card:   The inmate=s family or friends may go to. www.westernunion.com.
       1)    Select Bill Payment
       2)    Select Quick Collect

   For each Western Union Quick Collect transaction, the following information must be provided:
       1)    Inmate Register Number
       2)    Inmate Name
       3)    City code: FBOP
       4)    State code: DC

Please note the inmate name and register number must be entered correctly. Failure to provide the correct information may prevent the transaction from being completed.   **The City Code will always be: FBOP and the State Code will always be: DC.**

Each transaction is accepted or rejected at the point of sale.   The sender has the sole responsibility of sending the funds to the correct inmate.   If an incorrect register number and/or name are used, and funds are accepted and posted to that inmate, funds may not be returned.

Western Union will charge the sender a fee for U.S. cash transfers processed at their agent locations.   Transfers via the telephone or internet have higher fees.   Non-U.S. money transfers also have higher fees.

Any questions or concerns from the general public regarding Western Union transfers and fees should be directed to Western Union.

**Special Mail**

**The Correspondence Program Statement identifies correspondence received from the following as Special Mail: President, Vice President, U.S. Attorneys, members of the U.S. Congress, Attorneys, Embassies and Consulates, the U.S. Department of Justice (excluding the Bureau of Prisons, but including U.S. Attorneys), other Federal law enforcement officers, State Attorneys General, Prosecuting Attorneys, Governors, U.S. Courts (including U.S. Probation Officers), and State Courts.   For incoming correspondence to be processed under the special mail procedures, the sender must be adequately identified on the envelope and the front of the envelope must be marked "Special Mail - Open only in the presence of the inmate" or words to that effect.   Clearly identified Special Mail from the Chambers of a Judge or a member of the U.S. Congress does not require Special Mail markings and will be forwarded to your counselor for opening in your presence.**

**Special/Legal mail may be delivered to unit staff during open house hours or the mailroom during open house.**   You need to make sure the Mail Room staff can identify to whom the letter is being sent by using the public official's title on the envelope.

**Legal Mail**

Legal correspondence is processed the same as Special Mail and above-mentioned Program Statement further states...."the inmate is responsible for advising any attorney correspondence **will be handled as Special Mail only**

27

Revised November 2012

**if the envelope is marked with attorney's name and an indication the person is an attorney and the front of the envelope is marked "Special Mail - Open only in the presence of the inmate."**

You may prepare and mail any petition you wish as long as it pertains to your case only.   "Incoming Legal Mail," which meets Bureau requirements, will be sent directly to your counselor who will open, inspect, and turn it over to you.

**Inmate Correspondence with Representatives of the News Media**

An inmate may write, through Special Mail procedures, to representatives of the news media if specified by name or title.

The inmate may not receive compensation or anything of value for correspondence with the news media.   The inmate may not act as a reporter, publish under a byline, or conduct a business or profession while in Bureau custody.

Representatives of the news media may initiate correspondence with an inmate.   Correspondence from a representative of the news media will be opened, inspected for contraband, qualified as media correspondence and for content which is likely to promote either illegal activity or conduct contrary to regulations.

**Incoming Publications**

The Bureau permits inmates to subscribe to and receive publications without prior approval.   The term "publication" means a book, single issue of a magazine or newspaper, or materials addressed to a specific inmate, such as advertising brochures, flyers, and catalogs.   An inmate may receive soft-cover or hard-cover publications (for example, paperback books, newspaper clippings, magazines, and other similar items) only from the **publisher, from a book club, or from a bookstore**.   Accumulation of publications will be limited to five (5) magazines (not to be more than three (3) months old) and to the amount that can be neatly stored in the locker and/or shelf provided in each room because of sanitation and fire safety reasons.   The Unit Manager may allow more space for legal publications upon request.

**Implementing The Ensign Amendment Procedures**

Section 614 of the Fiscal Year 1999 Omnibus Budget Act (P.L. 105-277) prohibits the Bureau from distributing or making available to inmates any commercially published material which is sexually explicit or features nudity.

The policy provides commercially published information or material received at the institution which is sexually explicit or features nudity will be returned to the publisher or other sender.
Program Statement 5266.11, Incoming Publications, establishes criteria for any printed materials which may be received by an inmate.   The Warden will reject a publication if it is determined to be detrimental to the security, good order or discipline of the institution, or if it might facilitate criminal activity.
Publications which may be rejected by the Warden include, but are not limited to, publications which meet one of the following criteria:

It depicts or describes procedures for the construction or use of weapons, ammunition, bombs, or incendiary devices.

It depicts, encourages, or describes methods of escape from correctional facilities or contains blueprints, drawings, or similar descriptions of Bureau of Prisons' institutions.

It depicts or describes procedures for the brewing of alcoholic beverages or the manufacture of drugs. It is written in code.

It depicts, describes, or encourages activities which may lead to the use of physical violence or group disruption.

It encourages or instructs in the commission of criminal activity.

It is sexually explicit material by its nature or content possessing a threat to the security, good order, or

28

Revised November 2012

discipline of the institution.

**Correspondence Between Confined Inmates**

An inmate may be permitted to correspond with an inmate confined in another penal or correctional institution. This is permitted if the other inmate is either a member of the immediate family, or is party in a legal action (or witness) in which both parties are involved.   The following additional limitations apply:

> Such correspondence may always be inspected and read by staff at the sending and receiving institutions (it may not be sealed by the inmate).

> For Federal facilities, the unit managers at both institutions must approve the correspondence.   For a Federal inmate to write to a State inmate, the Warden of both facilities must approve the correspondence.

> The same approval process is required for telephone calls to an incarcerated immediate family member.

**Rejection of Correspondence**

The Warden may reject correspondence sent by or to an inmate if it is determined to be detrimental to the security, good order or discipline of the institution, protection of the public, or if it might facilitate criminal activity. Examples include:

> Matter which is non-mailable under law or postal regulations.

> Information of escape plots, of plans to commit illegal activities, or to violate institution rules.

> Direction of an inmate's business (prohibited act Code 408).   An inmate may not direct a business while confined.

This does not, however, prohibit correspondence necessary to enable an inmate to protect property or funds legitimately his at the time of his commitment.   Thus, for example, an inmate may correspond about refinancing a mortgage for his home or sign insurance papers; however, the inmate may not operate, for example, a mortgage or insurance business while confined in the institution.

**Notification of Rejection**

The Warden will give written notice to the sender concerning the rejection of mail and the reasons for rejection. The sender of the rejected correspondence may appeal the rejection.   The inmate will also be notified of the rejection of correspondence and the reasons for it.   The inmate also has the right to appeal the rejection.   The Warden shall refer the appeal to a designated officer other than the one who originally disapproved the correspondence.   Rejected correspondence ordinarily will be returned to the sender.

**Incoming Packages**

The Mail Management Manual requires all incoming packages to have staff approval prior to being received.   A Mail Form BP-331 is used for this purpose.   Packages received without the proper authorization will be returned to the sender as unauthorized.   The Bureau of Prisons discourages the use of package authorizations except as outlined in Program Statement 5580.08, which states:

> **The only packages an inmate may receive from home are those containing release clothing.   Release clothing packages may only be received within the last 30 days of confinement.   This clothing shall be stored in R&D and shall not be released to the general population.   Medical devices such as hearing aids, dentures, wheelchairs, braces, orthopedic/prescription shoes, and artificial limbs are authorized if medically required and approved by the Health Services Administrator.**

Revised November 2012

**Transferring**

When transferring to another institution, you will be called to R&D to pack out your personal property for appropriate mailing.   Perishable items such as soda pop, cheese, and opened food items may not be mailed.   These items should be disposed of prior to your departure.

Program Statement 5580.08, states <u>excess</u> personal property, being received from another institution or upon time of transfer, will be mailed to a non-Bureau destination of the inmate's choice.   *The inmate shall bear the expense of this mailing*.

Ordinarily, no more than two (2) boxes of property, size 14"X14"X19", shall be shipped at government expense for each inmate.   The inmate may elect to pay for expenses related to the shipment of authorized personal property beyond the two boxes.

**Change of Address/Forwarding of Mail**

The Receiving and Discharge staff will provide inmates with change of address cards required by the U.S. Post Office.   These cards are given to inmates who are being released or transferred to notify correspondents of a change in address.   Any general mail received after 30 days will be returned to sender.

<div align="center">

**Inmate Telephone System**

</div>

You will be issued a personal phone access code (PAC) number for use of the telephone.     A fee will be charged for a replacement PAC due to negligence and for requests of written telephone account statements.   Open house hours are normally 11:15 a.m. to Noon, Monday through Friday at the 4 Bldg. T Trust Fund Services office located across from Commissary.

Purchases for Inmate Telephone System (ITS) credits are made via the telephone twice daily Monday thru Friday from 4:30 p.m. - 11:30 p.m. or during phone operational times on week-ends and holidays.   All phone numbers are managed through the TRULINCS system, each inmate is allowed 30 active phone numbers.   The maximum length of each call will be limited to 15 minutes and the interval waiting period between calls shall be 30 minutes. Inmates with no access to TRULINCS must complete a Contact Form provided by a Unit Team member to add phone numbers and contact information.   This form must be hand delivered by staff to the Trust Fund Services department, where the information will be entered into TRULINCS within 3 working days.

You are limited to a maximum of 300 minutes of calling time per validation cycle.   Ordinarily, you will be allowed an extra 100 minutes in the months of November & December.   Inmates who exhaust their 300 minute limitation or are without funds may be provided a recorded ITS telephone call for good cause at the inmate's expense or in certain circumstances a collect call.   Unit staff will prepare a memo for the Warden's signature granting approval beyond the 300-minute limitation and/or approval for a collect call on the ITS system.

Telephone hours will begin at 6:00 a.m. and end no later than 11:30 p.m.   From 11:30 p.m. to 6:00 a.m., inmate telephone access will not be available.   All inmate telephones, with the exception of one per housing unit, will not be operational 7:30 a.m. – 10:30 a.m. and 12:30 p.m. – 4:00 p.m. (excluding weekends and holidays).   With the exception of properly placed calls to an attorney, **inmate telephone calls are monitored**.   A notice regarding monitoring shall be posted by each permanent inmate telephone.


Violation of any of the rules regarding telephone use may result in institutional disciplinary action and restriction of telephone privileges.   Third party calling is prohibited.   Any unlawful inmate telephone use will be referred to law enforcement authorities.   You may also be restricted if you have a PSF for Serious Telephone Abuse.

**Visiting**

All inmates should prepare a visiting list as soon as possible after arrival for approval by your Unit Team.

Revised November 2012

You will receive a copy of the approved visiting list.   Members of immediate families are usually approved if the relationship can be verified in the Pre-sentence Investigation and there is no indication the family member has a criminal record.   Other relatives, including grandparents, aunts, uncles, in-laws, and cousins may be added if you wish to have visits with them and they expect to be able to visit regularly.   The visiting privilege may be authorized by the Case Manager or Unit Counselor.   Inmates are responsible for mailing of the Visitor Information (BP-629) form to prospective visitors.   The forms are available through the unit counselor or case manager.   The forms must be mailed directly back to the case manager or counselor. Any form mailed back to the inmate will not be accepted.

You are responsible for advising your prospective visitor of the approval or disapproval of their placement on your approved visiting list.   One visitor may not visitor with more than one inmate at a time and staff will carefully review any requests for placement of a visitor on more than one inmate visiting list.

**Visiting Room**

The visiting room will be open for inmates visiting from 8:15 a.m. until 3:00 p.m. Saturday through Monday.   The visiting room is closed on , Tuesday, Wednesday, Thursday and Friday.   Visitors will not be processed into the institution after 2:30 p.m.   The visiting area, including restrooms in the visiting area, may be monitored to ensure institution security and good order.

Inmates may receive eight (8) visiting points per month.   Weekend and holiday visits are counted as two (2) points with the exception of Christmas, Thanksgiving and New Year's which will not have any points counted.   Weekday visits are one (1) point.   All visits will be counted on a daily basis regardless of whether the visitor stays all day. Social visits may be used at any frequency or intervals, such as scattered throughout the month or on consecutive days.

All visitors, with the exception of children under sixteen years, must display a valid state or government photo identification before being permitted into the institution.

Children under 16 may not visit an inmate unless accompanied by a responsible adult.   Adults bringing children in the visiting room are responsible for supervising the child and picking up items left by the child.   Toys are available for children to play with and the responsible adult must ensure the items are returned to the visiting room officer.   In the event the visiting room becomes too full, local visits may be terminated to permit infrequent (out-of-town) visitors to complete their visits.   Food and soft drink machines are available in the visiting room.

Special visits in cases of documented family emergencies may be made by submitting a written request through the unit team.

**Visitor Dress Code**

All visitors will be properly dressed when coming to visit at MCFP Springfield. Visitors will be expected to wear clothing which is in good taste. The Receptionist will ensure all visitors are dressed appropriately. **Visitors are prohibited from wearing sleeveless shirts, low cut, or see-through clothing, tube or tank tops, shorts/skorts, jogging suits, backless clothing, open-toed shoes or any other apparel of a suggestive or revealing nature (e.g., short shorts, miniskirts (anything more than two (2) inches above the knee is unacceptable, skin-tight clothing, etc.)** No hats or nonprescription sunglasses are allowed in the Visiting Room. Inmates are responsible for advising their visitors of the dress requirements in the Visiting Room, including not wearing clothing orange or khaki in color.

Visitors will not be allowed to enter the institution wearing light brown Hushpuppy shoes that are the same type as the inmates are allowed to buy through the Commissary and are authorized to wear into the Visiting Room.

**Attorney Visits**

Same hours as regular visits.   (Closed Tuesday, Wednesday, Thursday and Friday).

31

Revised November 2012

**Bedside Visits**

Hospitalized inmates who are medically unable to go to the institution visiting room are asked to have their visitors contact the Case Manager by telephone to **pre-schedule** any bed side visiting.

**Identification of Visitors**

State or government photo identification is required for visitors.   This may include a State Driver's License or State I.D. Card with full names and signatures affixed.   Birth Certificates are not considered proper identification. Persons without proper identification will not be permitted to visit.

Visitors may be asked to submit to a search and will be checked with a metal detector.   Visitors' purses, attorneys' briefcases, etc. may also be searched.   Other personal articles belonging to visitors must be placed in lockers provided by the institution or may be left in their cars.

No food may be brought into the visiting room, however, vending equipment is located in the visiting rooms.

Visitors are permitted to bring money into the visiting room to purchase items from the vending machines.   Also, a reasonable amount of diapers and other infant care items and sanitary napkins may be brought into the visiting room.   Inmates are not allowed to receive either coins or money for their Commissary account while in the visiting room.   Money for Commissary accounts should be sent through the mail.   Refer to the section in this handbook entitled Commissary.   No items may be exchanged in the visiting room without prior approval by the appropriate staff member.

**Local Transportation**

The U. S. Medical Center address is 1900 W. Sunshine Springfield Missouri 65807, phone number 417-862-7041. The U.S. Medical Center for Federal Prisoners is located on the western edge of the city of Springfield, Missouri, at the corner of Sunshine Street and Kansas Expressway.   Visitors traveling to the Medical Center from U.S. Highway 60 will exit off the Kansas Expressway interchange and travel north on Kansas Expressway approximately three (3) miles.   Interstate 44 is approximately six (6) miles north of the Medical Center on Kansas Expressway.   Visitors arriving on Interstate 44 will exit off and travel south on the Kansas Expressway to reach the institution.

Metropolitan City Cab 417-865-7700.
Yellow Cab (417) 862-5511
Greyhound bus (417) 862-6777

## Access to Legal Services

**Legal Correspondence**

Legal correspondence from attorneys will be treated as Special Mail if it is properly marked.   The envelope must be marked with the attorney's name and an indication he/she is an attorney and the front of the envelope must be marked "Special mail - open only in the presence of the inmate."   It is the responsibility of the inmate to advise his or her attorney about this policy.   If legal mail is not properly marked, it will be opened as general correspondence.

**Attorney Visits**

Attorneys should ordinarily make advance appointments for each visit.   Attorneys are encouraged to visit during the regular visiting hours; however, visits from an attorney can be arranged at other times based on the circumstances of each case and the availability of staff.   Attorney visits will be subject to visual monitoring, but not audio monitoring.

**Legal Material**

During attorney visits, a reasonable amount of legal materials may be allowed in the visiting area with prior approval.   Legal material may be transferred during attorney visits, but is subject to inspection for contraband. This material will be treated in a similar manner as the special mail procedures described above.   Inmates are

32

Revised November 2012

expected to handle the transfer of legal materials through the mail as often as possible.

**Attorney Phone Calls**

In order to make an unmonitored phone call between an attorney and an inmate, the inmate must follow procedures established by the institution.   **The inmate <u>must demonstrate</u> to staff he has an imminent court deadline in order to receive an attorney phone call.**   Phone calls placed through the regular inmate phones are subject to monitoring.

**Law Library**

The law library is located in the Recreation Department and contains a variety of legal reference materials for use in preparing legal papers.   Reference materials include the United States Code Annotated, Federal Reporter, Supreme Court Reporter, Bureau of Prisons Program Statements, Institution Supplements, Indexes, and other legal materials. The Law Library is open during convenient non-working hours, including weekends and holidays.   An inmate Law Library Clerk is available for assistance in legal research.   Legal materials are also available to inmates in detention or segregation status, ordinarily via a delivery system or satellite collection.

**Notary Public**

Under the provisions of 18 USC 4004, Case Managers are authorized to witness signature on documents.   Law allows a statement to the effect that papers which an inmate signs are "true and correct under penalty of perjury" will suffice in federal courts and other federal agencies, unless specifically directed to do otherwise.   Some states will not accept a government notarization for real estate transactions, automobile sales, etc.   In these cases, it will be necessary to contact unit staff for arrangements with an institution notary public.

**Public Defender**

The Office of the Federal Public Defender represents people charged with federal crimes when appointed by the Court.   Additionally, the public defender's office represent inmates when the government has filed a motion pursuant to Title 18, United States Code Section 4245 or 4246, when appointed by the Court.   The public defender also represent inmates on parole revocation matters when the inmate requests counsel and when appointed by the Court.

**Copies of Legal Materials**

Copies of cases from Law Books are generally not available for copying due to copyright laws.   Requests for legal copies must be submitted by 3:00 p.m. on Monday afternoon to the Recreation Center Office.   In addition, there is a debit card operated copy machine located near the Recreation Center office.

**Court Security Improvement Act and Related Contraband Material**

Effective immediately, all inmates are prohibited from obtaining or possessing any Uniform Commercial Code (UCC) financing statements (lien forms) and similar forms, including, but not limited to, UCC security agreements, acceptance for value presentments, or documents indicating copyright or attempted copyright of a name.   Inmates are also prohibited from possessing manuals or any other documents instructing inmates on the process to file false liens or encumbrances.   Additionally, inmates are prohibited from possessing any documents which contain personal information, including, but not limited to, home address, home telephone numbers, social security numbers, financial information, deed information, etc., of any federal government official, including, but not limited to, Bureau of Prisons staff, United States Attorneys, Assistant United States Attorneys, Judges, and other federal officers or employees.   If any inmate is found in possession of any of these items, they will be confiscated as contraband, and the inmate may be subject to disciplinary action or referred for possible prosecution.   Inmates may utilize the Administrative Remedy process to challenge the confiscation or rejection of such materials.

**Federal Tort Claims**

Revised November 2012

Negligence of institution staff resulting in personal injury or property loss or damage to an inmate, it can be the basis of a claim under the Federal Tort Claims Act.   To file such a claim, inmates must complete a Small Claims for Property Damage or Loss form, BP-A0943.   They can obtain this form from the Legal Office or the Unit Team.

**Freedom of Information/Privacy Act of 1974**

The Privacy Act of 1974 forbids release of information from agency records without written request by or without the prior written consent of the individual to whom the record pertained, except for specific instances.   Formal requests for access to records about another person and/or agency record other than those pertaining to themselves (including Program Statements and Operations Memoranda) shall be processed through the Freedom of Information Act, Title 5 USC 552.

**Inmate Access to Central Files**

An inmate may request review of disclosable portions of his central file (to include the Pre-sentence Report and/or Summary) prior to the individual's parole hearing.   Institution staff will permit the review of the central file under procedures established locally.   Inmates may not possess their presentence report or Statement of Reasons during confinement.

**Inmate Access to Other Documents**

An inmate can request access to the "Non-Disclosable Documents" in his central file and medical file, or other documents concerning himself, that are not in his central file or medical file by submitting a "Freedom of Information Act Request" to the Director of the Bureau of Prisons, Attention: FOI Request.   Such a request must briefly describe the nature of records wanted and approximate dates covered by the record.   The inmate must also provide his registration number and date of birth for identification purposes.

A request on behalf of an inmate by an attorney for records concerning an inmate will be treated as a "Privacy Act Request" if the attorney has forwarded an inmate's written consent to disclose materials.   If a document is deemed to contain information exempt from disclosure, any reasonable part of the record will be provided to the attorney after the deletion of the exempt portions.

**Executive Clemency**

The Bureau advises all inmates the President of the United States is authorized under the Constitution to grant executive clemency by pardon, commutation of sentence, or reprieve.   A pardon is an executive act of grace that is a symbol of forgiveness.   It does not connote innocence nor does it expunge the record of conviction.   A pardon can be in "full" or "partial" depending on whether it absolves a person from all or a portion of the crime.   A pardon may have conditions imposed upon it or it can be "absolute" which is without conditions of any kind.   A pardon restores basic civil rights and facilitates the restoration of professional and other licenses that may have been lost by reason of the conviction.   Other forms of executive clemency include commutation of sentence (a reduction of sentence imposed after a conviction) and a reprieve (the suspension of execution of a sentence for a period of time).   Inmates should contact their assigned case manager for additional information regarding this program.

**Commutation of Sentence**

The Bureau also advises inmates on commutation of sentences.   This is the form of executive clemency power used to provide post-conviction relief to inmates during their incarceration.   This clemency power is authorized by the Constitution for the Chief Executive Officer who is the President of the United States for federal offenses.   Commutation of sentence is usually the last chance to correct an injustice which has occurred in the criminal justice process.   Inmates applying for commutation of sentence must do so on forms available from the assigned unit team. The rules governing these petitions are available in the Law Library.

A pardon may not be applied for until the expiration of at least five (5) years from the date of release from confinement.   In some cases involving crimes of a serious nature, such as violation of Narcotics Laws, Gun Control Laws, Income Tax Laws, Perjury, and violation of public trust involving personal dishonesty, fraud involving substantial sums of money, violations involving organized crime, or crimes of a serious nature, a waiting period of

34

Revised November 2012
seven years is usually required.

## Problem/Grievance Resolution

**Inmate Request to Staff Member**

The Bureau form BP-Admin-70, commonly called a Cop-Out, is used to make a written request to a staff member. Any type of request can be made with this form.   Cop-Outs may be obtained in the living units from the Correctional Officer on duty.   Staff members who receive a Cop-Out will answer the request in a "reasonable" period of time.

**Administrative Remedy Process**

The Bureau emphasizes and encourages the resolution of complaints and grievances on an informal basis. Hopefully, an inmate can resolve a problem informally by contact with staff members or Cop-Outs.   When informal resolution is not successful, however, a formal complaint can be filed as an Administrative Remedy.   Complaints regarding Tort Claims, Inmate Accident Compensation, Freedom of Information or Privacy Act Requests, and complaints on behalf of other inmates are not accepted under the Administrative Remedy Procedure.

The first step of the Administrative Remedy procedure is the Informal Resolution Form issued by a Unit Counselor (BP-8).

If the issue cannot be informally resolved, the Counselor will issue a BP-229 (BP-9) form (usually within 72 hours of the time the inmate approached the employee with the problem).   The inmate will return the completed BP-9 and Informal Resolution form to a Counselor who will deliver it to the Legal Office.   The BP-9 complaint must be filed within twenty (20) calendar days from the date on which the basis for the incident or complaint occurred unless it was not feasible to file within that period of time.   Institution staff have twenty (20) calendar days to act on the complaint and to provide a written response to the inmate.   The time limit for the response may be extended for an additional twenty (20) calendar days, but the inmate must be notified of the extension.

When a complaint is determined to be of an emergency nature and threatens the inmate's immediate health or welfare, the reply must be made as soon as possible and within the third calendar day after filing.

If the inmate is not satisfied with the response to the BP-9, he may file an appeal to the Regional Director.   This

appeal must be received in the Regional Office within twenty (20) calendar days from the date of the BP-9 response.   The Regional Appeal is written on a BP-230 (BP-10) form and must have a copy of the BP-9 form and response attached.   The Regional Appeal must be answered within thirty (30) calendar days, but the time limit may be extended an additional thirty (30) days.   The inmate must be notified of the extension.

If the inmate is not satisfied with the response by the Regional Director, he may appeal to the Central Office of the Bureau of Prisons.   The National Appeal must be made on a BP-231 (BP-11) form and must have copies of the BP-9 and BP-10 forms with responses.

The BP-11 form may be obtained from the Unit Counselor.   The National Appeal must be answered within forty (40) calendar days, but the time limit may be extended an additional twenty (20) days if the inmate is notified.

A BP-229, BP-230, or BP-231 form should be written in three sections:

> Statement of Facts
> Grounds for Relief
> Relief Requested

35

Revised November 2012
**Time Limits (in calendar days) Filing**

> BP-9:   20 days of incident (Except for BP-9s involving PREA which may be longer)
> BP-10: 20 days from BP-9 response
> BP-11: 30 days from BP-10 response

| Response | Extensions |
|---|---|
| BP-9: 20 days | BP-9: 20 days |
| BP-10: 30 days | BP-10: 30 days |
| BP-11: 40 days | BP-11: 20 days |

If an inmate believes a complaint is of such a sensitive nature he would be adversely affected if the complaint became known to the institution, he may file the complaint directly to the Regional Director.   The inmate must explain in writing the reason for not filing the complaint with the institution.   If the Regional Director agrees the complaint is sensitive, it shall be accepted and a response to the complaint will be processed.   If the Regional Director does not agree the complaint is sensitive, the inmate will be advised in writing of the determination.   The inmate may then pursue the matter by filing a BP-9 at the institution.

<div align="center"><u>Disciplinary Procedures</u></div>

**Inmate Discipline Information**

If a staff member observes or believes he or she has evidence an inmate has committed a prohibited act, the first step in the disciplinary process is writing an incident report.   This is a written copy of the charges against the inmate. The incident report shall ordinarily be delivered to the inmate within twenty-four (24) hours of the time staff become aware of the inmate's involvement in the incident.   An informal resolution of the incident may be attempted by the Lieutenant.

If an informal resolution is accomplished, the incident report will be removed from the inmate's central file. Informal resolution is encouraged by the Bureau of Prisons for all violations except those in the high and greatest severity category.   Violation in the greatest severity category must be forwarded to the Disciplinary Hearing Officer for final disposition.   If an informal resolution is not accomplished, the incident report is forwarded to the UDC for an Initial Hearing.

**Initial Hearing**

Inmates must ordinarily be given an initial hearing within five (5) work days of the time staff become aware of the inmate's involvement in the incident (excluding the day staff became aware of the incident, weekends, and holidays).   The inmate is entitled to be present at the initial hearing.   The inmate may make statements or present documentary evidence in his behalf.   The UDC must give its decision in writing to the inmate by the close of business the next work day.   The UDC may extend the time limits of these procedures for good cause.   The Warden must approve any extension over five (5) days.   The inmate must be provided with written reasons for any extension.   The UDC will either make final disposition of the incident or refer it to the Disciplinary Hearing Officer (DHO) for final disposition.

**Discipline Hearing Officer (DHO)**

The Discipline Hearing Officer (DHO) conducts disciplinary hearings on serious rule violations.   The DHO may not act on a case that has not been referred by the UDC.   The Segregation Review Officer conducts periodic reviews of inmates in Disciplinary Segregation.

An inmate will be provided with advance written notice of the charges not less than 24 hours before the inmate's appearance before the DHO.   The inmate may waive this requirement.   An inmate will be provided with a full-time staff member of his or her choice to represent them if requested.   An inmate may make statements in his or her own defense and may produce documentary evidence.   The inmate may present a list of witnesses and request they testify at the hearing.   Inmates may not question a witness at the hearing.   The staff representative and/or the DHO will question any witness for the inmate.   An inmate may submit a list of questions for the witness(es) to the DHO, if there is no staff representative.   The DHO will request a statement from all unavailable witnesses whose testimony is

36

Revised November 2012

deemed relevant.

The inmate has the right to be present throughout the DHO hearing, except during deliberations.   The inmate charged may be excluded during appearances of outside witnesses or when institution security could be jeopardized.   The DHO may postpone or continue a hearing for good cause.   Reasons for the delay must be documented in the record of the hearing.   Final disposition is made by the DHO.

**Appeals of Disciplinary Actions**

Appeals of all disciplinary actions may be made through Administrative Remedy Procedures.   UDC appeals are made on a BP-9.   Appeals are made to the Regional Director (BP-10) and the General Counsel (BP-11).   On appeal, the following items will be considered:

> Whether the UDC or DHO substantially complied with the regulations on inmate discipline.

> Whether the UDC or DHO based its decisions on substantial evidence.

> Whether an appropriate sanction was imposed according to the severity level of the prohibited act.

The staff member who responds to the appeal may not be involved in the incident in any way.   These staff members include UDC members, the DHO, the investigator, the reporting officer, and the staff representative.

**Special Housing Unit Status**

There are two components of special housing.   These are Administrative Detention and Disciplinary Segregation.

Administrative Detention separates an inmate from the general population.   To the extent practical, an inmate in Administrative Detention shall be provided with the same general privileges as inmates in general population.   An inmate may be placed in Administrative Detention when the inmate is in holdover status during transfer, a new

commitment pending classification, pending investigation or a hearing for a violation of Bureau regulations,   pending investigation or trial for a criminal act, pending transfer, for protection, or is finishing confinement in Disciplinary Segregation.

Disciplinary Segregation is used as sanction for violations of Bureau rules and regulations.   Inmates in Disciplinary Segregation will be denied certain privileges.   Personal property will usually be impounded.   Inmates placed in Disciplinary Segregation are provided with blankets, a mattress, a pillow, toilet tissue, and shaving utensils (as necessary).

Inmates may possess legal and religious materials while in Disciplinary Segregation.   Also, staff shall provide a reasonable amount of non-legal reading material.   Inmates in Disciplinary Segregation shall be seen by a member of the medical staff daily including weekends and holidays.   A unit staff member will visit the segregation unit daily.   Inmates in both Administrative Detention and Disciplinary Segregation are provided with regular reviews of their housing status.

## Release

**Sentence Computation**

Commencing in May 2006, computations of inmate sentences will be completed by the Designations and Sentence Computation Center (DSCC), Grand Prairie, Texas.   An inmate will be given a copy of his or her sentence computation as soon as it is prepared, normally within 30 days of arrival.   Any questions about good time, jail time credit, parole eligibility, full term dates, release dates, or periods of supervision may be addressed through an inmate request to staff member form (Cop-Out) to the Correctional Systems Department (CSD).   CSD staff will forward the Cop-Out to appropriate staff in Grand Prairie for a response.

The CSD does conduct "open house" on Tuesdays from 10:00 a.m. until 11:00 a.m.   Inmate call-out procedures are utilized for resolving urgent problems.   The Program Statements below and/or the Law Library can address most areas of inmate concern and should answer the majority of your questions.

Revised November 2012

Sentence Computation, Pre-SRA (Old Law, MR and Par. Viol)
Sentence Computation, Sentencing Reform Act (New Law)
Interstate Agreement on Detainers

For those questions unanswered, you may go to open house or submit a Cop-Out to the CSD being specific in your area of concern and, if need be, you will be called out and given an explanation.

**Fines and Costs**

In addition to jail time, the court may impose a committed or non-committed fine and/or costs.   Committed fines mean the inmate will stay in prison until the fine is paid, makes arrangements to pay the fine, or qualifies for release under the provisions of Title 18 USC, Section 3569 (pauper's oath).   Non-committed fines have no condition of imprisonment based on payment of fines or costs.   Payment for a non-committed fine or cost is not required for release from prison or transfer to a contract Residential Re-Entry Center (RRC).

**Detainers**

Interstate Agreement on Detainers (IAD):   The provisions of the IAD are only applicable based on "Untried Charges."   Louisiana and Mississippi are the only two states who have not ratified the Agreement.   Detainers based on State Sentences, Probation Violation, Parole Violation, or Conditional Release Violations are not "Untried Charges."   You will be notified by Inmate Systems of any detainers lodged and whether the IAD is applicable or not.   If you desire to seek disposition of a detainer based on "Untried Charges", contact the Case Management Coordinator or the Supervisory Inmate Systems Specialist.

**Good Conduct Good Time**

This applies to inmates sentenced for an offense committed after November 1, 1987.   The Comprehensive Crime Control Act became law November 1, 1987.   The two most significant changes in the sentencing statutes deal with good time and parole issues.   There are no provisions under the new law for parole.   The only good time available will be fifty-four (54) days per year good conduct time (GCT).   This may not be awarded until the end of the year and may be awarded in part or in whole contingent upon behavior during the year.   Once awarded, it is vested and may not be forfeited.   There is no statutory good time or extra good time for people being sentenced for crimes committed after November 1, 1987.

**Good Conduct Time:** Inmates with sentences that have a **Date Offense Concluded** on or after November 1, 1987 are sentenced under the procedures of the Sentencing Reform Act (SRA) of 1984.   Title 18 USC ɔ 3624(b) governs the award of Good Conduct Time.   An inmate=s sentence procedure is based upon the Date Offense Concluded:

|  |  |
|---|---|
| SRA: | On or after **November 1, 1987** |
| VCCLEA: | On or after **September 13, 1994** |
| PLRA: | On or after **April 26, 1996** |

An inmate may have only one of the above types of sentences or may have a combination of two or all three.   Due to the **exemplary compliance** provisions of 18 USC 3624 (b), these sentences are not compatible regarding Good Conduct Time Dis-allowances, Forfeitures, and Vesting. Therefore, if these different types of sentences are aggregated with each other, de-aggregation is required prior to any DHO sanction affecting Good Conduct Time.

Currently SRA and VCCLEA may be aggregated.   De-aggregation must occur prior to DHO action.   This applies to any SRA/VCCLEA aggregate without regard to whether the VCCLEA is violent or nonviolent.

If an inmate has only a VCCLEA sentence, but one count is violent and one count is nonviolent, the VCCLEA will be treated as a violent sentence.   For DHO purposes, the sentence will remain an aggregate sentence subject to the **exemplary compliance** provisions.

PLRA sentences will be aggregated with PLRA sentences but not SRA or VCCLEA sentences.

Revised November 2012

Exemplary Compliance:

> VCCLEA Nonviolent - GED requirement.   GED UNSAT GCT does not vest.   All GCT earned while in non-vesting status may be subject to forfeiture.   Max GCT earning in one year = 54 days.

> VCCLEA Violent - GED requirement same as nonviolent.   Higher DHO sanctions.   Max GCT earning in one year = 54 days.

> PLRA - GED requirement for vesting same as VCCLEA, however, if the inmate is in a non-vesting status then the max GCT earning while in that status is 42 days per year.   Also, higher DHO sanctions.

**THE GOOD TIME DISCUSSIONS BELOW DO NOT APPLY TO INMATES SENTENCED UNDER THE NEW SENTENCING GUIDELINES**

**Statutory Good Time**

"Good Time" awarded by the Bureau of Prisons under statutes enacted prior to November 1, 1987, has the effect of reducing the stated term of the sentence - that is, it advances the date when release will be mandatory if the offender is not paroled at an earlier date.   The award of good time does not in itself advance the offender's release date.   It has that effect only if the offender would not otherwise be paroled before the mandatory date.   The behavior for which good time is awarded may also be considered by the Parole Commission in setting a parole date.   This is not always done, however.   Even when it is, the extent of the benefit to the offender may not be equivalent to the good time earned.

Under 18 U.S. Code 4161, an offender sentenced to a definite term of six (6) months or more is entitled to a deduction from his term, computed as follows, if the offender has faithfully observed the rules of the institution and has not been disciplined:

> Not greater than one (1) year - five (5) days for each month of the not less than six (6) months or more than one (1) year sentence

> More than one (1) year, less than three (3) years - six (6) days for each month of the stated sentence

> At least three (3) years, less than five (5) years - seven (7) days for each month of the stated sentence

> At least five (5) years, less than ten (10) years - eight (8) days for each month of the stated sentence

> ten (10) years or more - ten (10) days for each month of the stated sentence

At the beginning of a prisoner's sentence, the full amount of statutory good time is credited, subject to forfeiture if the prisoner commits disciplinary infractions.

If the sentence is for five (5) years or longer, 18 USC 4206(d) requires the Parole Commission to release an offender after he has served two-thirds of the sentence, unless the Commission determines he has seriously violated Bureau of Prisons rules or regulations or there is a reasonable probability he will commit a crime.   For offenders serving sentences of five to ten years, this provision may mandate release before the date established by subtracting good time from the sentence.

Statutory Good Time does not apply to life sentences or to those few inmates remaining who were sentenced under the Youth Corrections Act.   It applies to a split sentence if the period of confinement is exactly six (6) months; a shorter period does not qualify for good time under the statute and a longer period cannot be part of a split sentence.

The following applies only to inmates sentenced for an offense committed prior to November 1, 1987.

**Extra Good Time**

The Bureau of Prisons awards extra good time credit for performing exceptionally meritorious service,   duties of

39

outstanding importance, or for employment in an industry or camp. An inmate may earn only one type of good time at a time (e.g. an inmate earning industrial or camp good time is not eligible for meritorious good time), except a lump sum award may be given in addition to another extra good time award. Neither the Warden nor the Disciplinary Hearing Officer may forfeit or withhold extra good time.

The Warden may disallow or terminate the awarding of any type of extra good time (except for lump sum awards), but only in a non-disciplinary context and only upon recommendation of staff. The Disciplinary Hearing Officer may also disallow or terminate the awarding of any type of extra good time (except lump sum awards) as a disciplinary sanction. Once an awarding of meritorious good time has been terminated, the Warden must approve a new staff recommendation in order for the award to re-commence. A "disallowance" means an inmate does not receive an extra good time award for only one calendar month. A "disallowance" must be for the entire amount of extra good time for that calendar month. There may be no partial disallowance. A decision to disallow or terminate extra good time may not be suspended pending future consideration. A retroactive award of meritorious good time may not include a month in which extra good time has been disallowed or terminated.

**Residential Re-Entry (RRC) Center Good Time**

Extra good time for an inmate in a Federal or contract Residential Re-Entry Center is awarded automatically beginning on arrival at that facility and continuing as long as the inmate is confined to the Center, unless the award is disallowed.

**Camp Good Time**

An inmate assigned to a camp is automatically awarded extra good time beginning on the date of commitment to the camp and continuing as long as the inmate is assigned to the camp unless the award is disallowed.

**Lump Sum Awards**

Any staff member may recommend to the Warden the approval of an inmate for a lump sum award of extra good time. Such recommendations must be for an exceptional act or service that is not a part of a regularly assigned duty. The Warden may make lump sum awards of extra good time of not more than thirty (30) days. If the recommendation is for more than thirty (30) days and the Warden agrees, the Warden will refer the recommendation to the Regional Director, who may approve the award.

No award will be approved if the award would be more than the maximum number of days allowed under 18 USC 4162. The actual length of time served on the sentence, including jail credit time, is the basis on which the maximum amount of the award is calculated. Any extra good time already earned will be subtracted from this stated maximum. Staff may recommend lump sum awards of extra good time for the following reasons:

An act of heroism

Voluntary acceptance and satisfactory performance of an unusually hazardous assignment

An act which protects the lives of staff or inmates or the property of the United States. This is to be an act and not merely the providing of information in custodial or security matters

A suggestion which results in substantial improvement of a program or operation or which results in significant savings

Any other exceptional or outstanding service.

**Good Time Procedures (OLD LAW)**

Extra good time is awarded at a rate of three days per month during the first twelve months and at the rate of five days per month thereafter (i.e., the first twelve months, as stated, means 11 months and 30 days - Day for Day - of earning extra good time before an inmate can start earning five days per month. For example, if an inmate were to stop working, transfer from Industry to an institution job, or if good time was terminated for any reason, the time the inmate is not earning good time does not count in the calculation of the first twelve (12) months). If the beginning

Revised November 2012

or termination date of an extra good time award occurs after the first day of the month, a partial award of days is made.   An inmate may be awarded extra good time even though some or all of the inmate's statutory good time has been forfeited or withheld.

Extra good time is not automatically discontinued while an inmate is hospitalized, on furlough, out of the institution on writ of Habeas Corpus, or removed under the Interstate Agreement on Detainers Act.   Extra good time may be terminated or disallowed during such absences if the Warden finds the inmate's behavior warrants such action.

An inmate committed for civil contempt is not entitled to extra good time deductions while serving the civil contempt sentence.

An inmate in an extra good time earning status may not waive or refuse extra good time credits.

Once extra good time is awarded, it becomes vested and may not be forfeited or withheld or retroactively terminated or disallowed.

**Parole**

Parole is release from incarceration under conditions established by the U.S. Parole Commission.   Parole is not a pardon or an act of clemency.   A parolee remains under the supervision of a U.S. Probation Officer until the expiration of his or her full term.   Inmates are ordinarily permitted an opportunity to appear before the Parole Commission within 120 days of commitment (EXCEPTIONS: inmates sentenced before September 6, 1977, and inmates with a minimum parole eligibility of ten (10) years).   If the inmate chooses not to appear before the Parole Board within the first 120 days of commitment, a waiver must be given to the Case Manager or Unit Counselor prior to the time of the scheduled Parole Hearing.   This waiver will be made part of the Parole Commission file and the inmate's central file.

All inmates who previously waived a Parole hearing are eligible to appear before the Parole Board at any regularly scheduled hearing after they waive.   Application for a Parole hearing must be made at least 60 days before the first day of the month of the hearings.   The Parole Board conducts hearings at selected Bureau institutions, including USMCFP-Springfield, once every 16 weeks.

Application to the Parole Commission for a hearing is the responsibility of the inmate, but in certain cases the Unit Team will assist the inmate if necessary.   Application forms may be obtained from the Case Manager .

Following the hearing, the inmate will be advised of the tentative decision reached in the case by the hearing examiners.   The recommendations of the hearing examiners must be confirmed by the Regional Office of the Parole Board.   This confirmation usually takes three to four weeks and is made through the mail on a form called a "Notice of Action."   This decision may be appealed by the inmate.   Forms for appeal may be obtained from Case Managers. If granted a presumptive parole date (a parole date more than six (6) months following the hearing) a Parole Progress Report will be sent to the Parole Board three to six months before the parole date.

Parole may be granted to a detainer or for the purpose of deportation.   The inmate should have an approved residence and an approved employer before being released on parole.

**Release Planning**

If granted Parole by the U.S. Parole Commission, the Commission will require an approved parole plan prior to release.   An approved parole plan consists of an offer of employment and a place to reside.

The job must pay at least minimum wage and normally may not require extensive travel.   The place to reside must be a reputable establishment, but can be almost anywhere (parents, wife, friend, YMCA, etc.).   The proposed parole plan is thoroughly investigated by the U.S. Probation Officer and must be approved.   The parole plan is part of the material which is submitted in connection with the parole hearing.   The Unit Team submits the inmate's release plans to the U.S. Probation Officer approximately eight months before the scheduled parole date.

**Residential Re-Entry Center/Halfway House Transfers**

41

Revised November 2012

Inmates who are nearing release and who need assistance in obtaining a job, residence or other community resources may be transferred to a Residential Re-Entry Center (RRC).   In some cases, you may receive more than 6 months due to the Second Chance Act.   All inmates are reviewed for up to 12 months RRC placement utilizing a five factor review based on the Second Chance Act.   However, this is only approved by the Regional Director.   You may discuss this process with your unit team.

The Bureau's Residential Re-Entry Branch, within the Correctional Programs Division, supervises services provided to offenders housed in contract facilities and participating in specialized programs in the community.   The Residential Re-Entry Manager (RRM) links the Bureau of Prisons with the U.S. Courts, other Federal agencies, State and local Governments, and the community.   Located strategically throughout the country, the RRM is responsible for developing and maintaining a variety of contract facilities and programs, working under the supervision of the appropriate Regional Administrator.

Community programs have three major emphases:

> residential community-based programs provided by Residential Re-Entry Centers and local detention facilities

> intensive nonresidential supervision to offenders in the community programs boarding juvenile and adult offenders in contract correctional facilities.

**Community-Based Residential Programs**

The community-based residential programs available include both typical Residential Re-Entry Centers and local detention facilities.   Each provides a suitable residence, structured programs, job placement, and counseling while monitoring the offender's activities.   They also provide drug testing and counseling, and alcohol monitoring and treatment.   While in these programs, employed offenders are required to pay subsistence to help defray the cost of their confinement.   The inmate's payment rate during RRC residence is 25% of the inmate's income.

Most Bureau of Prisons community-based residential programs are provided in Residential Re-Entry Centers. These facilities contract with the Bureau of Prisons to provide residential correctional programs near the offender's home community.   RRC's are used primarily for two types of offenders:

> Those nearing release from a BOP institution, as a transitional service while the offender is finding a job, locating a place to live, and re-establishing family ties.

> Those under community supervision who need guidance and supportive services beyond what can be provided through regular supervision.

Each RRC now provides two components within one facility, a pre-release component and a community corrections component.   The pre-release component assists offenders making the transition from an institutional setting to the community, or as a resource while under supervision.   The community corrections component is more restrictive and, except for employment and other required activities, the offenders in this second more restrictive component must remain at the RRC, where recreation, visiting, and other activities are provided in-house.

The other option for community-based residential programming is local detention facilities.   Some local jails and detention centers are used to confine offenders serving short sentences.   Many have work release programs where an offender is employed in the community during the day and returns to the institution at night.   These facilities may also be used for offenders sentenced to terms of intermittent confinement such as nights, weekends, or other short intervals.   Some of these local facilities have work release programs similar to the community corrections component in a RRC, serving to facilitate the transition from the institution to the community.

**VCCLEA**

The Violence Crime Control and Law Enforcement Act (VCCLEA) of 1994 requires the Bureau of Prisons to notify

Revised November 2012

state and local law enforcement officials at least two weeks prior to releasing an inmate to supervised release, probation, or parole who have been convicted of a "drug trafficking" crime or a "crime of violence".   The notification includes the proposed residence, prior/current convictions for violence/drug trafficking, and the conditions of supervision.

The VCCLEA makes the earning of Good Conduct Time by violent offenders contingent upon exemplary compliance with institution discipline regulations.   VCCLEA inmates' good time will only vest if they have earned a General Education Diploma (GED) or high school diploma or are making satisfactory progress towards earning a GED.

The VCCLEA also requires the Bureau of Prisons to notify inmates convicted of sexual offenses of sexual offender treatment programs within the releasing area.

The Cost of Incarceration Fee (COIF) requires inmates to pay for a portion or all of the costs associated with their first year of incarceration based on their assets as reflected in the presentence report.   The cost of incarceration fee does not apply to inmates who received fines or when the sentencing judge waived the fine.

Non-violent inmates who meet a certain criteria may receive up to a one (1) year reduction to their sentence for completion of an intensive residential drug treatment program.   Completion of the 40-hour Drug Education Program is a prerequisite for admission into the intensive residential program.   Information concerning the program can be obtained from the institution drug program coordinator or drug treatment specialist.

**PLRA**

The Prison Litigation Reform Act (PLRA) provisions apply to inmates with an offense date on or after April 26, 1996.

All PLRA inmates must demonstrate exemplary compliance with institution disciplinary regulations in order to earn good conduct time.   **PLRA inmate's good time will not vest until the end of their sentences.**   The PLRA also provides that Federal judges may order the forfeiture of good conduct time upon a finding the inmate filed a malicious lawsuit, filed a lawsuit in order to harass the opposing party, or presented false evidence to the court. PLRA inmates who are not making satisfactory progress towards earning their GED will only potentially be awarded a maximum of 42 days good time per year rather than 54 days.

The standard for satisfactory progress is defined as an inmate deemed to be making satisfactory progress unless and until he refuses to enroll in school, withdraws, or is found guilty of a prohibited act that occurs in the literacy program.

**DNA COLLECTION**

DNA Evidence Backlog Elimination Act of 2000, USA Patriot Act of 2001, Justice for All Act of 2005, DNA Fingerprint Act of 2005, and the Adam Walsh Child Protection and Safety Act of 2006 requires the Bureau of Prisons to obtain DNA samples from inmates who are:

- Convicted of any federal offense (felony or misdemeanor)
- Convicted of any Uniform Code of Military Justice (military) offense (felony or misdemeanor)
- Convicted of qualifying D.C. Code offense
- Arrested or facing charges (pretrial inmates)
- Non-U.S. persons who are detained under the authority of the United States

**Treaty Transfer**

Public Law 95-144 authorizes the transfer of offenders to or from foreign countries pursuant to the conditions of a current treaty which provides for such transfer.   Title 18 of U.S. Code 4102 authorizes the Attorney General to act on behalf of the United States in regard to such treaties.   The United States has agreements with several countries, including Canada and Mexico, to facilitate the transfer of inmates to their country of citizenship.   In general, such treaties provide for citizens of one country convicted of a crime in another country and who, as a result of this conviction, is sentenced to imprisonment or some form of conditional release in that country to instead be transferred

43

Revised November 2012

to the individuals country of citizenship for completion of sentence.   The program is voluntary and is subject to approval of both countries.

<u>**Conclusion**</u>

Hopefully, this information will assist you in your first days in Federal custody.   You should feel free to ask any staff member for assistance, particularly your unit staff.   For individuals who are not yet in custody and who have been given this book to prepare for commitment, the Bureau's Community Corrections Manager or the staff at the institution to which you have been designated can help clarify your concerns.

Revised November 2012

# Inmate Rights and Responsibilities

## RIGHTS

**1.** You have the right to expect as a human being you will be treated respectfully, impartially, and fairly by all personnel.

**2.** You have the right to be informed of the rules, procedures, and schedules.

**3.** You have the right to freedom of religious affiliation and voluntary religious worship.

**4.** You have the right to health care which includes nutritious meals, proper bedding and clothing and a laundry schedule for cleanliness of the same, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles, medical, and dental treatment.

**5.** You have the right to visit and correspond with family members and friends and correspond with members of the news media in keeping with Bureau rules and institution guidelines.

**6.** You have the right to unrestricted and confidential access to the courts by correspondence (on matters such as the legality of your conviction, civil matters, pending criminal cases, and conditions of your imprisonment).

**7.** You have the right to legal counsel from an attorney of you choice by interviews and correspondence.

## RESPONSIBILITIES

**1.** You have the responsibility to treat others, both employees and inmates, in the same manner.

**2.** You have the responsibility to know and abide by them concerning the operation of the institution.

**3.** You have the responsibility to recognize and respect the rights of other in this regard.

**4.** It is your responsibility not to waste food, to follow the laundry and shower schedule, maintain neat and clean living quarters, keep your area free of contraband, and seek medical and dental care as you may need it.

**5.** It is your responsibility to conduct yourself properly during visits, not accept or pass contraband, and not violate the law or Bureau rules or institution guidelines through your correspondence.

**6.** You have the responsibility to present honestly and fairly your petitions, questions, and problems to the court.

**7.** It is your responsibility to use the services of an attorney honestly and fairly.

**8.** It is your responsibility to use these resources in keeping with the procedures and schedule prescribed and to respect the rights of other inmates to use the materials and assistance.

45

Revised November 2012

**RIGHTS**

**8.** You have the right to participate in the use of law library reference materials to assist you in resolving legal problems. You also have the right to receive help when it is available through a legal assistance program.

**9.** You have the right to a wide range of reading materials for educational purposes and for your own enjoyment. These materials may include magazines and newspapers sent from the community, with certain restrictions.

**10.** You have the right to participate in education, vocational training, and employment as far as resources are available, and in keeping with your interests, needs, and abilities.

**11.** You have the right to use your funds for commissary and other purchases consistent with institution security and good order, opening bank and/or savings accounts, and to assist your family.

**RESPONSIBILITIES**

**9.** It is your responsibility to seek and utilize such materials for your personal benefit without depriving others of their equal rights to the use of this materials.

**10.** You have the responsibility to take advantage of activities which may help you live a successful and law abiding life within the institution and in the community. You will be expected to abide by the regulations governing the use of such activities.

**11.** You have the responsibility to meet your financial obligations including, but not limited to, court imposed assessments, fines, and restitution. You also have the responsibility to make use of your funds in a manner consistent with your release plans, your family needs, and for other obligations you may have.

46

Revised November 2012

## Federal Bureau of Prisons
## Health Care Rights and Responsibilities

While in the custody of the Federal Bureau of Prisons you have the right to receive health care in a manner that recognizes your basic human rights, and you also accept the responsibility to cooperate with your health care plans and respect the basic human rights of your health care providers.

### Your Health Care Rights:

1. You have the **right to access** health care services regardless of race, color, creed, sexual preference, or national origin. Health services include medical, mental health, dental and all support services. The USUSMCFP Springfield will charge a co-pay fee of $2.00 for inmate requested visits to health care providers. Scheduled and emergency care will be provided at no personal expense. Health Services cannot be denied due to lack (verified)of personal funds to pay for your care.

2. You have the right to know the name and professional status of your health care providers and to be treated with respect, consideration and dignity to include consideration of psychosocial, spiritual and cultural variables that may influence the perceptions of illness.

3. You have the right to address any concern regarding your health care to any member of the institution staff including the physician, the Health Services Administrator, members of your Unit Team, the Associate Warden and the Warden

### Your Responsibilities:

1. You have the responsibility to comply with the health care policies of your institution, and follow recommended treatment plans established for you, by your health care providers to include proper use of medications, proper diet, following all health related instructions with which you are provided, and keeping all appointments. **You have the responsibility to pay an identified fee for any health care encounter initiated by yourself, excluding emergency care. You will also pay the fee for the care of any other inmate on whom you intentionally inflict bodily harm or injury**.

2. You have the responsibility to treat these providers as professionals and follow their instructions to maintain and improve your overall health.

3. You have the responsibility to address your concerns in the accepted format, such as the *Inmate Request to Staff Member* form, main line, or the accepted *Inmate Grievance Procedures.*

47

Revised November 2012

**Your Health Care Rights:**

4. You have the right to provide the Bureau of Prisons with Advance Directives or a Living Will that would provide the BOP with instructions if you are admitted as an inpatient to a hospital.   Care is not dependant on the existence of an Advance Directive.

5.   You have the right to be provided with information regarding your diagnosis, treatment and prognosis. **This includes the right to be informed of health care outcomes that differ significantly from the anticipated outcome**.

6. You have the right to obtain copies of certain releasable portions of your health record.

7. You have the right to be examined in privacy.

8. You have the right to participate in health promotion and disease prevention programs, including those providing education regarding infectious diseases.

9. You have the right to report complaints of pain to your health care provider, **have your pain assessed and managed in a timely and medically acceptable manner, be provided information about pain and pain management, as well as information on the limitations and side effects of pain treatments**.

**Your Responsibilities:**

4. You have the responsibility to provide the Bureau of Prisons with accurate information to complete this agreement. You are also responsible for contacting the Social Work department for more information on formulating an Advance Directive.

5.You have the responsibility be prudent in deciding with whom to share your medical/mental health information.

6. You have the responsibility to be familiar with the current policy and abide by such to obtain these records.

7. You have the responsibility to comply with security procedures should security be required during your examination.

8**.** You have the responsibility to maintain your health and not to endanger yourself, or others, by participating in activity that could result in the
spreading or catching an infectious disease.

9. You have the responsibility to communicate with your health care provider honestly regarding your pain and your concerns about your pain. You also have
the responsibility to adhere to the prescribed treatment plan and medical restrictions. It is your responsibility to keep your provider informed of both positive and negative changes in your condition to assure timely follow up.

48

Revised November 2012

**Your Health Care Rights:**

10. You have the right to receive prescribed medications and treatments in a timely manner, consistent with the recommendations of the prescribing health care provider.

11. You have the right to be provided healthy and nutritious food. You have The right to instruction regarding a Healthy diet.

12. You have the right to request a routine physical examination, as defined by Bureau of Prisons' Policy.
(If you are under the age of 50, once every two years; if over the age of 50, once a year and within one year of your release).

13. You have the right to dental care as defined in Bureau of Prisons' Policy to include preventative services, emergency care and routine care.

14. You have the right to a safe, clean and healthy environment, including smoke-free living areas.

15. You have the right to refuse medical/mental health treatment in accordance with Bureau of Prisons' Policy. Refusal of certain diagnostic tests for infectious diseases can result in administrative action against you. You have the right to be counseled regarding the possible ill-effects of refusing medical treatment.

**Your Responsibilities:**

10. You have the responsibility to be honest with your health care provider(s), to comply with
prescribed treatments and follow prescription orders. You also have the responsibility not to provide any other person your medication or other prescribed
item.

11. You have the responsibility to eat healthy and not abuse or waste food or drink.

12. You have the responsibility to notify medical staff that you wish to have an examination.

13. You have the responsibility to maintain your oral hygiene and health.

14. You have the responsibility to maintain the cleanliness of personal and common areas and safety in consideration of others. You have the responsibility to follow smoking regulations.

15. You have the responsibility to notify health services regarding any ill-effects that occur as a result of your refusal. You also accept the
responsibility to sign the treatment refusal form..

16. You have the responsibility to be actively involved in your medical/mental health care and to base your expectations on the reality of your illness.

17.You have the responsibility be prudent in deciding with whom to share your medical/mental health information.

49

Revised November 2012

**Your Health Care Rights:**

16. You have the right to be involved in all aspects of the decision making process regarding your medical/mental health care. Every effort will be made to honor your beliefs and expectations regarding the care provided.

17. You have the right to expect that your medical/mental health information will only be shared with individuals involved in your care as limited by state and federal laws. You may share your information with whomever you choose.

18. You have the right to receive care in a safe environment and to be free from neglect, exploitation, and   all forms of abuse to include sexual, physical, mental, and verbal.

19. You have the right to refuse any experimental research, or educational activities that may be involved in your treatment plan without fear of reprisal.

20. You have the right to participate or refuse to participate in social, spiritual, or community activities and to refuse to speak with anyone not associated with this institution regarding your medical condition if this does not interfere with the terms of your incarceration.

**Your Responsibilities:**

18. You have the responsibility to report all cases of misconduct to institution staff.

19. You have the responsibility to voice your objection to these activities.

20. You have the responsibility to voice your objection to these activities.

21. You have the responsibility to ensure that your expression and practice is in accordance with national and local BOP policy.

22. It is your responsibility not to waste food, to follow the laundry and shower schedule, maintain neat and clean living quarters, keep your area free of contraband, and seek medical and dental care as you may need it.

23. You have the responsibility to recognize and respect the rights of other in this regard.

24. You have the responsibility to present honestly and fairly your petitions, questions, and problems to the court.

25. It is your responsibility to seek and utilize such materials for your personal benefit without depriving others of their equal rights to the use of this materials.

Revised November 2012

**Your Health Care Rights:**

21. You have the right to express personal values and practice cultural and spiritual beliefs provided they do not interfere with your treatment plan, other inmates, or the orderly running of the institution.

22**.** You have the right to health care which includes nutritious meals, proper bedding and clothing and a laundry schedule for cleanliness of the same, an opportunity to shower regularly, proper ventilation for warmth and fresh air, a regular exercise period, toilet articles, medical, and dental treatment.

23. You have the right to freedom of religious affiliation and voluntary religious worship, to include access to pastoral and other spiritual services.

24. You have the right to unrestricted and confidential access to the courts by correspondence (on matters such as the legality of your conviction, civil matters, pending criminal cases, and conditions of your imprisonment).

25. The patient has the right to a wide range of reading materials for educational and recreational purposes with certain restrictions.

26. The patient has the right to participate in education, vocational training, and employment as far as resources are available, and in keeping with their interests, needs, and abilities.

**Your Responsibilities:**

26. You have the responsibility to take advantage of activities which may help you live a successful and law abiding life within the institution and in the community. You will be expected to abide by the regulations governing the use of such activities

51

Revised November 2012

## Inmate Fact Sheet -Preventive Health Program for Men
### Preventive Health Screening- Initial

The following preventive health screening is provided shortly after you enter federal prison:

**TB Skin Test-** Unless your medical record shows a previous positive TB skin test.

**Chest X-ray** - If you have a positive TB skin test, or if you are foreign born or have recently been outside the U.S. or if you have HIV infection

**Syphilis** -   At intake physical exam if have HIV infection, or have a history of syphilis, gonorrhea, or chlamydia

Your health care provider may recommend additional health screens (tests) based on your medical history and physical examination.

### Preventive Health Screening for Sentenced Inmates

The following preventive health screens are routinely provided for *sentenced* inmates.   You can also request a prevention visit to review needed preventive health services, every three years (if you are under age 50) or every year (if you are age 50 and over).

**Viral Hepatitis** - If you are at risk of hepatitis B or hepatitis C viral infections or report that you had a prior infection.

**HIV** - If you are at risk of infection or report a prior infection.

**TB Skin Test** - Every year, unless you had a positive test in the past.

**Colon Cancer** - Testing for blood in your stool every year, beginning at age 50; colonoscopy if you are at higher risk for colon cancer.

**Diabetes** - If you are at risk, screening every 3 years, beginning at age 45.

**Cholesterol** - Beginning at age 35, screen every 5 years (sooner if you are at risk).

In addition, vaccinations are provided as recommended.   Other preventive health services may be made available to you, based on your age and specific needs.

### Take care of yourself while you are in prison!

Exercise regularly.
Eat a healthy diet (low fat, more fruits and vegetables).
Take medications as recommended by your doctor.
Don't use tobacco or illegal drugs, or get a tattoo while in prison.
Don't have sexual contact with others while in prison.

Revised November 2012

## **Sexual Assault**

### What Is Sexual Assault?

According to the Federal Bureau of Prisons, sexual assault is any forceful or threatening sexual behavior forced on you by one or more inmates.   This includes pressure, threats, or other actions and communications to force you to engage in a partial or complete sexual act.

### Your Right To Be Safe From Sexual Assault

While you are incarcerated, no one has the right to pressure you to engage in sexual acts.   You do not have to tolerate sexual assault or pressure to engage in unwanted sexual behavior regardless of your age, size, race, or ethnicity.   Whether you are straight, gay, lesbian, or bisexual, you have the right to be safe from unwanted sexual advances and acts.

### About Your Safety

If you feel your right to be left alone sexually is being violated, BOP staff are available to help you deal with this problem.   You should feel free to discuss your concerns about sexual assault with any staff member.   Some staff, like psychologists, are specially trained to help you deal with problems in this area.   If you are in an emergency situation, approach any staff member.   It's part of their job to ensure your safety.   You do not have to name other inmates to receive assistance, but specific information may make it easier for staff to help you.

If you are sexually assaulted, you should immediately ask for medical treatment.   Even though you may want to clean up after the assault, it is important to see medical staff before you shower, wash, drink, eat, change clothing, or use the bathroom.   Medical staff will examine you for injuries which may or may not be readily apparent to you.   They can also check you for sexually transmitted diseases and gather any physical evidence of assault.

### Avoiding Sexual Assault
Here are some things you can do to protect yourself against sexual assault:

X       Do not accept gifts or favors from other inmates.   Most gifts or favors from other inmates come with strings attached to them.

X       Be alert!  Do not use contraband substances such as drugs or alcohol.   These can weaken your ability to stay alert and make good judgments.

53

Revised November 2012

X       Be direct and firm if other inmates ask you to do something you don't want to do.   Do not give mixed messages to other inmates regarding your wishes for sexual activity.

X       Avoid out of the way or poorly lit areas of the institution.

X       Choose your associates wisely.   Look for people who are involved in safe, positive institutional activities like educational programs, psychology groups, or religious services.   Get involved in these activities yourself.

X       Trust your instincts.   If you sense a situation may be dangerous, it probably is.

<u>Counseling Services Related To Sexual Assault</u>

Most people need help to recover from the emotional effects of sexual assault.   If you are the victim of a sexual assault, whether it's recent or in the past, psychology staff are available to counsel you.   If you feel you need help to keep form sexually assaulting someone else, psychological services are available to help you gain control over these impulses.

**Before You Attack Another Inmate Remember . . .**

Sexual assault is a serious crime.   The Bureau of Prisons will investigate all reported sexual assault incidents.   If you are found guilty of sexual assault, you will be subject to disciplinary action which may include loss of good time, time in disciplinary segregation, and/or additional criminal charges and time in prison.

If you are interested in more information on this topic, Psychology Services staff are available to assist you.

Revised November 2012

## **Visiting Room Rules and Regulations**

The following guidelines have been established to provide an opportunity to visit within the confines of the U.S. U.S. Medical Center for Federal Prisoners in a safe and orderly manner. They have been formulated so visiting privileges may continue to be a productive and integral part of this institution's operation and the inmate's adjustment.   Questions concerning these guidelines should be directed to the Receptionist or Visiting Room Officers.

1.     The Front Lobby Receptionist/Officer will ensure all visitors are dressed appropriately.   All visitors will be properly dressed when coming to visit at MCFP Springfield. Visitors will be expected to wear clothing which is in good taste. The Receptionist will ensure all visitors are dressed appropriately. **Visitors are prohibited from wearing sleeveless shirts, low cut, or see-through clothing, tube or tank tops, shorts/skorts, jogging suits, backless clothing, open-toed shoes or any other apparel of a suggestive or revealing nature (e.g., short shorts, miniskirts (anything more than two (2) inches above the knee is unacceptable, skin-tight clothing, etc.)** No hats or nonprescription sunglasses are allowed in the Visiting Room. Inmates are responsible for advising their visitors of the dress requirements in the Visiting Room, including not wearing clothing orange or khaki in color.

Visitors will not be allowed to enter the institution wearing light brown Hushpuppy shoes that are the same type as the inmates are allowed to buy through the Commissary and are authorized to wear into the Visiting Room.

The Operation Lieutenant or Duty Officer will be consulted prior to denying a visitor entry into the institution because of his or her attire. Excessive provocative attire is a reason to deny and/or preclude visiting.

2.     Physical contact between the inmates and his visitor(s) will be limited to a hand shake, embrace, or a brief closed mouth kiss, upon the initial arrival and at the completion of the visit. Once the inmates and visitors are seated, inmates may not slump in the chairs, put their feet on the tables, lay on each other, cross legs with another, embrace, massage, or anything else which involves excessive and constant touching. Visitors, with the exception of small child, will not be permitted to sit on the lap of an inmate.

The officers will issue only one warning. This will be documented as your one and only warning concerning excessive contact. Any additional contact will be subject to termination of the visit, and disciplinary action will result in suspension of visiting privileges.

It is the responsibility of the inmate to ensure all visits are conducted in a quiet, orderly, and dignified manner. All visits not conducted in an appropriate manner will be terminated.

If there is any reasonable basis to suspect items are being passed, which constitutes

55

Revised November 2012

a violation of the law or regulations, the officer will examine the item(s) and the Operations Lieutenant will be consulted for guidance.

3. Children are the responsibility of their parents and will remain with their parents while in the Visiting Room.   They are not permitted to roam through the Visiting Room or disturb other visitors.

4. Visitors with infants **WILL NOT BE PERMITTED** to carry a diaper bag into the Visiting Room.   A clear plastic bag will be provided to carry items needed for sufficient care of the child.   The items allowed are limited to:   two (2) bottles with formula, three (3) diapers, one (1) change of outer garments, (1) baby blanket, and two (2) jars of baby food (must be in factory sealed containers).

5. Coats (outer garments) and hats may be left in the lockers provided and are not permitted inside the Visiting Room; however, the Medical Center assumes no responsibility for lost or stolen items.   After outer garments are left on the coat racks provided, visitors will not be permitted to retrieve any items from the garments.

6. Visitors will only be allowed to bring in to the Visiting Room a small clear clutch purse, handkerchief, comb, coins, or reasonable amounts of currency, female hygiene items, identification cards, and immediate needs for medications such as those needed for heart disease, respiratory malfunctions, etc.   Billfolds are allowed to be taken into the Visiting Room.

7. Inmates are permitted to bring only the following items into the Visiting Room:   handkerchief, comb, wedding band, and prescription glasses. Inmates are not permitted to take food items, letters, pictures, etc., from the Visiting Room back inside the institution.

8. **The Visiting Room at the U.S. U.S. Medical Center for Federal Prisoners is closed on Tuesdays, Wednesdays, Thursdays and Fridays.   Special visits for these days must be arranged through the inmate's Case Manager.**   Visiting hours are from 8:15 a.m. to 3:00 p.m.   Inmates are allowed eight (8) visiting points per month.   Visits on weekdays count as one (1) point; however, Saturday, Sunday, and holidays count as two (2) points.   Clergy and legal visits do not count against the inmate's monthly allowance.   Clergy visits are limited to two-hour duration.   Additional or "special visits" must be approved at least one week in advance by the inmate's unit team.   Completion of the necessary paperwork is the responsibility of the inmate.

9. Inmates are permitted three (3) adult visitors at a time.   If more than three (3) adults arrive to visit, they may wait in the lobby and exchange places with those in the visiting room.   If necessary, the number of adults may be reduced by the Visiting Room Officers.   At no time will there be more than six (6) visitors for one inmate at one time.

Revised November 2012

10.     When no additional seating is available in the Visiting Room, those inmates who have local visitors (within a twenty-five mile radius of the institution) and have visited the longest will terminate their visits to allow visiting space for out-of-town visitors.

11.     Private attorneys and consular officials are permitted to carry briefcases into the Visiting Room; however, such briefcases are subject to inspection by the receptionist prior to entry.

12.     An inmate wishing to show legal documents to his attorney will mail them to him/her prior to his visit.   In situations where the inmate has a time-sensitive deadline, he may have a member of the unit team seal the legal documents in an envelope and take it to the Visiting Room when the attorney arrives.   The inmate will make these arrangements prior to reporting to the Visiting Room.   These legal documents will again be inspected for contraband upon termination of the visit and the inmate's return to his unit.   The inmate's unit team member will return to the Visiting Room to pick up the documents and return them to the inmate.   No legal documents will be brought through the Shakedown Room.

13.     Tape recorders may be used by attorneys with prior approval in writing from the Warden.   Use will be in compliance with Bureau of Prison Program Statement 1315.3, dated 12-04-81 entitled "Inmate Legal Activities".   See Section 543.13, 3"e", page 5.   The Visiting Room Annex will be used in such circumstances.

14.     Any inquiries made by visitors concerning an inmate will be directed to the inmate's unit team.   The inmate can advise the visitors of the names of his unit team members.

15.     Visitors who give evidence of recent use of intoxicants or display inappropriate behavior will not be permitted to visit.

16.     Visitors may not leave money in the Visiting Room or Front Entrance for credit to an inmate=s account.

17.     Visitors will visit only with the inmate on whose visiting list they appear.

18.     **WARNING:   IT IS A FEDERAL CRIME TO BRING UPON THE INSTITUTION GROUNDS ANY WEAPONS, INTOXICANTS, DRUGS, OR OTHER CONTRABAND.  18 U.S.C. SECTION 1791 PROVIDES A PENALTY OF IMPRISONMENT FOR NOT MORE THAN TWENTY YEARS, A FINE OF NOT MORE THAN $250,000, OR BOTH, TO A PERSON WHO PROVIDES, OR ATTEMPTS TO PROVIDE, TO AN INMATE ANYTHING WHATSOEVER WITHOUT THE KNOWLEDGE AND CONSENT OF THE WARDEN.   ALL PERSONS ENTERING UPON THESE PREMISES ARE SUBJECT TO ROUTINE SEARCHES OF THEIR PERSON, PROPERTY (INCLUDING VEHICLES), AND PACKAGES. THE WARDEN, UPON A REASONABLE SUSPICION THAT A PERSON MAY BE INTRODUCING CONTRABAND OR DEMONSTRATING**

57

Revised November 2012

**ACTIONS THAT MIGHT OTHERWISE ENDANGER INSTITUTION SAFETY, SECURITY, OR GOOD ORDER, MAY REQUEST THE PERSON, AS A PREREQUISITE TO ENTRY, TO SUBMIT TO A VISUAL SEARCH, PAT SEARCH, URINE SURVEILLANCE TEST, BREATHALYZER TEST, OR OTHER COMPARABLE TEST.   A VISITOR HAS THE OPTION TO REFUSE ANY OF THE SEARCH OR TEST OR ENTRANCE PROCEDURES, WITH THE RESULT THAT THE VISITOR WILL NOT BE PERMITTED ENTRY TO THE INSTITUTION.**

19.   Violation of any of the above stated regulations may result in termination of visiting privileges or prosecution, if appropriate.

20.   Visitors will be allowed to visit with one inmate at a time.   Requests for approval of a visitor already on another inmate=s visiting list will be closely reviewed by staff.

21.   The U.S. U.S. Medical Center for Federal Prisoners is located on the western edge of the city of Springfield, Missouri at the corner of Sunshine Street and Kansas Expressway.   Visitors traveling to the Medical Center from U.S. Highway 60 will exit off the Kansas Expressway interchange and travel north on Kansas Expressway approximately three miles.   Interstate 44 is approximately six miles north of the Medical Center on Kansas Expressway.   Visitors arriving on Interstate 44 will exit off and travel south on the Kansas Expressway to reach the institution.

22.   Local Taxi Cab Services:
      Springfield Yellow Cab - (417) 862-5511
      Metropolitan City Cab - (417) 865-7700

      Airlines:
The following airlines provide service to the Springfield-Branson Regional Airport:
American Eagle/American Airlines, US Airways/US Airways Express, United Express

58

**Revised January 2012**

<u>**Advance Directive and Durable Power of Attorney**</u>

**What is an Advanced Directive?**

An Advance Directive allows you to communicate your health care preferences when you lose the capacity to make or communicate your own decisions.   A United States Supreme Court decision (Cruzan) recognizes that all people have a constitutional right to refuse any medical treatment, including ventilators and feeding tubes.   Further, state laws authorize you to name a person to make health care decisions for you when you cannot.   These documents are intended to assure your wishes are known and followed.   They will be more helpful and informative if you discuss you wishes with your family, friends, and heath care providers as part of your advance care planning.

**Durable Power of Attorney for Health Care Decisions**

The *Durable Power of Attorney for Health Care Decisions* allows you to appoint a person to make health care decisions for you.   This document goes into effect ***WHEN AND ONLY WHEN*** you cannot make or communicate decisions for yourself.

**Psychiatric Advance Directives**

Psychiatric Advance Directives are legal documents used to record a competent individual's specific instructions or preferences regarding future mental health treatment. Psychiatric Advance Directives can be used to plan for the possibility that the individual may lose capacity to give or withhold informed consent to treatment during acute episodes of psychiatric illness. It is important to note however that Psychiatric Advance Directives are not legally binding in the state of Missouri. The forms provide you with the opportunity to share your thoughts regarding your <u>*preferences*</u> related to your mental health treatment. In the event of a psychiatric emergency or if you lose the capacity for making reasoned decisions regarding your mental health treatment, Bureau of Prisons policies and procedures will be followed to include involuntary medication and physical interventions if deemed necessary. If you are interested in further information regarding Psychiatric Advance Directives, you may contact the Social Work Department.

**The Benefit of Communication**

The greatest benefit of your *Advance Directive* is its power as a communication tool.   Discuss your *Advance Directive* with your doctor; also, make your wishes about healthcare known to family, friends, clergy, and your attorney (if you have one).   These need to be ongoing conversations.

**Commonly Asked Questions**

1.  **Who can I talk to about an *Advanced Directive*?**
    A Social Worker, your Doctor, a Nurse, or Unit Team staff can help you.   Your doctor is the best person to talk to about your health care preferences. Nurses and Unit Team staff can help you get in touch with a Social Worker who can assist you in the process, or just answer questions.

2.  **Do I need both an *a Health Care Directive* and a *Durable Power of Attorney for Health Care Decisions*?**
    No.   While it is useful to have both, it is not necessary.   Due to the complexity of health care, situations may arise that your *Health Care Directive* does not cover.   To anticipate such events, you should name a person (agent) you trust to make decisions for you.   This may not be an incarcerated individual.

3.  **How is the *Durable Power of Attorney for Health Care Decisions* different from other powers of attorney?**
    Powers of Attorney usually address business and financial matters.   A *Durable Power of Attorney for Health Care Decisions* allows you to name a person (agent) to make health care

59

**Revised January 2012**

decisions for you.   It only takes effect when you lose the ability to make or communicate your own decisions.   Some people choose to name separate agents for business and health care decisions and must use separate documents.   This document addresses health care matters only.

4.     **Whom should I name as my agent?**
It is important you name an agent who knows your goals and values and whom you trust to act in accordance with your wishes.   You may name a family member, but, it is not necessary to do so.

You can choose your spouse, adult child, or a close friend.   Be sure to talk with your agent about your wishes in detail and confirm he or she agrees to act on your behalf.   An inmate cannot be named as your agent.

5.     **If I have already enacted an *Advance Directive* and/or *"Living Will" for Health Care Decisions*?**
Your Living Will may not be as comprehensive as the *Advanced Directive*.   Furthermore, your Living Will probably does not allow you to name an agent.   If you decide to enact the more comprehensive *Health Care Directives* and/or *Durable Power of Attorney for Health Care Decisions*, be certain you notify persons to whom you have distributed your Living Will that it is revoked and provide them with a copy of your new *Advance Directive*.

6.     **If I have completed a document previously, do I need to revoke it and complete a new one?**
No.   Previous documents are similar to the *Health Care Directives/Durable Power of Attorney for Health Care Decisions.*   Some of the documents distributed prior to 1992 did not include a Durable Power of Attorney.   It is always a good idea to review any previously completed documents, and discuss any needed changes with your health care providers.

7.     **Do I need an attorney to enact a *Health Care Directive* or *Durable Power of Attorney for Health Care Decisions*?**
No.   However, you may want to discuss your *Advance Directive* with your attorney, if you have one.   A Social Worker can help you enact an *Advanced Directive* at this facility.

8.     **Do *Advance Directives* need to be witnessed or notarized?**
Yes.   Witnessing and notarizing requirements vary from state to state.   At the U.S. Medical Center for Federal Prisoners, your *Health Care Directive* and/or *Durable Power of Attorney* will be witnessed by two staff members.   The *Durable Power of Attorney* must be signed in front of, and notarized by a notary of the public.   The *Health Care Directive* does not require notarization.

9.     **What happens to my *Advance Directive* after I have completed it?**
This document will become a part of your permanent health record.
You may request copies of your *Advance Directive* to provide to any agent(s) named in your *Durable Power of Attorney for Health Care Decisions* and other appropriate individuals (i.e. family, friends, clergy, and attorney).   Discuss the details of your *Advance Directive* with these individuals.

10.    **When does my *Advance Directive* go into effect?**
Your *Advance Directive* goes into effect WHEN AND ONLY WHEN you are no longer able to make or communicate your health care decisions.

11.    **How long will my *Advance Directive* be effective?   May I change or revoke it?**
Your *Advance Directive* is effective unless you revoke it.   It is recommended you review your *Advance Directive* periodically, especially when there is a change in your health status.

12.    **Can I expect health care providers to carry out the directions in my *Advance Directive*?**
Yes.   There are legal and ethical duties for health care providers to follow patient directions whether verbal or written.

**Revised January 2012**

13.    **Can my *Advance Directive* or decisions made by my agent be overridden by my family members?**

No.   If you have designated an agent, he/she has the same legal and moral authority to make health care decisions for you that you do.   Discuss your *Advance Directive* and treatment preferences with your agent and your family when you complete the document.   However, your agent may wish to obtain additional information from your family to assist him/her in making decisions.

14.    **Will my *Advance Directive* be honored in an emergency situation?**

The *Advanced Directive* states that if a treatment may result in recovery of an acceptable quality of life, it should be tried for a reasonable period of time.   Since in an emergency situation it may be impossible for health care providers to make this judgement, you should assume treatment would be tried.   If treatment does not lead to a significant recovery, you should expect your *Advance Directive* would be honored and treatment that has proven to be ineffective should be withdrawn.

15.    **May I request that artificially administered food and water (tube feedings) be withdrawn?**

Yes.   A clear and specific request in your *Advance Directive* shall be honored.

16.    **May I make a provision for donating organs or tissues in my a*dvance Directive*?**

No.   This is not an option while you are incarcerated at a Federal Bureau of Prisons facility.

**Revised January 2012**

## HEALTH CARE DIRECTIVE

I make this **HEALTH CARE DIRECTIVE (ADirective≅)** to exercise my right to determine the course of my health care and to provide clear and convincing proof of my wishes and instructions about my treatment.   If I am persistently unconscious or there is no reasonable expectation of my recovery from a seriously incapacitating or terminal illness or condition, I direct that all of the life-prolonging procedures that I have initialed below be withheld or withdrawn.

_____    artificially supplied nutrition and hydration (including tube feeding of food and water)

_____    surgery or other invasive procedures

_____    heart-lung resuscitation

_____    antibiotic

_____    dialysis

_____    mechanical ventilator (respirator)

_____    Chemotherapy

_____    radiation therapy

_____    all other Alife prolonging≅ medical or surgical procedures that are merely intended to keep me alive         without reasonable hope of improving my condition or curing my illness or injury

However, if my physician believes that any life-prolonging procedure may lead to a significant recovery, I direct my physician to try the treatment for a reasonable period of time.   If it does not improve my condition, I direct the treatment be withdrawn even if it shortens my life. I also direct that I be given medical treatment to relieve pain or to provide comfort, even if such treatment might shorten my life, suppress my appetite or my breathing, or be habit-forming.

_____
Inmate Name and Register No. (Printed)

_____    _____
Inmate Signature                              Date

_____
Witness (1) Name (Printed)

_____    _____
Witness (1) Signature                    Date

_____
Witness (2) Name (Printed)

_____    _____
Witness (2) Signature                    Date

62

## REVOCATION OF HEALTH CARE DIRECTIVE

I hereby make reference to the Advanced Directive executed by me, dated ___

his documented is hereby rescinded/terminated and all provisions and instructions contain therein, effective this date.

Inmate Name _____ Register Number

Date: _____ Patient Signature:_____

Date:_____ Physician Signature:_____

# Durable Power of Attorney for Health Care Decisions

*It is important to choose someone to make health care decisions for you when you cannot. Tell the person (agent non-inmate) you choose what you would want. The person you choose has the same right as you do to make decisions and to make sure your wishes are honored. If you **DO NOT** choose someone to make decisions for you, write **NONE** on the line for the agent's name.*

I, _____ register number _____, appoint the person named below to be my agent to make health care decisions for me when and only when I cannot make decisions or communicate what I want done. This is a Durable Power of Attorney for Health Care Decisions and the power of my agent shall not end if I become incapacitated or if there is uncertainty that I am dead. This revokes any prior Durable Power of Attorney for Health Care Decisions. My agent may not appoint anyone else to make decisions for me. I and my estate hold my agent and my care givers harmless and protect them against any claim based upon following this Durable Power of Attorney for Health Care or my Health Care Directions. Any costs should be paid from my own resources. I grant to my agent full power to make all decisions for me about my health care, including the power to direct the withholding or withdrawal of life-prolonging treatment. In exercising this power, I expect my agent to be guided by my directions as stated in my Advance Directive. My agent is also authorized to:

! Consent, refuse or withdraw consent to any care, treatment, service or procedure (including artificially supplied nutrition and/or hydration/tube feeding) used to maintain, diagnose or treat a physical or mental condition;

! Make all necessary arrangements for any hospital, psychiatric treatment facility, hospice, nursing home, or other health care organization; employ or discharge health care personnel (any person who is authorized or permitted by the laws of the state to provide health care services) as my agent shall deem necessary for my physical, mental, or emotional well being;

! Request, receive, and review any information regarding my physical or mental health, or my personal affairs, including medical and hospital records; execute any releases of other documents that may be required in such information;

! Take legal action, if needed, to do what I have directed; and

! Become my guardian if one is needed.

**If you DO NOT want the person (agent) you name to be able to do any of the above things, draw a line through it, and put your initials at the end of the line.**

Agent's Name (Printed): _____Phone _____

Address:_____

***If you do not want to name an alternate, write Anone.≅***

First Alternate Agent                              Second Alternate Agent
Name _____       Name_____

Address_____       Address_____

Phone _____       Phone _____

Signature _____       Date _____

Witness _____       Date _____

Witness _____       Date _____

**Notarization:**
On this _____ day of _____ in the year of _____ personally appeared before me the person signing, known by me to be the person who completed this document and acknowledged it as his/her free act and deed. IN WITNESS WHEREOF I have set my hand and affixed my official seal in the County of _____ State of _____ on the date written above.

Notary Public_____ Commission Expires

## <u>REVOCATION OF DURABLE POWER OF ATTORNEY</u>

I hereby make reference to the Durable Power of Attorney executed by me, dated _____.

This documented is hereby rescinded/terminated and all provisions and instructions contain therein,

effective this date.

_____    _____
Inmate Name                                                Register Number

Date: _____      Patient Signature:_____

Date: _____      Physician Signature: _____

**NOTARIZATION:**
On this _____ day of _____ in the year of _____
personally appeared before me the person signing, known by me to be the person who completed this document and acknowledged it as his/her free act and deed. IN WITNESS WHEREOF I have set my hand and affixed my official seal in the County of Greene, State of Missouri, on the date written above.

Notary Public_____ Commission Expires

65

Revised November 2012

## PROHIBITED ACTS AND AVAILABLE SANCTIONS

### GREATEST SEVERITY LEVEL PROHIBITED ACTS

100    Killing.

101    Assaulting any person, or an armed assault on the institution's secure perimeter (a charge for assaulting any person at this level is to be used only when serious physical injury has been attempted or accomplished).

102    Escape from escort; escape from any secure or non-secure institution, including community confinement; escape from unescorted community program or activity; escape from outside a secure institution.

103    Setting a fire (charged with this act in this category only when found to pose a threat to life or a threat of serious bodily harm or in furtherance of a prohibited act of Greatest Severity, *e.g.,* in furtherance of a riot or escape; otherwise the charge is properly classified Code 218, or 329).

104    Possession, manufacture, or introduction of a gun, firearm, weapon, sharpened instrument, knife, dangerous chemical, explosive, ammunition, or any instrument used as a weapon.

105    Rioting.

106    Encouraging others to riot.

107    Taking hostage(s).

108    Possession, manufacture, introduction, or loss of a hazardous tool (tools most likely to be used in an escape or escape attempt or to serve as weapons capable of doing serious bodily harm to others; or those hazardous to institutional security or personal safety; *e.g.,* hacksaw blade, body armor, maps, handmade rope, or other escape paraphernalia, portable telephone, pager, or other electronic device).

109    (Not to be used).

110    Refusing to provide a urine sample; refusing to breathe into a Breathalyzer; refusing to take part in other drug-abuse testing.

111    Introduction or making of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

112    Use of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

113    Possession of any narcotics, marijuana, drugs, alcohol, intoxicants, or related paraphernalia, not prescribed for the individual by the medical staff.

114    Sexual assault of any person, involving non-consensual touching by force or threat of force.

115    Destroying and/or disposing of any item during a search or attempt to search.

196    Use of the mail for an illegal purpose or to commit or further a Greatest category prohibited act.

**Revised November 2012**

197     Use of the telephone for an illegal purpose or to commit or further a Greatest category prohibited act.

198     Interfering with a staff member in the performance of duties most like another Greatest severity prohibited act.   This charge is to be used only when another charge of Greatest severity is not accurate.   The offending conduct must be charged as "most like" one of the listed Greatest severity prohibited acts.

199     Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Greatest severity prohibited act.   This charge is to be used only when another charge of Greatest severity is not accurate.   The offending conduct must be charged as "most like" one of the listed Greatest severity prohibited acts.

## AVAILABLE SANCTIONS FOR GREATEST SEVERITY LEVEL PROHIBITED ACTS

A.   Recommend parole date rescission or retardation.

B.   Forfeit and/or withhold earned statutory good time or non-vested good conduct time (up to 100%) and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1. Disallow ordinarily between 50% and 75% (27-41 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C.   Disciplinary segregation (up to 12 months).

D.   Make monetary restitution.

E.   Monetary fine.

F.   Loss of privileges (*e.g.,* visiting, telephone, commissary, movies, recreation).

G.   Change housing (quarters).

H.   Remove from program and/or group activity.

I.   Loss of job.

J.   Impound inmate=s personal property.

K.   Confiscate contraband.

L.   Restrict to quarters.

M.  Extra duty.

## HIGH SEVERITY LEVEL PROHIBITED ACTS

200     Escape from a work detail, non-secure institution, or other non-secure confinement, including community confinement, with subsequent voluntary return to Bureau of Prisons custody within four hours.

**Revised November 2012**

201     Fighting with another person.

202     (Not to be used).

203     Threatening another with bodily harm or any other offense.

204     Extortion; blackmail; protection; demanding or receiving money or anything of value in return for protection against others, to avoid bodily harm, or under threat of informing.

205     Engaging in sexual acts.

206     Making sexual proposals or threats to another.

207     Wearing a disguise or a mask.

208     Possession of any unauthorized locking device, or lock pick, or tampering with or blocking any lock device (includes keys), or destroying, altering, interfering with, improperly using, or damaging any security device, mechanism, or procedure.

209     Adulteration of any food or drink.

210     (Not to be used).

211     Possessing any officer=s or staff clothing.

212     Engaging in or encouraging a group demonstration.

213     Encouraging others to refuse to work, or to participate in a work stoppage.

214     (Not to be used).

215     (Not to be used).

216     Giving or offering an official or staff member a bribe, or anything of value.

217     Giving money to, or receiving money from, any person for the purpose of introducing contraband or any other illegal or prohibited purpose.

218     Destroying, altering, or damaging government property, or the property of another person, having a value in excess of $100.00, or destroying, altering, damaging life-safety devices (e.g., fire alarm) regardless of financial value.

219     Stealing; theft (including data obtained through the unauthorized use of a communications device, or through unauthorized access to disks, tapes, or computer printouts or other automated equipment on which data is stored).

220     Demonstrating, practicing, or using martial arts, boxing (except for use of a punching bag), wrestling, or other forms of physical encounter, or military exercises or drill (except for drill authorized by staff).

221     Being in an unauthorized area with a person of the opposite sex without staff permission.

222     (Not to be used).

**Revised November 2012**

223    (Not to be used).

224    Assaulting any person (a charge at this level is used when less serious physical injury or contact has been attempted or accomplished by an inmate).

225    Stalking another person through repeated behavior which harasses, alarms, or annoys the person, after having been previously warned to stop such conduct.

226    Possession of stolen property.

227    Refusing to participate in a required physical test or examination unrelated to testing for drug abuse (e.g., DNA, HIV, tuberculosis).

228    Tattooing or self-mutilation.

229    Sexual assault of any person, involving non-consensual touching without force or threat of force.

296    Use of the mail for abuses other than criminal activity which circumvent mail monitoring procedures (e.g., use of the mail to commit or further a High category prohibited act, special mail abuse; writing letters in code; directing others to send, sending, or receiving a letter or mail through unauthorized means; sending mail for other inmates without authorization; sending correspondence to a specific address with directions or intent to have the correspondence sent to an unauthorized person; and using a fictitious return address in an attempt to send or receive unauthorized correspondence).

297    Use of the telephone for abuses other than illegal activity which circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a High category prohibited act.

298    Interfering with a staff member in the performance of duties most like another High severity prohibited act.   This charge is to be used only when another charge of High severity is not accurate.   The offending conduct must be charged as "most like" one of the listed High severity prohibited acts.

299    Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another High severity prohibited act.   This charge is to be used only when another charge of High severity is not accurate.   The offending conduct must be charged as "most like" one of the listed High severity prohibited acts.

**AVAILABLE SANCTIONS FOR HIGH SEVERITY LEVEL PROHIBITED ACTS**

A.   Recommend parole date rescission or retardation.

B.   Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 50% or up to 60 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1 Disallow ordinarily between 25% and 50% (14-27 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C.   Disciplinary segregation (up to 6 months).

**Revised November 2012**

D.  **Make monetary restitution.**

E.  **Monetary fine.**

F.  **Loss of privileges (*e.g.,* visiting, telephone, commissary, movies, recreation).**

G.  **Change housing (quarters).**

H.  **Remove from program and/or group activity.**

I.  **Loss of job.**

J.  **Impound inmate=s personal property.**

K.  **Confiscate contraband.**

L.  **Restrict to quarters.**

M.  **Extra duty.**

**MODERATE SEVERITY LEVEL PROHIBITED ACTS**

300      **Indecent Exposure.**

301      **(Not to be used).**

302      **Misuse of authorized medication.**

303      **Possession of money or currency, unless specifically authorized, or in excess of the amount authorized.**

304      **Loaning of property or anything of value for profit or increased return.**

305      **Possession of anything not authorized for retention or receipt by the inmate, and not issued to him through regular channels.**

306      **Refusing to work or to accept a program assignment.**

307      **Refusing to obey an order of any staff member (may be categorized and charged in terms of greater severity, according to the nature of the order being disobeyed, *e.g.* failure to obey an order which furthers a riot would be charged as 105, Rioting; refusing to obey an order which furthers a fight would be charged as 201, Fighting; refusing to provide a urine sample when ordered as part of a drug-abuse test would be charged as 110).**

308      **Violating a condition of a furlough.**

309      **Violating a condition of a community program.**

310      **Unexcused absence from work or any program assignment.**

311      **Failing to perform work as instructed by the supervisor.**

312      **Insolence towards a staff member.**

**Revised November 2012**

313    Lying or providing a false statement to a staff member.

314    Counterfeiting, forging, or unauthorized reproduction of any document, article of identification, money, security, or official paper (may be categorized in terms of greater severity according to the nature of the item being reproduced, *e.g.,* counterfeiting release papers to effect escape, Code 102).

315    Participating in an unauthorized meeting or gathering.

316    Being in an unauthorized area without staff authorization.

317    Failure to follow safety or sanitation regulations (including safety regulations, chemical instructions, tools, MSDS sheets, OSHA standards).

318    Using any equipment or machinery without staff authorization.

319    Using any equipment or machinery contrary to instructions or posted safety standards.

320    Failing to stand count.

321    Interfering with the taking of count.

322    (Not to be used).

323    (Not to be used).

324    Gambling.

325    Preparing or conducting a gambling pool.

326    Possession of gambling paraphernalia.

327    Unauthorized contacts with the public.

328    Giving money or anything of value to, or accepting money or anything of value from, another inmate or any other person without staff authorization.

329    Destroying, altering, or damaging government property, or the property of another person, having a value of $100.00 or less.

330    Being unsanitary or untidy; failing to keep one's person or quarters in accordance with posted standards.

331    Possession, manufacture, introduction, or loss of a non-hazardous tool, equipment, supplies, or other non-hazardous contraband (tools not likely to be used in an escape or escape attempt, or to serve as a weapon capable of doing serious bodily harm to others, or not hazardous to institutional security or personal safety) (other non-hazardous contraband includes such items as food, cosmetics, cleaning supplies, smoking apparatus and tobacco in any form where prohibited, and unauthorized nutritional/dietary supplements).

332    Smoking where prohibited.

**Revised November 2012**

333    Fraudulent or deceptive completion of a skills test (*e.g.*, cheating on a GED, or other educational or vocational skills test).

334    Conducting a business; conducting or directing an investment transaction without staff authorization.

335    Communicating gang affiliation; participating in gang related activities; possession of paraphernalia indicating gang affiliation.

336    Circulating a petition.

396    Use of the mail for abuses other than criminal activity which do not circumvent mail monitoring; or use of the mail to commit or further a Moderate category prohibited act.

397    Use of the telephone for abuses other than illegal activity which do not circumvent the ability of staff to monitor frequency of telephone use, content of the call, or the number called; or to commit or further a Moderate category prohibited act.

398    Interfering with a staff member in the performance of duties most like another Moderate severity prohibited act.   This charge is to be used only when another charge of Moderate severity is not accurate.   The offending conduct must be charged as "most like" one of the listed Moderate severity prohibited acts.

399    Conduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another Moderate severity prohibited act.   This charge is to be used only when another charge of Moderate severity is not accurate.   The offending conduct must be charged as "most like" one of the listed Moderate severity prohibited acts.

**AVAILABLE SANCTIONS FOR MODERATE SEVERITY LEVEL PROHIBITED ACTS**

A.   Recommend parole date rescission or retardation.

B.   Forfeit and/or withhold earned statutory good time or non-vested good conduct time up to 25% or up to 30 days, whichever is less, and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1 Disallow ordinarily up to 25% (1-14 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

C.   Disciplinary segregation (up to 3 months).

D.   Make monetary restitution.

E.   Monetary fine.

F.   Loss of privileges (*e.g.*, visiting, telephone, commissary, movies, recreation).

G.   Change housing (quarters).

H.   Remove from program and/or group activity.

I.   Loss of job.

**Revised November 2012**

J.   Impound inmate's personal property.

K.  Confiscate contraband.

L.   Restrict to quarters.

M.  Extra duty.

**LOW SEVERITY LEVEL PROHIBITED ACTS**

400      (Not to be used).

401      (Not to be used).

402      Malingering, feigning illness.

403      (Not to be used).

404      Using abusive or obscene language.

405      (Not to be used).

406      (Not to be used).

407      Conduct with a visitor in violation of Bureau regulations.

408      (Not to be used).

409      Unauthorized physical contact (e.g., kissing, embracing).

498      Interfering with a staff member in the performance of duties most like another Low severity
         prohibited act.   This charge is to be used only when another charge of Low severity is not
         accurate.   The offending conduct must be charged as "most like" one of the listed Low
         severity prohibited acts.

499      Conduct which disrupts or interferes with the security or orderly running of the institution
         or the Bureau of Prisons most like another Low severity prohibited act.   This charge is to
         be used only when another charge of Low severity is not accurate.   The offending conduct
         must be charged as "most like" one of the listed Low severity prohibited acts.

**AVAILABLE SANCTIONS FOR LOW SEVERITY LEVEL PROHIBITED ACTS**

B.1      Disallow ordinarily up to 12.5% (1-7 days) of good conduct time credit available for year (to
         be used only where inmate found to have committed a second violation of the same
         prohibited act within 6 months); Disallow ordinarily up to 25% (1-14 days) of good conduct
         time credit available for year (to be used only where inmate found to have committed a
         third violation of the same prohibited act within 6 months) (a good conduct time sanction
         may not be suspended).

D.  Make monetary restitution.

E.   Monetary fine.

**Revised November 2012**

F.   **Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).**

G.   **Change housing (quarters).**

H.   **Remove from program and/or group activity.**

I.   **Loss of job.**

J.   **Impound inmate's personal property.**

K.   **Confiscate contraband**

L.   **Restrict to quarters.**

M.   **Extra duty.**

Revised November 2012

## ADDITIONAL AVAILABLE SANCTIONS FOR REPEATED PROHIBITED ACTS WITHIN THE SAME SEVERITY LEVEL

| Prohibited Act Severity Level | Time Period for Prior Offense (same code) | Frequency of Repeated Offense | Additional Available Sanctions |
|---|---|---|---|
| Low Severity (400 level) | 6 months | 2nd offense | 1. Disciplinary segregation (up to 1 month). 2. Forfeit earned SGT or non-vested GCT up to 10% or up to 15 days, whichever is less, and/or terminate or disallow extra good time (EGT) (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available Moderate severity level sanction (300 series). |
| Moderate Severity (300 level) | 12 months | 2nd offense | 1. Disciplinary segregation (up to 6 months). 2. Forfeit earned SGT or non-vested GCT up to 37 1/2% or up to 45 days, whichever is less, and/or terminate or disallow EGT (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available High severity level sanction (200 series). |
| High Severity (200 level) | 18 months | 2nd offense | 1. Disciplinary segregation (up to 12 months). 2. Forfeit earned SGT or non-vested GCT up to 75% or up to 90 days, whichever is less, and/or terminate or disallow EGT (an EGT sanction may not be suspended). |
| | | 3rd or more offense | Any available Greatest severity level sanction (100 series). |
| Greatest Severity (100 level) | 24 months | 2nd or more offense | Disciplinary Segregation (up to 18 months). |

Revised November 2012

## ϶ 541.3   Prohibited acts and available sanctions.

**(a)   *Prohibited acts*.   The list of prohibited acts are divided into four separate categories based on severity: Greatest; High; Moderate; and Low.   We describe the prohibited acts in Table 1 - Prohibited Acts and Available Sanctions.   Aiding, attempting, abetting, or making plans to commit any of the prohibited acts is treated the same as committing the act itself.**

**(b)   *Available sanctions*.   The list of available sanctions for committing prohibited acts is listed in Table 1 - Prohibited Acts and Available Sanctions.   If you commit repetitive prohibited acts, we can impose increased sanctions, as listed in Table 2 - Additional Available Sanctions for Repeated Prohibited Acts Within the Same Severity Level.**

(1)   **Greatest Severity Level Offenses**.   The Discipline Hearing Officer (DHO) imposes one or more of sanctions A through E.   Sanction B.1 must be imposed for a VCCLEA inmate rated "violent" (an inmate who, per the Violent Crime Control and Law Enforcement Act of 1994, committed a crime of violence on or after September 13, 1994) and for a PLRA inmate (an inmate sentenced for an offense committed on or after April 26, 1996, per the Prison Litigation Reform Act).   The DHO may impose any available sanctions (A through M) in addition to sanctions A through E.   All Greatest severity level charges must be referred to the DHO.

(2)   **High Severity Level Offenses**.   The DHO imposes one or more of sanctions A through M, and, except as noted in the sanction, may also suspend one or more sanctions A through M.   Sanction B.1 must be imposed for a VCCLEA inmate rated "violent" and for a PLRA inmate.   All High severity level charges must be referred to the DHO.

Prohibited Act Code 225, Stalking, is for the purpose of punishing repetitive inmate behavior, e.g., loitering, staring, leering, inappropriate remarks (short of insolence, profanity, or sexual proposals), that are not clearly covered by another prohibited act code.   When staff encounter such behavior, the inmate should be specifically warned that it is inappropriate and must cease.   If the behavior fits another prohibited act code provision, the inmate should be charged with violating that specific provision instead of stalking.   Examples of other prohibited act code behavior that may be used instead of Code 225, Stalking, include, but are not limited to Insolence (Code 312), Being in an Unauthorized Area (Code 316), Threatening (Code 203), and Making a Sexual Proposal or Threat (Code 206).

(3)   **Moderate Severity Level Offenses**.   The DHO imposes at least one sanction A through M, but, except as noted in the sanction, may suspend any sanction(s) imposed. Sanction B.1 ordinarily must be imposed for a VCCLEA inmate rated "violent" and for a PLRA inmate.

Except for charges referred to the DHO, the Unit Discipline Committee (UDC) shall impose at least one sanction F through M, but may suspend any sanctions imposed.

The UDC ordinarily refers to the DHO a moderate severity level charge for a VCCLEA inmate rated "violent" or for a PLRA inmate if the inmate was found to have committed two moderate offenses during his/her current anniversary year (the 12-month period for which an inmate may be eligible to earn good conduct time [GCT]).   The UDC must document the reasons why a third charge for such an inmate was not referred to the DHO.

A prohibited act charge for 331 involving tobacco or nutritional supplements must be referred to the DHO for final disposition.

Revised November 2012

(4)  **Low Severity Level Offenses**.   The DHO imposes at least one sanction B.1, or D through M.   The DHO may suspend any sanction(s) imposed; however, a B.1 sanction may not be suspended.   Except for charges referred to the DHO, the UDC imposes at least one sanction F through M, but may suspend any sanction(s) imposed.

The UDC ordinarily refers to the DHO a low severity level charge for a VCCLEA inmate rated "violent" or for a PLRA inmate if the inmate had been found to have committed three low offenses during his/her current anniversary year.   The UDC must document the reasons why a charge for such an inmate was not referred to the DHO.

Sanction B.1 may be imposed on the Low severity level **only** if the inmate has committed a Low severity level prohibited act more than once within a six-month period (except for a VCCLEA inmate rated "violent" or a PLRA inmate).

(5)  **All Severity Level Offenses**.   In all categories of severity**, aiding** another person to commit any of these offenses, **attempting** to commit them, or **making plans** to commit them, **is considered equivalent to committing the offense itself**.   In these cases, the letter "A" is combined with the offense code.   For example, planning an escape is Escape, Code 102A.   Attempting to adulterate food or drink is Code 209A.

When the prohibited act is **Interfering with a Staff Member in the Performance of Duties (Code 198, 298, 398 or 498) or Conduct Which Disrupts (Code 199, 299, 399, or 499)**, the DHO or UDC must specify the severity level of the conduct that is most comparable to an offense(s) at that severity level. **Example:** "I find the act of Conduct Which Disrupts (Code 299) to be of High severity level, most comparable to the prohibited act of Engaging in a Group Demonstration (Code 212)."

**Suspensions of any sanction cannot exceed six months**.   Suspended sanctions may only be revoked and executed if the inmate is found to have committed a subsequent prohibited act.   Only the DHO may execute, suspend, or revoke and execute suspension of sanctions A through E (B and B.1. may never be suspended).   The DHO or UDC may execute, suspend, or revoke and execute suspensions of sanctions F through M.   The DHO may execute UDC-suspended sanctions.   However, the UDC may **not** execute DHO-suspended sanctions A through E.

When an inmate receives an incident report while on a DHO-imposed, but suspended sanction, the new incident report is forwarded by the UDC to the DHO, both for a final disposition on the new incident report, and for a disposition on the suspended sanction. This procedure is not necessary when the UDC informally resolves the new incident report.   The DHO may return an incident report to the UDC if a decision not to execute the suspended sanction is made.

The UDC or DHO may impose increased sanctions for repeated, frequent offenses per the guidelines in Table 2.

Noting that not all UDC or DHO decisions finding an inmate committed a prohibited act will result in a change to the inmate=s security designation score, the Unit Team may recommend a greater security transfer, using their professional judgment, and in accordance with the policy on Inmate Security Designation and Custody Classification.

**Ə 541.4   Loss of good conduct sentence credit as a mandatory sanction.**

**(a)   You will lose good conduct sentence credit as a mandatory disciplinary sanction if you are in one of the following two groups:**

Revised November 2012

(1)   *VCCLEA-violent inmates.*   The date of your U.S. Code offense was on or after September 13, 1994, but before April 26, 1996, and you committed a "crime of violence" as defined by the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA); or

(2)   *PLRA inmates and D.C. Code offenders.*   The date of your U.S. Code offense was on or after April 26, 1996, and, therefore, under the Prison Litigation Reform Act (PLRA), or the date of your District of Columbia (DC) Code offense was on or after August 5, 2000.

(b)   If you are an inmate in one of the above groups and commit a prohibited act, you will lose good conduct sentence credit as a mandatory disciplinary sanction. The amount of good conduct sentence credit you will lose depends on the severity level of the prohibited act(s) committed, as follows:

(1)   *Greatest Severity Level Offenses.*   You will lose at least 41 days, or 75% of available credit if less than 54 days are available for the prorated period, for each act committed.

(2)   *High Severity Level Offenses.*   You will lose at least 27 days, or 50% of available credit if less than 54 days are available for the prorated period, for each act committed.

(3)   *Moderate Severity Level Offenses.*   You will lose at least 14 days, or 25% of available credit if less than 54 days are available for the prorated period, after committing two or more Moderate severity acts during the current year of your good conduct sentence credit availability.

(4)   *Low Severity Level Offenses.*   You will lose at least 7 days, or 12.5% of available credit if less than 54 days are available for the prorated period, after committing three or more Low severity acts during the current year of your good conduct sentence credit availability.

**Available Sanctions** (upon finding the inmate committed the prohibited act(s)):

**(A)   Recommend Parole Date Rescission or Retardation.**   The DHO may recommend retardation or rescission of parole grants to the U.S. Parole Commission or respective parole authority.

**(B)   Forfeit Earned Statutory Good Time, Non-vested Good Conduct Time, or Terminate or Disallow Extra Good Time.**

*Forfeited good conduct time* (GCT) is not eligible for restoration.   However, *forfeited statutory good time* (SGT) may be restored.   Restoration of statutory good time is approved at initial eligibility only when the inmate has shown a period of improved good behavior.   When the Warden (or designee) denies restoration of forfeited statutory good time, the unit team notifies the inmate of the reasons for denial.   The unit team establishes a new eligibility date, not to exceed six months from the date of denial.

An application for restoration of statutory good time is forwarded from the inmate's unit team, through the DHO and Captain for comments, to the Warden for final decision.

Inmates who committed their crimes on or after November 1, 1987, and are sentenced under the Sentencing Reform Act provisions of the Comprehensive Crime Control Act, are only eligible to receive 54 days GCT credit (18 U.S.C. ∍ 3624(b)).   This credit is given at the end of each year served and, once given, is vested.   For these inmates, the DHO's authority is final and subject only to review by the Regional Director to ensure conformity with the discipline policy and by inmate appeal through Administrative Remedy procedures.

Revised November 2012

The statutory good time available for forfeiture is limited to an amount computed by multiplying the months served at the time of the offense for which forfeiture is taken, by the applicable monthly rate specified in 18 U.S.C. ᴈ 4161 (less previous forfeiture or withholding).   The amount of GCT available for forfeiture is limited to total days in "non-vested" status at the time of misconduct (less previous forfeiture).

Forfeiture of GCT may not be suspended.

Disallowance of extra good time is limited to extra good time for the calendar month in which the violation occurs.   It may not be withheld or restored.

The sanction of termination or disallowance of extra good time may not be suspended.

Forfeited GCT will not be restored.   Authority to restore forfeited statutory good time is delegated to the Warden, and may not be delegated lower than the Associate Warden level.   Limitations on this sanction and eligibility for restoration are based on the severity scale.

To ensure an inmate's case is not overlooked when statutory good time has been forfeited, the unit manager will ensure the eligibility requirements are reviewed for restoration per the time frames in the Program Statement on Classification and Program Review of Inmates.   A recommendation of the unit team for or against restoration is forwarded to the Warden through the DHO and Captain.   Except as noted, eligibility for restoration of forfeited statutory good time is computed from the date of the withholding or forfeiture action by the DHO.

An inmate who has escaped and receives a forfeiture at a subsequent in absentia hearing begins the eligibility for restoration period upon return to Bureau custody.   The Warden refers to the Regional Director any case where exceptional circumstances support restoration of statutory good time before completion of the eligibility requirements.

Sanction B does not apply to inmates committed under the Comprehensive Crime Control Act for crimes committed on or after November 1, 1987, and prior to passage of the Violent Crime Control and Law Enforcement Act of 1994 (September 23, 1994).   For those inmates, the applicable sanction is B.1.

**(B.1)   Disallowance of Good Conduct Time.**   An inmate sentenced under the Sentencing Reform Act provisions of the Comprehensive Crime Control Act (committed a crime on or after November 1, 1987) may not receive statutory good time, but is eligible to receive 54 days GCT credit each year (18 U.S.C. ᴈ 3624(b)).   Once awarded, the credit is vested, and may not be disallowed.

Crimes committed on or after September 13, 1994, and before April 26, 1996, (VCCLEA) credit is not vested unless the inmate has earned or is making satisfactory progress toward a high school diploma or equivalent degree (or is exempt because of a learning disability).

For crimes committed on or after April 26, 1996, (PLRA and SRAA) GCT credit toward an inmate's service of sentence vests on the date the inmate is released.   Once disallowed, the credit may not be restored, except by immediate review or appeal as indicated below.   Prior to this award being made, the credit may be disallowed for an inmate found to have committed a prohibited act.

A sanction of GCT disallowance may not be suspended.   Only the DHO can take action to disallow GCT. The DHO considers the severity of the prohibited act and the suggested disallowance guidelines in making a determination.

A decision to go above the guideline is warranted for a greatly aggravated offense or a repeated violation of another prohibited act within a relatively short time (e.g., within 24 months for a greatest severity level

79

**Revised November 2012**

prohibited act, 18 months for a high severity level prohibited act, and 12 months for a moderate severity

level prohibited act).   A decision to go below the guidelines is warranted for strong mitigating factors.   A decision above or below the guidelines is justified in the DHO report.

VCCLEA inmates rated "violent" and PLRA inmates are ordinarily disallowed GCT for each prohibited act they are found to have committed at a DHO hearing, consistent with the following:

# **Greatest Severity Level Offenses**.   A minimum of 41 days (or, if less than 54 days are available for the prorated period, a minimum of 75% of available GCT) for each act committed.

# **High Severity Level Offenses**.   A minimum of 27 days (or, if less than 54 days are available for the prorated period, a minimum of 50% of available GCT) for each act committed.

# **Moderate Severity Level Offenses**.   A minimum of 14 days (or, if less than 54 days are available for the prorated period, a minimum of 25% of available GCT) for each act committed if the inmate has committed two or more moderate severity level offenses during the current anniversary period.

# **Low Severity Level Offenses**.   A minimum of 7 days (or, if less than 54 days are available for the prorated period, a minimum of 12.5% of available GCT) for each act committed if the inmate has committed three or more low moderate offenses during the current anniversary period.

Except for VCCLEA inmates rated "violent" or PLRA inmates, Sanction B.1 may be imposed on the Low severity level only where the inmate has committed a Low severity level act more than once within a six-month period.

GCT credit may only be given to an inmate serving a sentence of more than one year, but less than life.   In the last year or part of a year of an inmate's sentence, only the GCT available for the time remaining may be disallowed.

**(C)   Disciplinary Segregation.**   The DHO may direct that an inmate be placed or retained in disciplinary segregation.   Consecutive disciplinary segregation sanctions can be imposed for inmates found to have committed offenses that are part of different acts only.   Limits on time in disciplinary segregation are based on the severity scale (see Tables 1 and 2).

Unless otherwise specified by the DHO, disciplinary segregation placements for different or separate prohibited acts are imposed consecutively.

**(D)   Make Monetary Restitution.**   The DHO may direct that an inmate reimburse the U.S. Treasury for damages to U.S. Government property that the individual caused or contributed to.   The UDC is prohibited from imposing the sanction of make monetary restitution.

Commissary privileges should be suspended by the DHO until restitution is made.   See the Program Statement **Trust Fund/Deposit Fund Manual** for instructions regarding impoundment of inmate funds.

**(E)   Monetary Fine.**   The DHO may direct that an inmate pay a fine, as follows:

# Greatest severity level offense – Up to $500, or 75% of the inmate=s trust fund balance.
# High severity level offense – Up to $300, or 50% of the inmate=s trust fund balance.
# Moderate severity level offense – Up to $100, or 25% of the inmate=s trust fund balance.
# Low severity level offense – Up to $50, or 12.5% of the inmate=s trust fund balance.

**Revised November 2012**

Commissary privileges should be suspended until the fine is paid.   See the Trust Fund/Deposit Fund Manual for instructions regarding impoundment of inmate funds.

This sanction cannot be used as a form of monetary restitution.   The UDC is prohibited from imposing the sanction of monetary fine.

**(F)   Loss of Privileges (e.g., visiting, telephone, e-mail, commissary, movies, recreation).**   The DHO or UDC may direct that an inmate forego specific privileges for a specified time.

The DHO or UDC may impose non-contact visiting or immediate family-only visitation in addition to loss of visiting.

Loss of recreation privileges (exercise periods) may not be imposed on inmates in a Special Housing Unit (SHU), but may be used for general population inmates.

The DHO or UDC may impose a loss of mattress sanction from lights on to lights off for inmates in the SHU.   Staff must ensure the inmate has a mattress from lights off to lights on.

**(G)   Change Housing (Quarters).**   The DHO or UDC may direct that an inmate be moved to other housing.

**(H)   Remove from Program or Group Activity.**   The DHO or UDC may direct that an inmate not participate in any program or group activity for a specified time.

**(I)   Loss of Job.**   The DHO or UDC may direct that an inmate be removed from his/her present job or assigned to another job.

**(J)   Impound Inmate's Personal Property.**   The DHO or UDC may direct that an inmate's personal property be stored in the institution for a specified time.

**(K)   Confiscate Contraband.**

**(L)   Restrict Quarters.**   The DHO or UDC may direct that an inmate be confined to quarters or its immediate area for a specified time.

**(M)   Extra Duty.**   The DHO or UDC may direct that an inmate perform tasks other than those performed during his/her regular job.

**Revised November 2012**

**Inmate Personal Property List – National Limit Authorized For Transfer Between Institutions**

B = Black
W = White
BW = Black/White Combination
GRY = Gray
GRN = Green (pastel)
C = Commissary Only
I = BOP Issue

**CLOTHING:**
Bathrobe, WG (no hoods) (C) (1)
Cap, Baseball, WG (no logos) (C) (1)
Shoes, Athletic, W ($100 maximum value/no pumps/no pockets) (C) (1 pr)
Shoes, Specialty, (W) (B) (BW) ($100 value maximum/no pumps/no pockets) court, turf, running shoe (C) (2 pr)
Shoes, Casual (C) (1 pr)
Shoes, Shower, WG (C), (1 pr)
Shoes, Slippers (colorless) (C) (1 pr)
Shoes, Work(C) (1 pr)
Shorts, Gym, WG(C) (2)
Socks, Tube, W(C) (5)
Sweatshirt, G (pullover/no hoods/cotton)(C)(2) (no logos)
Sweat pants, G (cotton) (C) (2) (no logos)
T-Shirts/Sleeveless Undershirts, WG (no pockets/no logos) (C) (5)
Underwear, W (boxers or briefs) (C) (7)
Handkerchief, (white only), (5)

**PERSONALLY OWNED ITEMS:**
Address Book (C) (1)
Alarm Clock (non-electric) (C) (1)
Bag, Athletic Tote (C) (1) no logo
Batteries (C) (4)
Books (hard/soft) (5)
Book/Reading Light (C) (1)
Bowl (plastic/24 oz or(C) less)(C) (1)
Calculator, Small (electronically unsophisticated, inexpensive, non-print feature/battery or solar operated) (C) (1)
Calendar, Small (1)
Comb/Pick (plastic)(C) (2)
Combination Lock (C) (1)
Contact Lens (clear/prescribed) (2 pair)
Contact Lens Solution (1)
Shaving Bag(C) (1)
Cup (plastic)(C) (1)
Dentures (1 set)
Earplugs(C) (1 set) Eyeglasses (no stones) (2 pair)
Eyeglass Case (2)
Hairbrush(C) (1)
Headphones (C) (1)
Jug (plastic/1 gal)(C) (1)
Laundry Bag (mesh)(C) (1)
Letters (25)
Mirror (small/plastic)(C) (1)
Pen, Ballpoint(C) (2)

82

Pencils(C) (2)
Photo Album/Scrapbook (C) (1)
Photos (single-faced) (25)
Picture Frame (clear plastic) (C) (2)
Playing Cards (C) (2 decks)
Radio W/Earplugs (walkman-type) (C) (1)
Stamps (C) total value equivalent to (40, 1st Class)
Sunglasses (non-reflective) (C) (1)
Thermos (plastic liner) (up to 64 ozs) (C) (1)
Towel (white/large) (C) (1)
Watch ($100 maximum value, no stones, electronically
unsophisticated, i.e. inability to send signals)(C) (1)
Watchband (C) (1)
Wedding Band (no stones/white/yellow metal) (1)
Writing Tablet (C) (2)

**HYGIENE ITEMS**: Items noted in highlight may be possessed at the discretion of the Warden and may be transferred between institutions (at the inmate's expense).

Brushless Shave (C) (1)
Conditioner/Hair(C) (1)
Dental Floss and/or Pick (unwaxed) (C) (1 container)
Denture Adhesive (C) (1)
Denture Brush(C) (1)
Denture Cleaner/Powder(C) (1)
Denture Cup (C) (1)
Deodorant (C) (2)
Hair Oil/Gel (C) (1)
Laundry Detergent (C) (1)
Lens Cloth (C) (1)
Lotion, Skin (Moisturizing) (C) (1)
Mouthwash (C) (1)
Nail Clippers (no file) (C) (1)
Powder/Body/Foot (C) (1)
Razor(C) (1)
Scissors, Mustache (blunt tip)(C) (1)
Shampoo(C) (1)
Shaving Cream/Lotion (C) (1)
Sewing Kit (C) (1)
Shoe Polish/Lotion (C) (1)
Soap, Bar (C) (3)
Soap Dish (C) (1)
Toothbrush (C) (1)
Toothbrush Holder (C) (1)
Toothpaste (C) (2 tubes)
Tweezers (blunt tip) (C) (1)

**RECREATIONAL ITEMS**

Athletic Supporter (2)
Embroidery Hoops/Needles (1 set)
Eye Protection (1)
Gloves (fingerless/athletic) (1)
Gloves (handball) (2)
Harmonica (1)
Headbands/Sweatband (white) (2)
Knee Wraps (2)
Knitting/Crochet Needles (1)
Mouth Pieces (1)

Racquetballs (2 cans of 2) (4)
Softball Gloves (1)
Tennis Balls (1 can of 3)
Tools for Bead Work (1)
Weight Lifting Belt (1)
Weight Lifting Gloves (1)
Weight Lifting Wraps
Yarn (1)

**APPROVED RELIGIOUS ITEMS**

Items authorized in "Manual on Inmate Beliefs and Practices" and "Transferrable Religious Property," posted on Chaplaincy Services Branch Sallyport page.

**APPROVED MEDICAL DEVICES**

Non-perishable commissary items sealed in unopened, original containers may also be transported or shipped.

**MCFP SPRINGFIELD APPROVED PROPERTY**
**OTHER ITEMS**

Chocolate (instant, 10 packets)
Coffee (instant, unopened) (1)
Coffeemate (unopened)
Tea (instant, unopened)
Non-Perishable Commissary Items, sealed in Original Containers
**May not be transferred to another institution, but may be shipped home at the inmate's expense.**
Bucket (ice) (1) )
Magazines / Newspapers (5)
Beard/Mustache Trimmer (1)
Fruit (1)
Fan (C) (1)
Soda, Can (C)

**All items sold in the MCFP Commissary not approved for transfer above or in Attachment A of Program Statement 5580.08.**

# FOREIGN CONSULATES/EMBASSIES

*If you need assistance in contacting your consulate or embassy or your embassy is not listed below, please contact your unit team for further information or assistance .*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Colombia Consulate**
500 N Michigan Avenue, Suite 2040
Chicago, IL 60611
Telephone (312)923-1196
Fax (312)923-1197

**The Consulate General of Canada**
Two Prudential Plaza
180 Stetson Avenue
Chicago, IL 60601
Telephone (312)616-1860
Fax (312) 616-1877

**Czech Republic Embassy**
3900   Spring of Freedom St.,
Washington, D.C. 20008
Telephone (202)274-9100

**German Embassy**
4645 Reservoir Rd
Washington, D.C.   20007-1998
Telephone (202)298-4000
Fax (202)298-4249

**Embassy of Guatemala**
2220 R. St. NW
Washington, D.C. 20008
Telephone (202)745-4952
Fax (202)745-1908

**Consulate General of Italy**
500 N. Michigan Ave, Suite 1850
Chicago, IL 60611
Telephone (312)467-1550
Fax (312)467-1335

**Embassy of the Republic of Korea**
 2450 Massachusetts Avenue, NW
Washington, D.C. 20008
Telephone (202)939-5600
Fax (202)797-0595

**Laos Embassy to the USA**
2222 S. Street NW
Washington, D.C. 20008
Telephone (202)332-6416
Fax (202)-332-4923

**Embassy of Lebanon**
2560 28th Street, NW
Washington, D.C. 20008
Telephone (202)-939-6300

**Consulate of Mexico**
1015 Locust St., Suite 922
St. Louis, MO 63101
Telephone (314)436-3233
Fax (314)436-2395

**Consulate General of Nigeria**
828 2nd Avenue, 10th Floor
New York, New York 10017
Telephone (212)850-2200

**British Consulate-General**
13th Floor, The Wrigley Building
400 N Michigan Avenue
Chicago, IL 60611
Telephone: (312)970-3800
 Fax: (312)970-3852

**Philippine Consulate General**
3600 Wilshire Blvd, Suite 500
Los Angeles, CA 90010
Telephone (213)639-0980
Fax (213)639-0990

 **Embassy of Vietnam**
 1233 20th St. NW, Suite 400
 Washington, D.C. 20036
 Telephone (202)861-0737
 Fax (202)861-0917

**Embassy of Ghana**
3512 International Drive NW
Washington, D.C. 20008
Telephone (202)686-4520
Fax (202)686-4527

**Consulate-General of Spain**
180 North Michigan Avenue
 Suite 1500
Chicago, IL 60601
Telephone: (312)782-4588/4589
 Fax: (312)728-1635

**US U.S. Medical Center for Federal Prisoners
Quality Management Department**

> If you have any concerns about your care and safety, Health Services staff are available to hear your comments and to take appropriate actions, if necessary.

## PATIENT SAFETY IS OUR GOAL!
### WE PLEDGE TO:

1.  Clean our hands often.
2.  Check your identification before providing any medication, obtaining laboratory specimens or doing a procedure.
3.  Explain thoroughly any care, treatments, and medications you may receive.
4.  Stop any procedure if you tell us something is wrong or does not look right.
5.  Listen to your questions and concerns.
6.  Actively ask for your feedback on any concerns you may have about patient safety.

### Utilization Review

1.  Upon arrival to the institution, all inmates are assigned to a primary care provider.

2.  Your assigned provider will conduct an initial physical and place you in a chronic care clinic if you have a chronic   illness, such as high blood pressure or diabetes.

3.  If the provider would like to order special tests, like an MRI, or have you see a specialized doctor, like a cardiologist, the provider will submit a request for utilization review.

4.  Utilization review is a process routinely use in the community to be certain that the test or specialized visit is medically necessary and that the provider has taken all of the important steps to make the visit the most beneficial.   For example, if a doctor wants a patient to see a specialist to evaluate   Hepatitis C, utilization review would make certain that all important blood tests are taken prior to the visit.   We want to make certain that the specialist has all of the necessary information available during the visit.

5.  The institution's Utilization Review Committee (URC) will review all requests by providers prior to making a denial of the request.   If the URC denies a request, both you and the provider will be notified in writing.   Your provider will be able to discuss the future plan of care.

### The Joint Commission

This institution is accredited by The Joint Commission.   Accreditation means that we go above and beyond to ensure the safety and quality of your care and that we continuously work to improve that care.

If you have a serious complaint about the quality of you care, you may notify the Joint Commission at:

> Office of Quality Monitoring
> The Joint Commission
> One Renaissance Boulevard
> Oakbrook Terrace, IL 60181

You are encouraged first to bring your complaint to the attention of your providers and the healthcare leaders.

86

**SEXUALLY TRANSMITTED DISEASES**

Questions and Answers as You Enter This Correctional Facility

Your health is important to those who work in this facility. Medical staff members are willing to discuss any health concerns you have.
An important health issue is sexually transmitted diseases or STDs. STDs are among the most common infectious diseases in the U.S. Anyone who has unsafe (unprotected) sex can get an STD. If you have had unprotected sex (without a condom) with a woman, you may have come into contact with vaginal fluid and genital sores or lesions. This contact may have exposed you to an STD.   If you have had unprotected sex with a man, you may have come into contact with semen and genital sores or lesions. This contact may have exposed you to an STD.

This information will tell you about common STDs and what their symptoms look like. You may have been infected with an STD in the past. You may have ignored or not noticed the symptoms. Because untreated STDs can cause serious health problems, you may want to be tested. If you have questions about STDs or think you have any symptoms, sign up for sick call. It is okay to ask questions and talk with medical staff members. This information will be handled confidentially.

When you arrive at a Bureau of Prisons (BOP) facility, you are advised in writing of the disciplinary system there. Engaging in sexual acts and/or making sexual proposals or threats to another constitutes a prohibited act (high category), and you are subject to sanctions as defined in the BOP policy on Inmate Discipline and Special Housing Unit.

Stay Safe: Don't have sex with other inmates.

Things to know about STDs:
1.   Men and women who have any form of unprotected sex are at risk for STDs. This is true regardless of age, race, ethnic background, or income. It is true whether your partners are of the same sex or the opposite sex.
2.   You can prevent STDs, and the best way is to avoid having sex. Sex with other inmates is not allowed and can be dangerous.
3.   Many STDs can be cured with medicine. Other STDs can be treated to avoid more problems. Even after you have been treated for an STD you can become reinfected. Treatment is not a vaccine; it cannot prevent future infections.
4.   You may be infected with an STD and not have any symptoms. If you have had unsafe sex and not been tested for STDs awhile, talk to a health care worker.
5.   If you have HIV, being infected with an STD can make the HIV worse. If you have any questions about STDs talk to your assigned clinician.

What are common STDs in the U.S.?
Chlamydia Gonorrhea
Caused by bacteria spread during vaginal, anal, and oral sex
Can be treated and cured with antibiotic drugs may or may not be any symptoms

Symptoms can include burning when urinating (peeing)

Men - discharge from penis, burning and itching around the head of the penis, pain or swelling in the testicles (balls)

Women - vaginal fluid that does not look normal, lower abdominal or back pain, pain during sex, and bleeding between menstrual cycles

Without treatment:

Men - can spread to the epididymis (a tube that carries sperm from the testis) and cause pain, fever, and sterility
Women - can spread into the womb or fallopian tubes and cause pelvic inflammatory disease (PID) and infertility

Syphilis Caused through contact with lesions or open sores on the outer genitals, vagina, anus, or in
the rectum. Sores can also occur on the lips and in the mouth.   One or more sores, lasting 3-6 weeks, at
the spot where bacteria entered the body; sores will heal but infection remains; may be a rash on the palms of the
hands or bottoms of feet; rashes clear up on their own.

Without treatment –
fever, swollen lymph glands, sore throat, patchy hair loss
Later - damage to brain, nerves, liver, bones, joints, eyesight, and death
Human Immunodeficiency Virus (HIV)
Caused by a virus spread through unsafe vaginal, anal, and oral sex
Anti-retroviral drugs can help build your body's resistance to deadly illnesses and cancers; they do not cure HIV.

You may be infected with HIV and not have any symptoms for 7-10 years HIV attacks and weakens your immune
system; a weakened immune system can lead to serious illness and possibly death

Herpes Simplex Virus (HSV)
Genital herpes can be spread during unsafe sexual contact.   Antiviral drugs may shorten and prevent outbreaks, but
they cannot cure herpes. May cause blisters on or around genitals or rectum; herpes sores on the mouth can also be
spread.

Hepatitis B Virus (HBV)
Spread through unsafe sex with an infected person.   There is a vaccine to prevent HBV About 30% of persons with
HBV have no signs or symptoms

HBV symptoms:
Fatigue, abdominal pain, jaundice (yellowish skin), loss of appetite.   Chronic HBV infection occurs in about 6% of
adults Death from chronic liver disease occurs in about 15-25% of infected persons

Human Papilloma Virus (HPV)
Spread through unsafe sexual contact.   You may have HPV and not be able to see it; you may notice genital warts
(soft, moist, pink or red swellings around the genitals).     Infection often goes away on its own, but HPV that does
not go away can lead tocancer

Talking to the Medical Staff

If you have had unsafe sex and have not been tested

If you have had unsafe sex and have not been tested for STDs (or have any reason to think that you may have an
STD), talk with the medical staff.   Ask any questions you have about symptoms and testing.   Even if you were
trated for an STD before coming to a correctional facility, if you have had unsafe sex since then you may be infected.
 The medical staff can provide more information and help you decide about being tested.

If you have an STD and don't get treatment, you may have worse health problems in the future.

IF I HAVE AN STD, WHAT TREATMENT CAN I GET?

Getting treated right away will help reduce the long-term problems found with STD's.   If you have an STD, your health care provider may treat you with pills, liquid medicine, or a shot.   If you are given pills, you must take them just like your doctor tells you to.   Do not share pills with partners or friends.

STDs caused by bacteria, such as chlamydia, gonorrhea, or syphilis, can be treated with antibiotic medicines.

STDs caused by viruses, such as HIV and herpes, cannot be cured.   You will have these diseases for life. Treatment can help reduce or control these illnesses, but there are no cures.

U. S. Department of Justice
Federal Bureau of Prisons
Sexually Abusive Behavior
Prevention and Intervention

**You Have the Right to be Safe from Sexually Abusive Behavior.**

**You Have the Right to be Safe from Sexually Abusive Behavior.**
The Federal Bureau of Prisons has a **zero tolerance** policy against sexual abuse.   While you are incarcerated, **no one has the right to pressure you to engage in sexual acts**.
You do not have to tolerate sexually abusive behavior or pressure to engage in unwanted sexual behavior from another inmate or a staff member.   Regardless of your age, size, race, ethnicity, gender or sexual orientation, you have the right to be safe from sexually abusive behavior.

**What Can You Do To Prevent Sexually Abusive Behavior?**
Here are some things you can do to protect yourself and others against sexually abusive behavior:
- Carry yourself in a confident manner at all times. Do not permit your emotions (fear/anxiety) to be obvious to others.
- Do not accept gifts or favors from others. Most gifts or favors come with strings attached to them.
- Do not accept an offer from another inmate to be your protector.
- Find a staff member with whom you feel comfortable discussing your fears and concerns.
- Be alert! Do not use contraband substances such as drugs or alcohol; these can weaken your ability to stay alert and make good judgments.
- Be direct and firm if others ask you to do something you don=t want to do. Do not give mixed messages to other inmates regarding your wishes for sexual activity.
- Stay in well lit areas of the institution.
- Choose your associates wisely. Look for people who are involved in positive activities like educational programs, psychology groups, or religious services. Get involved in these activities yourself.
- Trust your instincts. If you sense that a situation may be dangerous, it probably is. If you fear for your safety, report your concerns to staff.
- 

**What Can You Do if You Are Afraid or Feel Threatened?**
If you are afraid or feel you are being threatened or pressured to engage in sexual behaviors, you should discuss your concerns with staff. Because this can be a difficult topic to discuss, some staff, like psychologists, are specially trained to help you deal with problems in this area.

If you feel immediately threatened, approach any staff member and ask for assistance. It is part of his/her job to ensure your safety.   If it is a staff member that is threatening you, report your concerns immediately to another staff member that you trust, or follow the procedures for making a confidential report.

**What Can You Do if You Are Sexually Assaulted?**

If you become a victim of a sexually abusive behavior, **you should report it immediately to staff** who will offer you protection from the assailant.    You do not have to name the inmate(s) or staff assailant(s) in order to receive assistance, but specific information may make it easier for staff to know how best to respond. You will continue to receive protection from the assailant, whether or not you have identified him or her (or agree to testify against him/her).

After reporting any sexual assault, you will be referred immediately for a medical examination and clinical assessment. Even though you many want to clean up after the assault **it is important to see medical staff BEFORE you shower, wash, drink, eat, change clothing, or use the bathroom.** Medical staff will examine you for injuries which may or may not be readily apparent to you. They can also check you for sexually transmitted diseases, pregnancy, if appropriate, and gather any physical evidence of assault. The individuals who sexually abuse or assault inmates can only be disciplined and/or prosecuted if the abuse is reported. **Regardless of whether your assailant is an inmate or a staff member, it is important to understand that you will never be disciplined or prosecuted for being the victim of a sexual assault**.

**How Do You Report an Incident of Sexually Abusive Behavior?**

It is important that you **tell a staff member if you have been sexually assaulted.** It is equally important to inform staff if you have witnessed sexually abusive behavior.    You can tell your case manager, Chaplain, Psychologist, SIS, the Warden or any other staff member you trust.

BOP staff members are instructed to keep reported information confidential and only discuss it with the appropriate officials on a need-to-know basis concerning the inmate-victim=s welfare and for law enforcement or investigative purposes.    There are other means to confidentiality report sexually abusive behavior if you are not comfortable talking with staff.

   - **Write directly to the Warden, Regional Director or Director.** You can send the Warden an Inmate Request to Staff Member (Cop-out) or a letter reporting the sexually abusive behavior. You may also send a letter to the Regional Director or Director of the
Bureau of Prisons. To ensure confidentiality, use special mail procedures.

   - **File an Administrative Remedy.** You can file a Request for Administrative Remedy (BP-9). If you determine your complaint is too sensitive to file with the Warden, you have the opportunity to file your administrative remedy directly with the Regional
Director (BP-10). You can get the forms from your counselor or other unit staff.

   -**Write the Office of the Inspector General (OIG)** which investigates allegations of staff misconduct**.** OIG is a component of the Department of Justice and is not a part of the Bureau of Prisons. The address is:

<div align="center">

**Office of the Inspector General**
**P. O. Box 27606**
**Washington, D.C. 20530**

</div>

**Understanding the Investigative Process**

Once the sexually abusive behavior is reported, the BOP and/or other appropriate law enforcement agencies will conduct an investigation. The purpose of the investigation is to determine the nature and scope of the abusive behavior. You may be asked to give a statement during the investigation. If criminal charges are brought, you may be asked to testify during the
criminal proceedings.

90

**Counseling Programs for Victims of Sexually Abusive Behavior**
Most people need help to recover from the emotional effects of sexually abusive behavior. If you are the victim of sexually abusive behavior, whether recent or in the past, you may seek counseling and/or advice from a psychologist or chaplain. Crisis counseling, coping skills, suicide prevention, mental health counseling, and spiritual counseling are all available to you.

**Management Program for Inmate Assailants**
Anyone who sexually abuses/assaults others while in the custody of the BOP will be disciplined and prosecuted to the fullest extent of the law. If you are an inmate assailant, you will be referred to Correctional Services for monitoring. You will be referred to Psychology Services for an assessment of risk and treatment and management needs. Treatment compliance or refusal will be documented and decisions regarding your conditions of confinement and release may be effected. If you feel that you need help to keep from engaging in sexually abusive behaviors, psychological services are available.

**Policy Definitions**

**Prohibited Acts:** Inmates who engage in inappropriate sexual behavior can be charged with the following Prohibited Acts under the Inmate Disciplinary Policy:
**Code 114/ (A): Sexual Assault By Force**

**Code 205/ (A): Engaging in a Sex Act**

**Code 206/ (A): Making a Sexual Proposal**

**Code 221/ (A): Being in an Unauthorized Area with a Member of the Opposite Sex**

**Code 229/ (A): Sexual Assault Without Force**

**Code 300/ (A): Indecent Exposure**

**Code 404/ (A): Using Abusive or Obscene Language**


**Staff Misconduct:** The Standards of Employee Conduct prohibit employees from engaging in, or allowing another person to engage in sexual, indecent, profane or abusive language or gestures, and inappropriate visual surveillance of inmates.   Influencing, promising or threatening an inmate=s safety, custody, privacy, housing, privileges, work detail or program status in exchange for sexual favors is also prohibited.

**What is sexually abusive behavior?** According to federal law (Prison Rape Elimination Act of 2003) sexually abusive behavior is defined as:
a. **Rape:** the carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person **FORCIBLY** or against that person=s will; The carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person not forcibly or against the person=s will, where the victim is **incapable of giving consent** because of his/her youth or his/her temporary or permanent mental or physical incapacity; or The carnal knowledge, oral sodomy, or sexual assault with an object or sexual fondling of a person achieved through the **exploitation of the fear or threat** of physical violence or bodily injury.
Carnal Knowledge: contact between the penis and vulva or the penis and the anus, including penetration of any sort, however slight.
Oral Sodomy: contact between the mouth and the penis, the mouth and the vulva, or the mouth and the anus.
b. **Sexual Assault with an Object**: the use of any hand, finger, object, or other instrument to penetrate, however slightly, the genital or anal opening of the body of another person (**NOTE**: This does NOT apply

to custodial or medical personnel engaged in evidence gathering or legitimate medical treatment, nor to health care provider=s performing body cavity searches in order to maintain security and safety within the prison).

c. **Sexual Fondling**: the touching of the private body parts of another person (including the genitalia, anus, groin, breast, inner thigh, or buttocks) for the purpose of sexual gratification.

d. **Sexual Misconduct** (staff only): the use of indecent sexual language, gestures, or sexually oriented visual surveillance for the purpose of sexual gratification.

An incident is considered **Inmate-on-Inmate Abuse/Assault** when any sexually abusive behavior occurs between two or more inmates.   An incident is considered **Staff-on-Inmate Abuse/Assault** when any sexually abusive behavior is initiated by a staff member toward one or more inmates.   It is also considered Staff-on-Inmate Abuse/Assault if a staff member willingly engages in sexual acts or contacts that are initiated by an inmate.

**NOTE: Sexual acts or contacts between two or more inmates, even when no objections are raised, are prohibited acts, and may be illegal. Sexual acts or contacts between an inmate and a staff member, even when no objections are raised by either party, are always forbidden and illegal.   Inmates who have been sexual assaulted by another inmate or staff member will not be prosecuted or disciplined for reporting the assault.   However, inmates will be penalized for knowingly filing any false report.**

**Contact Offices**
**U.S. Department of Justice**
Office of the Inspector General
950 Pennsylvania Avenue, NW Suite 4322
Washington, D.C. 20530-0001

**Central Office**
Federal Bureau of Prisons
320 First Street, NW
Washington, D.C. 20534

**Mid-Atlantic Regional Office**
302 Sentinel Drive, Suite 200
Annapolis Junction, Maryland 20701

**South Central Regional Office**
4211 Cedar Springs Road, Suite 300
Dallas, Texas 72519

**North Central Regional Office**
Gateway Complex Tower II, 8th Floor
400 State Avenue
Kansas City, KS 66101-2492

**Southeast Regional Office**
3800 North Camp Creek Parkway, SW
Building 2000
Atlanta, GA 30331-5099

**Northeast Regional Office**
U.S. Customs House, 7th Floor
2nd and Chestnut Streets
Philadelphia, Pennsylvania 19106

**Western Regional Office**
7338 Shoreline Drive
Stockton, CA 95219

92

2)   **What are the possible test results?**

A negative test result means no HIV antibodies are detected in your blood at this time.

A positive test result means there is an infection with HIV. It does not mean a person has AIDS.

A test can rarely be inconclusive which means it's neither negative or positive. Your provider will discuss the need for retesting, should this occur.

3)   **Could the test results be inaccurate?**

Based on the steps processed by the laboratory to confirm the test, the results are considered more than 99% accurate. It is highly unlikely that the result is inaccurate.

Inaccurate HIV antibody results are termed *false negative* or *false positive.*

A *false negative* means the test indicates no evidence or infection when the individual is actually infected.

A *false positive* means the test indicates evidence of infection when the individual is actually not infected. This is extremely rare.

4)   **Why would a false negative occur?**

A *false negative* usually occurs because the test may not detect infection that's in the early stage. This happens because the test measures proteins (antibodies) in the blood that develop over weeks to months as the body reacts to infection with the virus. Antibodies may be detected as early as a month after infection with HIV, but can take up to 6 months to be measurable. Therefore, if a person was recently infected, the HIV antibody test may be negative. This is an example of a false negative. If you think you are at risk of being infected or have recently engaged in risky activity and your test result is negative, you should discuss the need for retesting with your medical provider.

5)   **Why would a false positive occur?**

A *false positive* can be associated with past injecting drug use, pregnancy, certain blood abnormalities, other related-viruses, and even contamination of the blood sample. Although this is very rare, a small chance of this occurring still exists. If you are absolutely certain you have none of the risk factors and received positive test results, discuss your concerns with your health care provider.

6)   **What if my results are positive?**

If your results are positive, you are infected with HIV. Your doctor will advise you of additional testing and recommended treatment options for HIV infection. Remember, a positive result does not mean you have AIDS and with current treatments, persons with HIV infection are living longer and healthier lives.

7)   **How long do I have to wait for the test results?**

The test results are usually available in about two weeks. Check with your provider on the process for obtaining your test results.

9)  How can I protect myself from HIV Infection?

During incarceration:

Abstain from sexual activity with other inmates, do not inject drugs, do not share razors or toothbrushes with other inmates, or get a tattoo, and avoid all other high risk behaviors. If you have a history of using illegal drugs or have a problem with alcohol abuse, seek advice on drug treatment programs available during incarceration and upon release from health care staff, social workers, psychology staff, or drug counselors.

Upon release:

Abstain from sexual activity or have sexual intercourse with only on partner and know whether th or she is infected or not. Talk honestly with your sexual partner and if they do not know if they are infected, encourage them to get tested. If you do choose to engage in sexual activity, the best current method of prevention is to use a condom or "rubber" to prevent contact with your partner's body fluids. This is no absolute protection, since condoms can tear. Becoming pregnant or getting a woman pregnant when infected which may pass HIV Infection to the unborn child. You should seek further advice and HIV education on more specific methods of preventing infection from your health care provider or from community AIDS prevention organizations upon release.

Abstain from injecting drugs, which is strongly associated with many health risks including infection with the hepatitis B virus, hepatitis C virus, and HIV. Many local health departments and community AIDS prevention organizations can refer you to drug treatment programs and other support services in the community.

If you do continue to engage in injection drug use, you should use clean needles whenever possible, and never share your needles or other injection drug use equipment with others. You may reduce your changes of infection by rinsing the "works" with a bleach solution but this is not always effective or safe. You should contact a health care provider knowledgeable in this area to get specific instructions.

If you have any future questions, discuss them with your health care provider.

INSTITUTION STAFF DIRECTORY

INSTITUTION EXECUTIVE STAFF

| | |
|---|---|
| Warden | Linda Sanders |
| Associate Warden Health Services | Miguel Medina |
| Associate Warden Operations | M. Stewart |
| Associate Warden Programs | M.A. Stancil |
| Executive Assistant/ Camp Administrator | Kristi Bartlett |

UNIT MANAGEMENT STAFF:

MEDICAL/SURGICAL UNIT

| | | |
|---|---|---|
| Unit Manager | Sherry Jacobson | Building 3 |
| Case Manager | Beth Cupp | |
| Case Manager | Michael McIntyre | |
| Case Manager | Candis Akin | |
| Counselor | Brenda Hutchison | |
| Counselor | Creed Allen | |

MENTAL HEALTH UNIT

| | | |
|---|---|---|
| Unit Manager | Sharon Bennett | Building 10 |
| Case Manager | Bruce Schrock | |
| Case Manager | Bryan Halfpapp | |
| Case Manager | Ross Spencer | |
| Counselor | Mark Miller | |
| Counselor | Felicia Williams | |
| Counselor | Mike Williams | |

WORK CADRE UNIT

| | | |
|---|---|---|
| Unit Manager | Jon Roberts | Building 8 |
| Case Manager | Loria Carriger | |
| Case Manager | Brenna Hannaford | |
| Case Manager | Brooke Jenkins | |
| Counselor | Randy Gonzales | |
| Counselor | Mike Cupp | |

# Examples of Proper Room Sanitation:

**Work Cadre:**





# Exhibit 17



Back To Inmate Data Search | Full View/Print Preview

| Last Name | First Name | Middle Initial |
|---|---|---|
| | | B |

| Gender | Height (inches) | Weight | Hair Color |
|---|---|---|---|
| | | | |

| | | Custody Class | Admission |
|---|---|---|---|

**Projected Eligible Release Date**

| Prison Release Date | Release Type |
|---|---|

**Most Recent Location**    **As of Date**

| Complex | Unit | Last Movement | Status |
|---|---|---|---|

**Inmate Mailing Address**

This only applies to AZ ADCRR Supervision.

Earned Credit Release Date is provided for guidance. Confirmation can be sought by contacting ADCRR

It is important to note that all Release Dates are *projected* and are *subject to change*; confirm with ADCRR Time Computation Unit or the Offender Information Unit where the inmate is housed for potential changes

If you are a victim of crime, please call or email the Office of Victim Services for assistance with your victim rights or concerns: 602-542-1853 **azvictims@azadc.gov**

Details of inmate offenses can be accessed by reviewing the case file at the Office of the Clerk of the Court where the case was adjudicated

**Commitment and Sentence Information**

| Commit# | Sentence Length ( yy/mm/dd) | Sentence County | Court Cause# | Offense Date | Sentence Date | Sentence Status | Crime |
|---|---|---|---|---|---|---|---|
| | | | | | | | ATED |
| | | | | | | | DUI |

**Disciplinary Infractions**

| Violation Date | Infraction | Verdict Date | Verdict |
|---|---|---|---|
| | VIOL OF DEPT/INST RULE | | |
| | VIOL OF DEPT/INST RULE | | |
| | VIOL OF DEPT/INST RULE | | |
| | POSITIVE OR REFUSAL OF U/A | | |
| | DISRUPT COUNT OR OUT OF PLACE | | |

**Disciplinary Appeals**    *[Info]*

**Profile Classification**    *[Info]*

| Complete Date | Classification Type | Custody Risk | Internal Risk |
|---|---|---|---|
| | | | |

**Parole Action** *0 record(s)*

# Exhibit 18

**INMATE SEARCH DETAIL REPORT**                                                    █████████████ )

| INMATE DESCRIPTION | | INMATE SENTENCE AND LOCATION | |
|---|---|---|---|
| SEX: | ██ | SCDC ID: | ████ |
| RACE: | ██ | SID: | ████ |
| HEIGHT: | ██ | OFFENDER TYPE: | ████████ |
| WEIGHT: | ██ | ADMISSION DATE: | ███ |
| AGE: | | LOCATION: | ██ |
| CITIZENSHIP: | ██████ | DORM-ROOM-BUNK: | ███ |
| BUILD: | ██ | EWC LEVEL: | █ |
| COMPLEXION: | ████ | EEC LEVEL: | |
| HAIR COLOR: | ██ | PROJECTED RELEASE DATE: | ███ |
| EYE COLOR: | ██ | PROJECTED PAROLE ELIGIBILITY: | ███ |
| PICTURE DATE: | ███ | SUP. FURLOUGH ELIGIBILITY: | ███ |
| SUP. RE-ENTRY DATE: | | | |

**CURRENT OFFENSES**

| OFFENSE | SENTENCE TYPE | YRS | MOS | DYS | COUNTY | START DATE | V/NV | CAT | INDICT | STATUS |
|---|---|---|---|---|---|---|---|---|---|---|
| ███ | ████ | █ | █ | █ | ███ | ███ | █ | █ | | ██ |
| ███ | ████ | ████ | ███ | ███ | █ | █ | ███ | ██ |
| ██ | ████ | ████ | ███ | ███ | █ | █ | ████ | ██ |
| ████ | ████ | ████ | ███ | ███ | █ | █ | ███ | ██ |
| █████ | ████ | ████ | ███ | ███ | █ | █ | ████ | ██ |

**ESCAPES**

████████████

**DISCIPLINARY SANCTIONS**                                              SANCTIONS NOT AVAILABLE IN THE AUTOMATED SYSTEM PRIOR TO JANUARY 2009

| DATE | DESCRIPTION |
|---|---|
| ███ | POSS. OR ATTEMPT TO POSSESS CELL PHONE |
| | LOSS OF CANTEEN PRIVILEGES FOR 90 DAYS |
| | LOSS OF TELEPHONE PRIVILEGES FOR 90 DAYS |
| | LOSS OF TELEVISION PRIVILEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIVILEGES FOR 90 DAYS |
| ███ | USE,POSS NARC,MARIJ,UNAUTH DRUG, INHALANT |
| | LOSS OF CANTEEN PRIVILEGES FOR 135 DAYS |
| | DISC. DETENTION FOR 30 DAYS |
| | LOSS OF TELEPHONE PRIVILEGES FOR 135 DAYS |
| | LOSS OF TELEVISION PRIVILEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIVILEGES FOR 135 DAYS |
| ███ | USE,POSS NARC,MARIJ,UNAUTH DRUG, INHALANT |
| | LOSS OF CANTEEN PRIVILEGES FOR 160 DAYS |
| | DISC. DETENTION FOR 40 DAYS |
| | LOSS OF TELEPHONE PRIVILEGES FOR 160 DAYS |
| | LOSS OF TELEVISION PRIVILEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIVILEGES FOR 160 DAYS |

**INMATE SEARCH DETAIL REPORT**

| DISCIPLINARY SANCTIONS | SANCTIONS NOT AVAILABLE IN THE AUTOMATED SYSTEM PRIOR TO JANUARY 2009 |
|---|---|

| DATE | DESCRIPTION |
|---|---|
| ██████ | POSS. OR/ATTEMPT TO POSSESS CELL PHONE |
| | LOSS OF CANTEEN PRIVILEGES FOR 160 DAYS |
| | DISC. DETENTION FOR 40 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 160 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 160 DAYS |
| ██████ | USE,POSS NARC,MARIJ,UNAUTH DRUG, NHALANT |
| | LOSS OF CANTEEN PRIVILEGES FOR 110 DAYS |
| | DISC. DETENTION FOR 20 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 110 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 110 DAYS |
| ██████ | POSS. OR/ATTEMPT TO POSSESS CELL PHONE |
| | LOSS OF CANTEEN PRIVILEGES FOR 135 DAYS |
| | DISC. DETENTION FOR 30 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 135 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 135 DAYS |
| ██████ | POSS. OR/ATTEMPT TO POSSESS CELL PHONE |
| | LOSS OF CANTEEN PRIVILEGES FOR 110 DAYS |
| | DISC. DETENTION FOR 20 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 110 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 110 DAYS |
| ██████ | USE,POSS NARC,MARIJ,UNAUTH DRUG, NHALANT |
| | LOSS OF CANTEEN PRIVILEGES FOR 110 DAYS |
| | DISC. DETENTION FOR 20 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 110 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 110 DAYS |
| ██████ | POSSESSION OF A WEAPON |
| | LOSS OF CANTEEN PRIVILEGES FOR 110 DAYS |
| | DISC. DETENTION FOR 20 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 110 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 360 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 110 DAYS |
| ██████ | USE,POSS NARC,MARIJ,UNAUTH DRUG, NHALANT |
| | LOSS OF CANTEEN PRIVILEGES FOR 379 DAYS |
| | DISC. DETENTION FOR 90 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 409 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 379 DAYS |
| ██████ | POSSESSION OF A WEAPON |
| | LOSS OF CANTEEN PRIVILEGES FOR 180 DAYS |
| | LOSS OF TELEPHONE PRIV LEGES FOR 180 DAYS |
| | LOSS OF TELEVISION PRIV LEGES FOR 589 DAYS |
| | LOSS OF VISITATION PRIV LEGES FOR 180 DAYS |

| MOVEMENT | | | |
|---|---|---|---|
| MOVEMENT DATE | TO LOCATION | STATUS | REASON |

**INMATE SEARCH DETAIL REPORT**

## MOVEMENT

| MOVEMENT DATE | TO LOCATION | STATUS | REASON |
|---|---|---|---|
| ▇▇▇▇ | ▇▇▇ | ▇▇▇▇ | ▇▇▇▇ |
| ▇▇▇▇ | ▇▇▇▇ | ▇▇▇▇ | ▇▇▇▇▇ |

## EARNED WORK CREDITS

| JOB DESCRIPTION | START DATE | END DATE | TERMINATION REASON | JOB LEVEL |
|---|---|---|---|---|
| ▇▇▇▇▇ | ▇▇ | | | ▇ |
| ▇▇▇▇▇ | ▇▇ | ▇▇ | ▇▇▇▇ | ▇ |
| ▇▇▇▇▇ | ▇▇ | ▇▇ | ▇▇▇ | ▇ |
| ▇▇▇▇▇ | ▇▇ | ▇▇ | ▇▇▇ | ▇ |

## EARNED EDUCATION CREDITS

▇▇▇▇▇▇▇▇▇▇▇▇

**Parole Placement**



**Work Program**

**Notification Requests, Detainers, and/or Warrants**

| Detainer Date | Detainer Type | Charges | Authority | Agreement Date | Cancel Date |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |